**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| BRISTOL COUNTY RETIREMENT SYSTEM, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> ALLSCRIPTS HEALTHCARE SOLUTIONS, INC., GLEN E. TULLMAN, and WILLIAM J. DAVIS, <br><br> Defendants. | Case No.: <br><br> **CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** <br><br> DEMAND FOR JURY TRIAL |

Plaintiff Bristol County Retirement System ("Bristol County" or "Plaintiff") makes the following allegations based upon the investigation by Plaintiff's counsel, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by Allscripts Healthcare Solutions, Inc. ("Allscripts" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action brought on behalf of all persons who purchased or otherwise acquired the publicly-traded common stock of Allscripts (the "Class") between November 9, 2010 and April 26, 2012, inclusive (the "Class Period"), seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, against Allscripts and certain of its officers and/or directors.

2. Allscripts is a provider of healthcare-related information technology solutions and services, including systems to manage electronic health records, financial and administrative performance, revenue cycle, and care and discharge operations, among other elements. Allscripts' revenue is primarily derived from sales of proprietary software, related hardware, professional services, and information technology outsourcing services. Allscripts is the corporate result of the merger of Allscripts-Misys Healthcare Solutions, Inc. ("AMHS") and Eclipsys Corporation ("Eclipsys") announced on June 9, 2010 (the "Merger").

3. During the Class Period, Defendants issued materially false and misleading statements regarding the Company's business and financial results. Specifically, Defendants

made misleading statements regarding the Company's progress in integrating AMHS' and Eclipsys' disparate systems and its ability to translate its fragmented product lines into revenues. As a result of Defendants' false statements, Allscripts' stock traded at artificially inflated prices during the Class Period, reaching a closing price high of $22.71 per share on April 5, 2011.

4. The truth about Allscripts' business was revealed on April 26, 2012, when the Company filed a Form 8-K with the SEC describing its operating results for the first quarter of 2012. Allscripts shocked the market by reporting earnings sharply below guidance and expectations, as well as: (1) the termination of the Chairman of the Board of Directors ("Chairman"), Philip M. Pead; (2) the resignation of three directors; and (3) the resignation the Company's Chief Financial Officer ("CFO"), William J. Davis.

5. In reaction to this news, over the course of the next trading session on April 27, 2012, Allscripts' share price fell by $5.72 per share, or 35.70 percent, to close at $10.30 per share on extraordinarily heavy trading volume.

6. The truth, which was known by the Defendants but concealed from the investing public during the Class Period, was as follows:

(a) the process of developing a unified product offering after the Merger had suffered debilitating setbacks, including major undisclosed schisms among the most senior levels of the Company, which ultimately resulted in the loss of key personnel and harmful upheaval in Company leadership;

(b) a material portion of Allscripts' revenue and net income was predicated on the successful integration of these systems, and substantial business relationships had been destroyed by the Company's inability to make material progress in this area;

(c)     as a result of the foregoing, Allscripts lacked a reasonable basis for its claims of progress in post-Merger integration, sound operations, profitable results, and projections of continued growth.

7.     As a result of Defendants' false statements, Allscripts common stock traded at artificially inflated levels during the Class Period.  However, once the truth about Allscripts' practices was revealed to investors, the Company's share price dramatically declined, and Plaintiff and the other members of the Class suffered significant losses and damages.

## JURISDICTION AND VENUE

8.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

9.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78a(a)], and 28 U.S.C. § 1331.

10.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 28 U.S.C. § 1391(b), because many of the acts and practices complained of herein occurred in substantial part in this District.  Many of the acts and transactions that constitute the violations of law complained of herein, including the dissemination to the public of untrue statements of material facts, occurred in this District.

11.     In connection with the acts and conduct alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails and interstate wire and telephone communications.

## PARTIES

12.     Plaintiff Bristol County purchased Allscripts common stock during the Class Period, as set forth in the certification attached hereto, and was damaged as the result of Defendants' wrongdoing as alleged in this complaint.

13.     Defendant Allscripts is a provider of healthcare-related information technology services.  Allscripts is incorporated in Delaware and maintains its principal executive offices in Chicago, Illinois.  The Company's stock is listed on the NASDAQ Global Select Market (the "NASDAQ") and trades under the ticker symbol "MDRX."

