IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BRISTOL COUNTY RETIREMENT SYSTEM, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 12 C 3297 |
| ALLSCRIPTS HEALTHCARE SOLUTIONS, INC., GLEN E. TULLMAN, and WILLIAM J. DAVIS, | ) ) ) ) ) | |
| Defendants. | ) | |

MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, Chief Judge:

On May 2, 2012, plaintiff Bristol County Retirement System ("Bristol County") filed a two-count Complaint seeking class action relief against defendants Allscripts Healthcare Solutions, Inc. ("Allscripts), Glen E. Tullman ("Tullman"), and William J. Davis ("Davis") for alleged violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5. (Dkt. No. 1 ("Compl.") ¶ 1.) The purported class consists of "all persons who purchased or otherwise acquired the publicly-traded common stock of Allscripts (the "Class") between November 9, 2010 and April 26, 2012, inclusive (the "Class Period")." (*Id.*)

Pending before the court are two competing motions for appointment as lead plaintiff in this lawsuit — the "Motion of the Ironworkers Group for Appointment as Lead Plaintiff and Lead Counsel" (Dkt. No. 8) and "The Government of Bermuda Contributory and Public Service

1

Superannuation Pension Plans' and the International Brotherhood of Electrical Workers Local Union 38 Pension Fund's Motion for Appointment as Lead Plaintiff and Approval of Lead Plaintiff's Selection of Lead Counsel" (Dkt. No. 16). For the reasons set forth below, the "Motion of the Ironworkers Group for Appointment as Lead Plaintiff and Lead Counsel" (Dkt. No. 8) is denied and "The Government of Bermuda Contributory and Public Service Superannuation Pension Plans' and the International Brotherhood of Electrical Workers Local Union 38 Pension Fund's Motion for Appointment as Lead Plaintiff and Approval of Lead Plaintiff's Selection of Lead Counsel" (Dkt. No. 16) is granted.

## LEGAL STANDARD

Pursuant to Section 21D(a)(3)(B) of the Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), the court must "appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members." 15 U.S.C. § 78u-4(a)(3)(B)(i). The court applies a presumption that the "most adequate plaintiff" is "the person or group of persons" that (aa) "has either filed the complaint or made a motion in response to a notice [advising members of the purported plaintiff class]"; (bb) "has the largest financial interest in the relief sought by the class;" and (cc) "otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). The purpose of the presumption's "largest financial interest" provision is "to increase the likelihood that institutional investors will serve as lead plaintiffs." *City of Sterling Heights Gen. Employees' Retirement Sys. v. Hospira, Inc.*, No. 11 C 8332, 2012 WL 1339678, at *3 (N.D. Ill. Apr. 18, 2012) (St. Eve, J.) (quoting H.R. Conf. Rep. 104-369). The presumption of adequacy may be

overcome by proof that the presumptively most adequate plaintiff "will not fairly and adequately protect the interests of the class" or "is subject to unique defenses." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).

ANALYSIS

A.  Presumptive Lead Plaintiff

The plain language of § 78u-4(a)(3)(B) makes clear that "the most adequate plaintiff" does not have to be only one individual or entity. For example, the PSLRA instructs the court to appoint as lead plaintiff "the member *or members* of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members." 15 U.S.C. § 78u-4(a)(3)(B)(i) (emphasis added). The statute further notes that the presumption of most adequate plaintiff applies to "the person *or group of persons*" satisfying the enumerated requirements. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I) (emphasis added).