14.     Defendant Glen E. Tullman is the Chief Executive Officer ("CEO") of Allscripts.

15.     Defendant William J. Davis is the CFO of Allscripts.  On April 22, 2012, CFO Davis notified the Company that he will be resigning effective May 18, 2012.

16.     The defendants referenced above in paragraphs 14 through 15 are referred to herein as the "Individual Defendants."

17.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Allscripts, were privy to confidential and proprietary information concerning Allscripts, its operations, finances, financial condition, and present and future business prospects. The Individual Defendants also had access to material and adverse non-public information concerning Allscripts, as discussed in detail below.  Because of their positions with Allscripts, the Individual Defendants had access to non-public information about the Company's business, finances, and future business prospects.  The non-public information included internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew, or recklessly disregarded, that

4

the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

18.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act, and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to, and did, directly or indirectly, control the conduct of Allscripts' business.

19.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Allscripts' quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company, and their access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were materially false and misleading.  The Individual Defendants are liable for the false statements pleaded herein.

20.     As senior executive officers and/or directors and as controlling persons of a publicly-traded company whose common stock is registered with the SEC, traded on the NASDAQ, and governed by the federal securities laws, the Individual Defendants had a duty to

promptly disseminate accurate and truthful information with respect to Allscripts' financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects. They also had a duty to correct any previously issued statements that had become materially misleading or untrue so that the market price of Allscripts common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

## FRAUDULENT CONDUCT AND COURSE OF BUSINESS

21.     Defendants are liable for: (1) making false statements; or (2) failing to disclose adverse facts known to them about Allscripts. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Allscripts common stock was a success, as it: (1) deceived the investing public regarding Allscripts' business; (2) artificially inflated the prices of Allscripts common stock; and (3) caused Plaintiff and other members of the Class to purchase Allscripts common stock at inflated prices.

## BACKGROUND

22.     On June 9, 2010, AMHS and Eclipsys issued a press release announcing their intention to merge in an all-stock transaction wherein Eclipsys shareholders would receive 1.2 shares of stock in Allscripts, the resulting company, for each Eclipsys share held prior to the Merger.

23.     In the same press release, AMHS announced that the leadership team of Allscripts would be composed of a combination of AMHS and Eclipsys personnel, with Defendant Tullman as CEO, Defendant Davis as CFO, and with Pead serving as Chairman of the Board of Directors as well as working in operational integration, product integration, international growth strategy, and key client and strategic relationships.

24.     On July 20, 2010, AMHS issued a press release with its financial results for the three- and twelve-month periods ended May 31, 2010.  The Company reported non-GAAP diluted earnings per share ("EPS") of $0.18.  As part of the release, Defendant Tullman stated:

> Our strong fourth quarter performance completes an outstanding year for Allscripts and confirms the strength of our industry-leading solutions . . . . The recent release by the US Department of Health and Human Services of the final rule on 'Meaningful Use' is a pivotal event for our industry. The waiting is over and the time is now for physicians to adopt electronic health records. Our proposed merger with Eclipsys is perfectly timed to take advantage of this opportunity. The merger will create the industry's most comprehensive suite of end-to-end solutions to deliver on the promise of a connected system of health.

25.     On this favorable news, AMHS' stock price rose $0.23 per share, or 1.38 percent, to close at $16.89 per share on July 20, 2010.

26.     On August 10, 2010, AMHS filed a Form 8-K that set forth the composition of the projected post-Merger executive leadership of Allscripts.  The Form 8-K, signed by Defendant Davis, stated in part:

> Allscripts-Misys Healthcare Solutions, Inc. ("Allscripts") and Eclipsys Corporation ("Eclipsys") have determined that, following completion of the merger (the "Merger") contemplated by their previously announced Agreement and Plan of Merger, the executive leadership will include Glen Tullman as Chief Executive Officer, Lee Shapiro as President, William J. Davis as Chief Financial Officer, Eileen McPartland as Chief Operating Officer, John Gomez as President, Product Strategy and Development, Jeff Surges as President, Sales, Diane Adams as Executive Vice President, Culture and Talent, Laurie McGraw as Chief Client Officer and Kent Alexander as General Counsel. Further, Philip M. Pead, in addition to his role as Chairman of the Board of Directors of Allscripts following completion of the Merger, will work with Allscripts management in four key strategic areas: operational integration; product integration; international growth strategy; and client relationships and partnerships. Finally, Chris E. Perkins, current Chief Financial Officer of Eclipsys, will continue to lead the Integration Management Office of Allscripts following completion of the Merger.