Two groups of movants are competing for the position of lead plaintiff in this case: the "Ironworkers Group" and the "Pension Plans Group." The Ironworkers Group consists of Ironworkers Locals 40, 361 & 417 – Union Security Funds ("IW 40"); Iron Workers Local 580 – Joint Funds ("IW 580"); and Iron Workers District Council of Western New York and Vicinity Welfare, Pension and Annuity Funds ("IWDC"). Together, IW 40, IW 580, and IWDC hold "three dozen accounts," and the Ironworkers Group's spreadsheet includes transactions for ten different member plans or funds. (Dkt. No. 34 at 5; Dkt. No. 9-4.) The Pension Plans Group consists of the Government of Bermuda Contributory and Public Service Superannuation Pension Plans ("Bermuda Pension Plans") and the International Brotherhood of Electrical Workers Local Union 38 Pension Fund ("Local 38 Pension Fund"). The Bermuda Pension Plans

3

are separately referred to as the "Bermuda Contributory Pension Plan" and "the Bermuda Superannuation Pension Plan." It is undisputed that both the Ironworkers Group and the Pension Plans Group are "institutional investors," and that both groups have filed timely motions for appointment as lead plaintiff.

      1.      <u>Largest Financial Interest</u>

The main dispute between the parties is over which of the two plaintiffs' groups has the "largest financial interest" in this case. The PSLRA "does not specify how courts should measure the 'largest financial interest in the relief sought by the class.'" *Hospira*, 2012 WL 1339678, at *3 (quoting 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb)). In the absence of statutory guidance, courts have considered four primary factors:

> (1) the total number of shares purchased during the class period; (2) the net shares purchased during the class period (in other words, the difference between the number of shares purchased and the number of shares sold during the class period); (3) the net funds expended during the class period (in other words, the difference between the amount spent to purchase shares and the amount received for the sale of shares during the class period); and (4) the approximate losses suffered.

*Id.* at *4 (quoting *Lax v. First Merch. Acceptance Corp.*, No. 97 C 2715, 1997 WL 461036, at *5 (N.D. Ill. Aug. 11, 1997) (Coar, J.)). "While courts differ on the precise weight to apply to each factor, most courts agree that [the] fourth factor—the approximate losses suffered—is the most salient factor in assessing the lead plaintiff." *Id.*

It is undisputed that the Pension Plans Group purchased more shares during the class period (234,860) than the Ironworkers Group (225,380). It is also undisputed, however, that the Pension Plans Group sold more shares during the class period (53,200) than the Ironworkers Group (1,700). As a result, the Ironworkers Group held more net shares during the class period (223,680) than the Pension Plans Group (181,660). The Ironworkers Group also had a larger

outlay of net funds expended during the class period ($3,927,950) than the Pension Plans Group ($3,605,229).

The Pension Plans Group argues that it suffered larger approximate losses ($2,021,982) than the Ironworkers Group ($1,526,924),[1] based on a first-in-first-out ("FIFO") method of accounting. Under the FIFO method of accounting, sales of stock during the class period are disregarded to the extent they are matched-up with any pre-class (e.g., "first in") purchases. *See Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*, 756 F. Supp. 2d 928, 937 (N.D. Ill. Nov. 22, 2010) (Guzman, J.) ("Because some of the sales are matched with pre-class period stock, courts applying FIFO exclude such transactions from the damage calculations"). It is undisputed that the Pension Plans Group held 54,180 shares of Allscripts stock at the beginning of the class period. Under a FIFO method of accounting, the Pension Plans Group's sales of Allscripts shares on October 4, 2011 (36,200 shares), November 30, 2011 (8,980 shares), and February 13, 2012 (8,020) therefore are not considered relevant to the overall calculation of losses during the class period, because those sales are assumed to involve the Pension Plans Group's pre-class shares. The FIFO method of accounting is often disfavored for purposes of calculating damages, because it has the potential to "give[ ] plaintiffs a windfall by not taking into consideration gains they obtained from sales of stock during the class period at a price that was inflated by fraud." *Household Int'l*, 756 F. Supp. 2d at 937; *see also In re Comdisco Sec.*

---

[1] The court has attempted to correct the Pension Plans Group's figures to the extent they are inconsistent with basic mathematical calculations as displayed in the Pension Plans Group's spreadsheet. (Dkt. No. 16-4.) For example, the Pension Plans Group's spreadsheet begins with a calculation stating that 11,790 shares purchased at a share price of $18.04 comes to a total cost of $212,703.39. This is incorrect, as 11,790 x $18.04 actually equals $212,691.60. The court has also taken the liberty of rounding to the nearest whole-dollar amount (e.g., $212,692 in the example) to ease everyone's burden in making computations.