27.     In response to this news, AMHS' stock price rose $0.24 per share, or 1.42 percent, to close at $17.03 per share.

28.     On August 24, 2010, Allscripts filed a Form 8-K reporting the completion of the Merger.  In response to this news, Allscripts' stock price rose $0.22 per share, or 1.27 percent, to close at $17.47 per share.

**DEFENDANTS' FALSE AND MISLEADING
STATEMENTS ISSUED DURING THE CLASS PERIOD**

29.     On November 8, 2010, Allscripts issued a press release announcing its financial results for the three- and nine-month periods ending September 30, 2010.  The Company reported non-GAAP diluted EPS of $0.19.  In connection with the earnings release, CEO Tullman stated:

> I am pleased with our strong operating performance during a quarter that included ***the successful merger with Eclipsys and solid progress on integration*** . . . . We are also excited by the industry's positive reaction to the merger. Clients and prospects tell us they appreciate having a new choice in the market, whether for a fully integrated solution that connects ambulatory practices to hospitals or for a best-of-breed approach that allows our clients to build on what they have. Our goal is to create a new operating model for healthcare – a connected community of health – and our merger moves our clients and their patients one step closer to that goal.[1]

30.     Separately, in connection with the earnings release, Defendant Davis stated, "Our integration plans are on track and we remain confident in our ability to achieve Allscripts cost synergy goals as previously outlined."

31.     On November 9, 2010, Allscripts filed a quarterly report on Form 10-Q for the three- and nine-month periods ended September 30, 2010.  The Form 10-Q stated in part:

---

[1]  All emphases are added unless otherwise noted.

We believe the combination of Allscripts and Eclipsys will allow the combined company to become a larger, more competitive "end-to-end" solutions provider within the healthcare information technology industry. Combining the companies' respective solution sets will result in one of the most comprehensive solution offerings for healthcare organizations of every size and setting. By combining physician-office and post acute care solutions from Allscripts with Eclipsys' enterprise solutions for hospitals and health systems, the combined company will offer a single platform of clinical, financial, connectivity and information solutions.

After the Eclipsys Merger, given the unique breadth of solutions and customer types, the company expects to be uniquely positioned to connect physicians, other care providers and patients across all health care provider settings including hospitals, small or large physician practices, extended care facilities, or in a home care setting. ***The Eclipsys Merger establishes significant breadth and critical mass to compete for opportunities among large hospital and health systems that increasingly are looking to one information technology vendor to provide a single, end-to-end solution across all points of care.***

32.     The Form 10-Q also included a certification by CEO Tullman that stated:

I, Glen E. Tullman, certify that:

1. I have reviewed this quarterly report on Form 10-Q of Allscripts Healthcare Solutions, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a. designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b. designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c. evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent quarter (the registrant's fourth quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting;

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's Board of Directors (or persons performing the equivalent functions):

a. all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting, which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b. any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

33. CFO Davis signed a substantially identical certification, also included as part of the Company's Form 10-Q.

34. On February 15, 2011, Allscripts issued a press release announcing its financial results for the three-month period ending December 31, 2010. The Company reported non-GAAP diluted EPS of $0.20 and raised its guidance for FY2011 non-GAAP EPS to between $0.86 and $0.90. In connection with the earnings release, CEO Tullman stated:

> *Allscripts delivered outstanding results this quarter, the first full period of combined operations since our merger with Eclipsys* . . . . Our sales momentum reflects our comprehensive set of solutions, our ability to execute and strong demand in the market. We achieved significant cross sales of our ambulatory and acute solutions into our client base. Most important, we are focused on realizing our vision of transforming today's disconnected silos of healthcare into a connected community of health.