*Litig.*, 150 F. Supp. 2d 943, 946 (N.D. Ill. June 27, 2001) (Shadur, J.) (recognizing "a host of cases . . . that reject the kind of artificial 'loss' that is manufactured by [the] FIFO construct in favor of a calculation that properly nets out purchases and sales *during* the class period and determines gains or losses in those terms.") (emphasis in original). In this case, for example, the Pension Plans Group actually sold 53,200 shares of Allscripts stock during the class period for $937,787, but this gain is disregarded when calculating FIFO damages. The Pension Plans Group's claimed FIFO losses of $2,021,982 are accordingly calculated by beginning with the actual purchase price of the 234,860 shares purchased by the Pension Plans Group during the class period ($4,543,016) and then subtracting the "mean estimated value" of these shares at the close of the class period ($2,521,034).[2] *See Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 256 F.R.D. 586, (N.D. Ill. Feb. 23, 2009) (St. Eve, J.) ("shares that were bought during the class period but were not sold during the class period are accounted for as if they had been sold at the average price of the shares in the 90 calendar days following the class period") (quoting *In re eSpeed, Inc. Sec. Litig.*, 232 F.R.D. 95, 102 (S.D.N.Y. 2005)). The result is a FIFO loss to the Pension Plans Group of $2,021,982.

The Ironworkers Group argues that under a last-in-first-out ("LIFO") method of accounting, the Pension Plans Group actually only suffered losses of $1,088,488. The court disagrees with the result obtained by the Ironworkers Group's application of LIFO. Generally, the LIFO method of accounting assumes that "both the purchase and sale occurred during the class period." *Household Int'l*, 756 F. Supp. 2d at 936. With this assumption in place, the actual

---

[2] The court accepts the Ironworkers Group's "mean price estimated value" of 10.7342 as more precise than the Pension Plans Group's "average share price" of 10.73.

dates of the relevant transactions do not affect the court's calculation of damages, except as detailed in note 3 below. As stated above, the Pension Plans Group purchased 234,860 shares of Allscripts stock during the class period for $4,543,016 and sold 53,200 shares of Allscripts stock during the class period for $937,787. The net funds expended by the Pension Plans Group during the class period are therefore $3,605,229. The remaining 181,660 shares of Allscripts stock purchased by the Pension Plans Group during the class period, but not sold by the Pension Plans Group during the class period, are then given their mean estimated value at the close of the class period ($10.7342), totaling $1,949,975. Subtracting this gain from the Pension Plans Group's net expenditures leads to total LIFO losses of $1,655,254.

The Ironworkers Group also begins its LIFO calculation by determining the net funds expended by the Pension Plans Group during the class period. At the next step, however, rather than subtracting the mean estimated value of the remaining 181,660 shares from this amount, the Ironworkers Group subtracts the mean estimated value of 234,460 shares (e.g. $2,516,741), for a total LIFO loss of $1,088,488. The Ironworkers Group contends that this number of remaining shares is appropriate under a LIFO method of accounting, because "Bermuda's last transaction during the Class Period was a ***purchase of 114,000 shares on February 27, 2012***." (Dkt. No. 37-1 at 6 (emphasis in original).) Similarly, the Bermuda Superannuation Pension Plan's last transaction during the class period was a purchase of 41,500 shares on February 27, 2012, and the Local 38 Pension Fund's only transactions during the class period were purchases totaling 78,960 shares. While these transaction dates and amounts are technically correct, the court rejects the Ironworkers Group's approach because it leads to the absurd result that the Pension

7

Plans Group is considered to have purchased 52,800 shares of Allscripts stock for $0.[3]

It is undisputed that the Ironworkers Group suffered approximate losses of $1,526,924 under either method of accounting. Based on the above calculations, the court finds that the Pension Plans Group has suffered a larger approximate loss than the Ironworkers Group under either the FIFO method of accounting ($2,021,982) or the LIFO method of accounting ($1,655,254). Coupled with the Pension Plans Group's greater purchase of shares during the class period, the court finds that the Pension Plans Group has the "largest financial interest in the relief sought by the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).