35. Defendant Davis also stated:

> Our fourth quarter results highlight the significant growth opportunities for Allscripts and *the success we are having bringing two great businesses together* . . . . In addition to record bookings, I am pleased with our solid revenue performance as well as the improvement in non-GAAP operating margin to 20.6 percent compared to 19.1 percent in the third quarter of 2010. We also made meaningful progress in delivering on the cost synergy goals we established related to our merger.

36. After the market closed on February 15, 2011, the Company hosted a conference call to discuss its results of operations. During that call, Defendant Tullman stated in part, "When we announced the merger with Eclipsys, there were four fundamental questions. The first, was can we deliver on our results as a combined Company? We've done that."

37. On March 1, 2011, the Company filed its Form 10-KT for the twelve-month period ending December 31, 2010, presenting substantially similar financial performance data. The Form 10-KT was signed by Defendants Tullman and Davis, and contained certifications substantially similar to that described in paragraph 32 above.

38.     On May 5, 2011, Allscripts issued a press release announcing its financial results for the quarter ending March 31, 2011. The Company reported non-GAAP diluted EPS of $0.21 and reaffirmed its guidance for full year 2011. In connection with the earnings release, CEO Tullman stated:

> Allscripts performance during the first quarter will provide a solid foundation for a strong 2011 . . . . *We are well positioned to take full advantage of the transformation that is occurring in healthcare.* We believe our ability to connect physicians, hospitals and other healthcare stakeholders to the information and insights needed to deliver world-class care will become the new operating system of healthcare.

39.     Defendant Davis also stated:

> Allscripts achieved strong financial results in the first quarter of 2011, including solid revenue growth and an improvement of 170 basis points in non-GAAP operating margin year-over-year, *reflecting progress on our cost synergy objectives* and leveraging our fixed and discretionary costs . . . . Our $2.7 billion backlog together with continued growth in bookings during 2011 will drive sustainable revenue, earnings and cash flow growth in 2011 and beyond. In addition, we are committed to balanced deployment of our strong cash flow to reduce debt, repurchase shares and invest internally for future growth as an opportunity to enhance value for Allscripts stakeholders.

40.     After the market closed on May 5, 2011, the Company hosted a conference call to discuss its results of operations. During that call, Defendant Tullman stated in part,

> When we brought together Allscripts and Eclipsys, it was in direct response to the fundamental shifts we saw occurring in our market. I'm very pleased with our progress to date. We have delivered on the commitments we made. We said we would continue to execute on a significant cross-sell opportunity in our combined client base, and we have. *We said we would demonstrate success integrating our product portfolio, and we have. We said we would deliver on cost synergies, and we have*, and we now have one new factor to add. We told you we would deliver net new Sunrise Enterprise sales in 2011, and we have.

41.     On May 9, 2011, the Company filed its Form 10-Q for the quarter ending March 31, 2011, presenting substantially similar financial performance data. The Form 10-Q was signed by Defendants Tullman and Davis, and contained certifications substantially similar to that described in paragraph 32 above.

42.     On August 2, 2011, Allscripts issued a press release announcing its financial results for the quarter ending June 30, 2011. The Company reported non-GAAP diluted EPS of $0.22 and adjusted its guidance for FY2011 EPS to between $0.88 and $0.90, the upper end of the previously described range. In connection with the earnings release, CEO Tullman stated:

> Allscripts strong second quarter performance reflects a healthy mix of new and add-on sales, including net-new Sunrise Enterprise transactions, demonstrating our ability to both grow and expand our industry-leading client base . . . . I am confident Allscripts is poised for continued growth. Our leadership team is in place and our solutions portfolio is robust, positioning the Company to lead the digital transformation of healthcare. I am very proud of the accomplishments of our team and their ongoing dedication to our vision of creating a Connected Community of Health.

43.     Defendant Davis also stated:

> Our revenue and non-GAAP earnings growth accelerated in the second quarter, reflecting a solid quarter of systems installations and continued robust upgrade activity . . . . At the same time, we remain focused on migrating and supporting our client base in their efforts to achieve meaningful use. Our non-GAAP operating profit increased 29 percent year-over-year, reflecting the benefit of anticipated merger-related cost synergies and the sustainable leverage of our financial model. We did this even while increasing our research and development spend during the second quarter. . . . Our financial health is evident in our ability to continue to generate very healthy cash flow, reduce debt and repurchase $50 million of Allscripts shares during the quarter.