---

[3] To the extent damages are limited to shares bought and sold within the class period, a strict chronological application of LIFO is complicated by the fact that the Pension Plans Group's only sales during the class period (October 4, 2011 (36,200); November 30, 2011 (8,980); February 13, 2012 (8,020)) greatly exceeded their "last in" purchases during the class period (June 24, 2011 (400 shares)). A true LIFO calculation constrained to the class period would limit the Pension Plans Group's in-class sales to the actual number of shares "last" purchased on June 24, 2011, in effect ignoring major gains earned by the Pension Plans Group during the class period and leading to an artificially-inflated calculation of loss (much like the FIFO calculation). The Ironworkers Group does not pursue this approach, but instead credits the Pension Plans Group with selling all 53,200 shares of Allscripts stock. To avoid an artificially-inflated calculation of *gain*, however, these sales must be credited against a fair purchase price. Neither party has supplied the court with any pre-class purchase price, and the court does not presume the appropriateness of using a pre-class purchase price. While not yielding a perfect result, the court finds that the most fair approach under the circumstances is to match in-class sales with in-class purchases, leading to the conclusion that the Pension Plans Group "retained" only 181,660 shares at the end of the class period. Another option would be to simply take the average of the Pension Plans Group's $2,021,982 FIFO calculation (which the court has found improperly ignores the Pension Plans Group's in-class sales) and the Ironworkers Group's $1,088,488 LIFO calculation (which the court has found improperly ignores the Pension Plans Group's pre-class purchases), leading to a "corrected" LIFO loss of $1,555,235. The court notes that this figure is still larger than the Ironworkers Group's claimed losses of $1,526,924.

2. Rule 23

The court must next consider whether the Pension Plans Group satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure. At this stage of the litigation, "typicality and adequacy of representation are the only relevant considerations." *In re Motorola Sec. Litig.*, No. 03 C 287, 2003 WL 21673928, at \*3 (N.D. Ill. July 16, 2003) (Pallmeyer, J.) ("A wide-ranging analysis of the Rule 23 factors should be left for consideration of a motion for class certification."). The court therefore considers whether "the claims or defenses of the [Pension Plans Group] are typical of the claims and defenses of the [purported] class" and whether the Pension Plans Group "will fairly and adequately protect the interests of the [purported] class." Fed. R. Civ. P. 23(a)(3) and (4) (alterations added).

"A claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members" and is "based on the same legal theory." *Arreola v. Godinez*, 546 F.3d 788, 798 (7th Cir. 2008) (quoting *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514 (7th Cir. 2006)). In this case, plaintiff Bristol County Retirement System has alleged that "Defendants issued materially false and misleading statements regarding [Allscripts'] business and financial results" and, "[a]s a result of Defendants' false statements, Allscripts' stock traded at artificially inflated prices during the Class Period." (Compl. ¶ 3.) Bristol County further alleges that, "once the truth about Allscripts' practices was revealed to investors, [Allscripts'] share price dramatically declined, and [Bristol County] and the other members of the Class suffered significant losses and damages." (Compl. ¶ 7.) The Pension Plans Group's claims are typical of the purported class members', insofar as the Pension Plans Group allegedly purchased Allscripts stock during the class period, paid artificially inflated

9

prices for Allscripts stock purchased during the class period, and suffered damages as a result.