44.     After the market closed on August 2, 2011, the Company hosted a conference call to discuss its results of operations. During that call, Defendant Tullman stated in part,

> The first thing was, as we looked at the merger, people said, well, can they work together? Continue to deliver? Then can they cross-

> sell, then can they sell in both directions, and then the final question was, does the software work together well? Each one of those we've knocked off quarter by quarter as we continue to educate the sales force, as we continue to educate our clients, and they see what we can deliver.

45.     During the trading session the following day, Allscripts' stock price rose $1.44 per share, or 8.60 percent, to close at $18.18 per share.

46.     On August 9, 2011, the Company filed its Form 10-Q for the quarter ending June 30, 2011, presenting substantially similar financial performance data. The Form 10-Q was signed by Defendants Tullman and Davis, and contained certifications substantially similar to that described in paragraph 32 above.

47.     On November 3, 2011, Allscripts issued a press release announcing its financial results for the quarter ending September 30, 2011. The Company reported non-GAAP diluted EPS of $0.25 and raised its guidance for full year 2011 EPS from a range of $0.88 to $0.90 to a range of $0.91 to $0.93. In connection with the earnings release, CEO Tullman stated:

> Our results reflect the strength of the healthcare IT market and our accelerating momentum with both new and existing clients, as reflected in our third quarter bookings growth . . . . Our unique vision for a Connected Community of Health is resonating with providers across all segments. We grew our hospital market share with three new Sunrise Clinical Manager clients in the quarter, and we continued to expand our ambulatory share, where we already have the largest footprint in the industry. We believe Allscripts is the one company best positioned to help healthcare providers thrive in this highly complex and dynamic healthcare environment.

48.     Defendant Davis also stated:

> Our third quarter financial results were strong, as we saw a significant jump in year-over-year bookings growth, accelerating revenue and net income increases . . . . In addition to strong new client sales, we continue to demonstrate success with significant add-on purchases within our installed base. Gross margins reflect a higher mix of professional services and third party system sales, a result of robust upgrade activity across our entire client base. **We continue to demonstrate the leverage inherent in our financial**

*model and merger-related synergies* as we delivered an increase in operating income margin versus the same quarter last year.

49.     During the trading session that day, Allscripts' stock price rose $0.72 per share, or 3.82 percent, to close at $19.57 per share.

50.     After the market closed on November 3, 2011, the Company hosted a conference call to discuss its results of operations.  During that call, Defendant Davis engaged in the following exchange:

> **Analyst:**  "Can you remind us again where you are in terms of the cost synergies that you outlined when the [Merger] was closed. I think it was supposed to be $25 million in the first year? Where  – are we at that run rate, or do we still have more to go?"
>
> **Defendant Davis:**  "Yes we're tracking that, if not $1 million or $2 million above that for the year. We feel very good about the $25 million, and as we work through our planning process for next year, remain confident in the incremental $10 million that would get us to $35 million, and then ultimately to $40 million in 2013. So, *our perspective is on our ability to achieve those committed synergies still remains very positive*."

51.     During the trading session the following day, Allscripts' stock price rose $1.22 per share, or 6.23 percent, to close at $20.79 per share.

52.     On November 9, 2011, the Company filed its Form 10-Q for the quarter ending September 30, 2010, presenting substantially similar financial performance data.  The Form 10-Q was signed by Defendants Tullman and Davis, and contained certifications substantially similar to that described in paragraph 32 above.

53.     On February 16, 2012, Allscripts issued a press release announcing its financial results for the quarter and year ending December 31, 2011.  The Company reported non-GAAP diluted EPS of $0.25 for the quarter and $0.93 for the year.  Allscripts offered guidance for full-year EPS for full year 2012 of between $1.06 and $1.10.  In connection with the earnings release, CEO Tullman stated:

Allscripts fourth quarter and 2011 results were strong by every measure, with record bookings, accelerating revenue growth, strong earnings growth and record operating cash flow . . . . Our performance reflects robust demand for our solutions, strong competitive positioning and success in expanding our market share.

Our vision of a Connected Community of Health is gaining momentum with the emerging shift to accountable and value-based care models. Allscripts is uniquely positioned to connect all key stakeholders with our industry-leading clinical and financial solutions, enabling critical business insights that improve outcomes.