"To meet the adequacy requirement, the plaintiff must demonstrate that (1) his claims are not antagonistic or in conflict with those of the [purported] class; (2) he has sufficient interest in the outcome of the case to ensure zealous advocacy; [and] (3) he is represented by competent, experienced counsel who will be able to prosecute the litigation vigorously." *In re Motorola*, 2003 WL 21673928, at *4 (alterations added). There is no suggestion that the Pension Plans Group's claims are in conflict with those of the purported class, and the sizeable amount of their alleged losses supports the assertion of the Pension Plans Group's representatives that they are "committed to maximizing the net recovery for the class consistent with good faith advocacy." (Dkt. No. 16-5 ¶ 6.) As discussed below, the court further finds that the Pension Plans Group is represented by competent, experienced counsel who will be able to prosecute this litigation vigorously. The court therefore presumes that the Pension Plans Group is the "most adequate plaintiff." 15 U.S.C. § 78u-4(a)(3)(B)(iii).

B. Rebuttal Evidence

The Ironworkers Group argues that the Pension Plans Group is an inappropriate choice for lead plaintiff, because the Pension Plans Group is "little more than a convenient grouping of plaintiffs pieced together by their counsel for the sole reason of securing a leadership position in this action." (Dkt. No. 32 at 9.) "[S]o long as the group is relatively small and therefore presumptively cohesive," however, no pre-litigation relationship is required by statute. *Hospira*, 2012 WL 1339678, at *6 (quoting *Goldstein v. Puda Coal, Inc.*, 827 F. Supp. 2d 348, 356 (S.D.N.Y. Dec. 6, 20122)). "Recently, the 'trend' has been to allow small groups of investors to act as lead plaintiff even if they do not have pre-existing relationships." *Bang v. Acura Pharm.*,

10

*Inc.*, No. 10 C 5757, 2011 WL 91099, at *7 (N.D. Ill. Jan. 11, 2011) (Kendall, J.); *but see Topaz Realty v. Northfield Labs., Inc.*, No. 06 C 1493, 2006 U.S. Dist. LEXIS 77613, at*9 (N.D. Ill. June 19, 2006) (Marovich, J.) ("decid[ing] against appointing 'artificial' groups of plaintiffs as lead plaintiffs"). Although the United States Court of Appeals for the Seventh Circuit has not spoken on this point, the United States Court of Appeals for the Third Circuit has instructed that the relatedness of a plaintiff group is potentially relevant to the question of adequate representation, "[i]f the court determines that the way in which a group seeking to become lead plaintiff was formed or the manner in which it is constituted would preclude it from fulfilling the tasks assigned to a lead plaintiff." *In re Cendant Corp. Litig.*, 264 F.3d 201, 266 (3d Cir. 2001).

Pursuant to statute, it is the Ironworkers Group's burden to produce proof that the Pension Plans Group will not fairly and adequately protect the interests of the class. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II). The mere fact that "the Pension Plans [Group] lack[s] any pre-existing structure or decision-making process" (Dkt. No. 32 at 9) does not persuade this court that the Pension Plans Group can not be adequate class representatives. Both the Bermuda Pension Plans and the Local 38 Pension Fund have experience serving as plaintiffs in shareholder actions. (Dkt. No. 16-5 ¶¶ 2-3.) Additionally, their representatives have already "directed counsel to implement communication procedures to enable us to confer via phone and/or email on short notice to ensure that we are able to make timely decisions." (*Id.* ¶ 7.) With only two plan representatives and three investor members, the Pension Plans Group does not represent "an unmanageably large group" of investors that "could not effectively manage the litigation and oversee class counsel." *Cf. Topaz Realty*, 2006 U.S. Dist. LEXIS 77613, at*10 (quoting *Bally Total Fitness Litig.*, 2005 WL 627960, at * 2 (N.D. Ill. Mar. 15, 2005) (Grady, J.)). The