54.    Defendant Davis also stated:

Allscripts delivered another strong quarter and year of financial performance . . . . We had the best bookings quarter in the Company's history and saw our non-GAAP revenue and net income grow 15 and 23 percent, respectively, in the fourth quarter. We also continued our long-term commitment to invest in innovation, while demonstrating continued operating leverage.

The quality of our results were particularly notable given record cash flow from operations and a decline in day sales outstanding (DSO) by six days, yielding a DSO of 84 days. We also continued to repurchase shares and reduce debt.

55.    During the trading session that day, Allscripts' stock price rose $0.19 per share, or 0.89 percent, to close at $21.47 per share.

56.    After the market closed on February 16, 2012, the Company hosted a conference call to discuss its results of operations. During that call, Defendant Davis stated:

Our ability to scale as well as *our success with driving merger-related cost synergies* helped improve our operating leverage.

Consistent with past communications, we anticipate an incremental $10 million in annual cost synergies in 2012 and an additional $5 million in 2013.

57.    However, later in the call Defendant Tullman engaged in the following exchange:

**Analyst:** I know you've had quite a few quarters now under your belt with Misys and I know the big justification or the big part of

the strategy there was the captive practice management base that they had. And I am curious if you can offer up qualitative or quantitative statistics on or thoughts on how the cross sell has gone into that base, you know, what inning we are in relatively speaking in terms of the HR adoption opportunity there. . . .

**Defendant Tullman:** It's interesting. We have seen in our practice management base across the board we have seen a lot of stability. Those products work well. We think the opportunity with ICD-10 in part is, as those folks start to upgrade we are going to see upgrades that are both on the practice management as well as the Electronic Health Record side.

The other thing you find is people don't want to move from what the companies are comfortable with. And that is especially true in payment processing. You know our payer PASS organization processes – you know, we are the third largest payment processing organization in healthcare and, specifically, relative to physician processing, I think we processed more physician direct payments than anyone. So that is something that people don't want to generally mess around with.

So we see ICD-10, a lot of activity there. A lot of movement there. We think the delay was beneficial because it will give people a little bit of breathing room amidst all this change. But frankly, folks are focused on it moving toward that and we are continuing to see not a lot of attrition and a lot of positive movement in the former Misys space.

**Analyst:** But in terms of – I mean can you give us a feel for where you're at in terms of the cross sell of EHR, you know the Allscripts professional and I would assume MyWay into that base. You know are we in the third inning of that, the fifth inning? I mean how far along are we in terms of are you in terms of executing that strategy?

**Defendant Tullman:** I think we are in the third inning. I think we have a lot of upside. We've made good progress. But I think we had a lot of upside in terms of selling Electronic Health Records. And again, what is interesting about this is that it's – there is a lot of product that we have to sell.

So we are meeting our plan; we are doing what we expected. But we also see a lot of upside potential as well. So I think we follow the penetration nationally. About 35% is where we are and I think that is kind of where we are going.

17

58.     On February 29, 2012, the Company filed its Form 10-K for the quarter and year

ending December 31, 2011. The Form 10-K was signed by Defendants Tullman and Davis, and

contained certifications substantially similar to that described in paragraph 32 above.

59.     Although the February 29, 2012, Form 10-K included full-year financial data

substantially similar to that discussed in the press release, the filing reported an adjusted value

for revenues for the three-month period ended September 30, 2011 ($363,736,000), which

differed materially from the corresponding figure reported in the Company's November 9, 2011

filing ($368,763,000).

### THE TRUTH EMERGES

60.     On April 26, 2012, Allscripts filed a Form 8-K with the SEC previewing its

operating results for the three months ending March 31, 2012. The Company reported non-

GAAP diluted EPS of $0.12 – sharply below the trend implied by the Company's guidance of

full-year EPS of between $1.06 and $1.12 for 2012 issued on February 16.