Ironworkers Group argues that the Pension Plans Group's joinder is "the product of lawyers selecting clients rather than clients selecting lawyers," (Dkt. No. 32 at 9), but the Ironworkers Group has submitted no proof of this assertion. On the contrary, the representatives of the Bermuda Pension Plans and the Local 38 Pension Fund state in their joint declaration that they "conferred with one another . . . [and] decided to move together in seeking appointment as lead plaintiff after due consideration and deliberation." (Dkt. No. 16-5 ¶ 4.) The Pension Plans Group has also filed with the court the sworn certification required by 15 U.S.C. § 78u-4(a)(2)(A). (Dkt. No. 16-3.) Therefore, after a thorough review of all the relevant factors, this court has no reason to believe that the Pension Plans Group will not fairly and adequately protect the interests of the purported class.

For all of the reasons set forth above, the court appoints the Pension Plans Group as lead plaintiff in this litigation.

C.     Lead Counsel

Under the PSLRA, the lead plaintiff is tasked with selecting and retaining counsel to represent the class, subject to the approval of the court. 15 U.S.C. § 78u-4(a)(3)(B)(v). The Pension Plans Group has moved for the appointment of Robbins Geller Rudman & Dowd LLP ("Robbins Geller") as lead counsel. Robbins Geller has substantial experience in securities class action litigation and is recognized as "one of the most successful law firms in securities class actions, if not the preeminent one, in the country." *In re Enron Corp. Sec.*, 586 F. Supp. 2d 732, 797 (S.D. Tex. 2008) (Harmon, J.) (Robbins Geller then known as Lerach Coughlin Stoia Geller Rudman and Robbins LLP ). As noted by the Pension Plans Group, "Robbins Geller attorneys are responsible for obtaining the largest securities fraud class action recovery ever [$7.3 billion

in *Enron*], as well as the largest recoveries in the Fifth, Sixth, Eighth, Tenth and Eleventh Circuits." (Dkt. No. 17 at 7.)

The court approves the Pension Plans Group's selection of Robbins Geller as lead counsel. As other courts have cautioned, however, this court "takes seriously its role in reviewing the reasonableness of proposed fee awards and will not hesitate to reject an unreasonable proposal, should an award of fees be necessary in this case." *Topaz Realty*, 2006 U.S. Dist. LEXIS 77613, at *15; *see also In re Motorola*, 2003 WL 21673928, at *7 ("At the conclusion of the litigation, of course, the court will carefully scrutinize any proposed fee award and will approve only a reasonable fee.").

## CONCLUSION

For the reasons set forth above, the "Motion of the Ironworkers Group for Appointment as Lead Plaintiff and Lead Counsel" (Dkt. No. 8) is denied and "The Government of Bermuda Contributory and Public Service Superannuation Pension Plans' and the International Brotherhood of Electrical Workers Local Union 38 Pension Fund's Motion for Appointment as Lead Plaintiff and Approval of Lead Plaintiff's Selection of Lead Counsel" (Dkt. No. 16) is granted. The "Pension Plans Group" is appointed as lead plaintiff and its selection of the law firm of Robbins Geller Rudman & Dowd LLP to serve as lead counsel is approved.

The "Motion of the Allscripts Institutional Investor Group for: (1) Appointment as Lead Plaintiff; and (2) Approval of Its Choice of Lead Counsel" (Dkt. No. 12) and the "Motion of the Pension & Retirement Funds for Appointment as Lead Plaintiff and Approval of Selection of Counsel" (Dkt. No. 19) are withdrawn by the movants (Dkt. Nos. 27, 29). In accordance with this court's scheduling order of 8/27/2012 (Dkt. No. 43), the Pension Plans Group is granted

leave to file a first amended complaint on or before 12/10/2012, should it desire to do so. All additional deadlines set forth in the court's 8/27/2012 scheduling order remain in effect.

ENTER:

*James F. Holderman*
JAMES F. HOLDERMAN
Chief Judge, United States District Court

Date: November 9, 2012

14