61.     Further, the Form 8-K contained a number of startling announcements:

> Pead's service as Chairman of the Board, director and officer of
> the Company terminated yesterday. Prior to this action, the Board
> engaged in extensive deliberations regarding the leadership of the
> Company. Following the deliberations, those who concurred with
> the consensus regarding such leadership expressed their intention
> to continue as directors, and those who did not concur (Catherine
> M. Burzik, Eugene V. Fife and Edward A. Kangas) informed the
> Company that they were resigning as directors. . . .

> *        *        *

> . . . On April 22, 2012, William J. Davis, the Company's Chief
> Financial Officer, notified the Company that he will be resigning
> as Chief Financial Officer of the Company, effective May 18,
> 2012.

62.     After the market closed on April 26, 2012, the Company hosted a conference call

to discuss its results of operations, during which it reduced full-year non-GAAP EPS guidance

by more than 25 percent, to a range of $0.74 to $0.80. During that call, Defendant Tullman finally acknowledged the true effects of the state of Allscripts' efforts to integrate its fractured and incongruous product lines:

> Our overall results were primarily driven by lower than expected sales and an unfavorable sales mix. This directly impacted both revenue and profit. . . . A number of our clients and prospects delayed commitment as they waited for us to introduce new releases and demonstrate more robust integration.
>
> \*  \*  \*
>
> Given that many of our clients are smaller practices, the challenges have not just been about upgrading software, but also include hardware upgrades, connectivity issues and work flow. For some, this is the first upgrade or change in years. While we have added staff to manage through this, there have been challenges, and candidly, there is more work to do relative to improving the client experience.

63. During the ensuing question-and-answer session, analysts openly expressed skepticism about the explanations provided by Allscripts executives as to the Company's results and the dramatic changes to its Board of Directors:

> **George Hill (Citigroup):** On this call, you said to us that you continue to think that the Company is best positioned to maintain and win share. The market statistics and the channel checks that I think myself and everybody else does, does not bear that out remotely. Please give us a reason why we should place any faith at all in that statement.
>
> \*  \*  \*
>
> **Larry Marsh (Barclays Capital):** [I]t looks like all the Eclipsys legacy board members either were terminated or quit. ***So it would suggest to some that the business you acquired in 2010 may be meaningfully different in value than what you thought***. Can you comment on that? And can you give us any sense of how you're going to be able to run this Company and convince your clients of your leadership if a third of the Board just resigned? . . .
>
> \*  \*  \*
>
> **Sean Weiland (Piper Jaffray & Co.):** With four Board members up and resigning, and ***I've never seen that kind of board turnover***

19

*because of a sloppy bookings quarter.* So I guess my question is, what else? ***What else is going on here that would cause that kind of turnover on the Board?***

\*    \*    \*

**Charles Ryhee (Cowen & Co.):**  You know, Glen, at HIMSS this year, which was only about a month and a half ago, you talked at length about sort of where you thought things were going. You had new managers out there, and you were discussing in response to a question about integration and concerns that you were kind of saying that it is important but it is not the deciding factor.  Yet, here you're telling us now that you have prospects delaying their commitments, they are not happy with the initial integration, integrated offering here.

\*    \*    \*

**Anthony Vendetti (Maxim Group):**  I just wanted to ask a question about the fourth quarter, because ***in the 10-K it looked like there was a restatement there for some system sales***.  And it looked like if you took out some of those system sales, it looked like you started to see kind of a trend of declining sales for a particular product. And I think it was more on the Allscripts side. I'm just wondering, is this – ***would you attribute most of this to Eclipsys, or is it the combination of mostly Eclipsys, a little bit of Allscripts?*** Can you just talk about that a little bit?

64.    In reaction to this news, over the course of the next trading session on April 27, 2012, Allscripts' share price fell by $5.72 per share, or 35.70 percent, to close at $10.30 per share on volume more than 30 times greater than the average during the Class Period and six times greater than that of any other day during the Class Period.

65.    The truth, which was known by the Defendants but concealed from the investing public during the Class Period, was as follows:

(a)    the process of developing a unified product offering after the Merger had suffered debilitating setbacks, including major undisclosed schisms among the most senior levels of the Company, which ultimately resulted in the loss of key personnel and harmful upheaval in Company leadership;

(b)     a material portion of Allscripts' revenue and net income was predicated on the successful integration of these systems, and substantial business relationships had been destroyed by the Company's inability to make material progress in this area;

(c)     as a result of the foregoing, Allscripts lacked a reasonable basis for its claims of progress in post-Merger integration, sound operations, profitable results, and projections of continued growth.

66.     As a result of Defendants' false statements, Allscripts common stock traded at artificially inflated levels during the Class Period.  However, when the truth about Allscripts' practices was revealed to investors, the Company's share price dramatically declined.

## LOSS CAUSATION

67.     During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a course of conduct to deceive the market that artificially inflated the prices of Allscripts common stock, and operated as a fraud or deceit on Class Period purchasers of Allscripts common stock by misrepresenting the Company's business and prospects.  Later, when Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Allscripts common stock fell precipitously.  As a result of their purchases of Allscripts common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## SCIENTER

68.     During the Class Period, Defendants had both the motive and opportunity to commit fraud.  They also had actual knowledge of the misleading nature of the statements they made or acted with reckless disregard for the true information known to them at the time for the reasons discussed above.  In so doing, Defendants committed acts, and practiced and participated

in a course of business that operated as a fraud or deceit on purchasers of Allscripts common stock during the Class Period.

## NO SAFE HARBOR

69.     Allscripts' verbal "Safe Harbor" warnings accompanying its oral forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

70.     Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Allscripts who knew that the FLS was false.  None of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:  FRAUD ON THE MARKET

71.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     the omissions and misrepresentations were material;

(c)     the Company's stock traded in an efficient market;

(d)     the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e)     Plaintiff and other members of the Class purchased Allscripts common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

72.     At all relevant times, the markets for Allscripts common stock were efficient for the following reasons, among others:

(a)     as a regulated issuer, Allscripts filed periodic public reports with the SEC;

(b)     Allscripts regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services; and

(c)     Allscripts common stock was actively traded in an efficient market, namely the NASDAQ, under the ticker symbol "MDRX."

## CLASS ACTION ALLEGATIONS

73.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class.  Excluded from the Class are Defendants, directors, and officers of the Company, and their families and affiliates.

74.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of February 10, 2012, Allscripts had approximately 190,514,662 shares of common stock outstanding, owned by thousands of persons.

75.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

(a)     whether Defendants violated the Exchange Act;

(b)     whether Defendants omitted and/or misrepresented material facts;

(c)     whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(e)     whether the prices of Allscripts common stock were artificially inflated; and

(f)     the extent of damage sustained by Class members and the appropriate measure of damages.

76.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

77.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests that conflict with those of the Class.

78.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violation of Section 10(b) of the
### Exchange Act and Rule 10b-5 Against All Defendants

79.     Plaintiff incorporates paragraphs 1 through 78 by reference.

80.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew to be or recklessly disregarded as to whether they were misleading, in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

81.     Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

> (a)     employed devices, schemes, and artifices to defraud;

> (b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

> (c)     engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Allscripts common stock during the Class Period.

82.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Allscripts common stock. Plaintiff and the Class would not have purchased Allscripts common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

83.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Allscripts common stock during the Class Period.

### COUNT II

### For Violation of § 20(a) of the
### Exchange Act Against the Individual Defendants

84.     Plaintiff incorporates paragraphs 1 through 83 by reference.

85.     The Individual Defendants acted as controlling persons of Allscripts within the meaning of Section 20(a) of the Exchange Act.  By virtue of their power to control public statements about Allscripts, the Individual Defendants had the power and authority to control Allscripts and its employees.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.     Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding Plaintiff and the members of the Class damages and interest;

C.     Awarding Plaintiff's reasonable costs, including attorneys' fees; and

D.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.


DATED: May 2, 2012

Respectfully submitted,

By:  */s/ Adam J. Levitt*

Adam J. Levitt
John Tangren
**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLC**
55 West Monroe Street
Chicago, Illinois 60603
Telephone: (312) 984-0000
Facsimile: (312) 984-0001
Email: levitt@whafh.com
tangren@whafh.com

*Local Counsel for Plaintiff
Bristol County Retirement System*

Christopher J. Keller
Michael W. Stocker
Rachel A. Avan
**LABATON SUCHAROW LLP**
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: ckeller@labaton.com
mstocker@labaton.com
ravan@labaton.com

*Counsel for Plaintiff
Bristol County Retirement System*