UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| BRISTOL COUNTY RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) | No. 1:12-cv-03297 <br><br> CLASS ACTION |
| Plaintiff, | ) ) | Judge Thomas M. Durkin <br> Magistrate Judge Young B. Kim |
| vs. | ) ) | |
| ALLSCRIPTS HEALTHCARE SOLUTIONS, INC., GLEN E. TULLMAN, WILLIAM J. DAVIS AND LEE SHAPIRO, | ) ) ) ) | |
| Defendants. | ) ) | DEMAND FOR JURY TRIAL |

LEAD PLAINTIFFS' AMENDED COMPLAINT FOR VIOLATION OF
THE FEDERAL SECURITIES LAWS

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ........................................................................................................................1

JURISDICTION AND VENUE ...............................................................................................10

PARTIES ....................................................................................................................................10

CONFIDENTIAL WITNESS ACCOUNTS ...........................................................................12

    INABILITY TO INTEGRATE PRODUCTS, CUSTOMER DEFECTIONS AND
        DISSATISFACTION.................................................................................................12

    SHARP DIVISION AMONG ALLSCRIPTS AND ECLIPSYS KEY
        PERSONNEL ...........................................................................................................25

    UNOBTAINABLE 2012 FINANCIAL GUIDANCE........................................................27

MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS
    MADE DURING THE CLASS PERIOD ..........................................................................30

    MATERIALLY FALSE AND MISLEADING STATEMENTS CONCERNING
        PRODUCT INTEGRATION.....................................................................................30

    REASONS WHY DEFENDANTS' STATEMENTS CONCERNING PRODUCT
        INTEGRATION WERE MATERIALLY FALSE AND MISLEADING ...........40

    MATERIALLY FALSE AND MISLEADING STATEMENTS REGARDING
        MERGER INTEGRATION......................................................................................45

    REASONS WHY DEFENDANTS' STATEMENTS REGARDING MERGER
        INTEGRATION WERE MATERIALLY FALSE AND MISLEADING ...........47

    DEFENDANTS' FALSE 2012 FINANCIAL GUIDANCE .............................................49

    REASONS WHY ALLSCRIPTS' 2012 FINANCIAL GUIDANCE WAS FALSE ........49

THE RELEVANT TRUTH IS REVEALED...........................................................................52

ADDITIONAL SCIENTER ALLEGATIONS.........................................................................66

    DEFENDANTS WERE DIRECTLY RESPONSIBLE FOR ALLSCRIPTS'
        PRODUCT AND MERGER INTEGRATION AS WELL AS ITS
        FINANCIAL GUIDANCE ......................................................................................66

    DEFENDANTS' INSIDER SALES FURTHER SUPPORT A STRONG
        INFERENCE OF SCIENTER ................................................................................71

**Page**

THE INDIVIDUAL DEFENDANTS' COMPENSATION AND "RETENTION PLAN" BONUSES ALSO SUPPORT A STRONG INFERENCE OF SCIENTER ........................................................................................................74

THE FEDERAL STIMULUS AND SUSPICIOUS EXODUS OF EXECUTIVES AND DIRECTORS ADDS TO SCIENTER ..........................................................75

LOSS CAUSATION/ECONOMIC LOSS ....................................................................76

NO SAFE HARBOR .....................................................................................................79

APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET..........81

CLASS ACTION ALLEGATIONS .............................................................................83

PRAYER FOR RELIEF ................................................................................................88

JURY DEMAND ..........................................................................................................89

840995_1

By and through its undersigned counsel, Lead Plaintiffs, The Government of Bermuda Contributory and Public Service Superannuation Pension Plans and the International Brotherhood of Electrical Workers Local Union 38 Pension Fund ("Plaintiffs"), allege the following against Defendants Allscripts Healthcare Solutions, Inc. ("Allscripts" or the "Company"), its former Chief Executive Officer ("CEO") Glen E. Tullman ("Tullman"), its former Chief Financial Officer ("CFO") William J. Davis ("Davis") and its former President Lee Shapiro ("Shapiro") (collectively, "Defendants"), upon personal knowledge as to those allegations concerning Plaintiffs and, as to all other matters, upon investigation of counsel, which included, without limitation: review and analysis of public filings made by Allscripts with the Securities Exchange Commission ("SEC"); review and analysis of press releases and other public communications by Defendants and other non-parties; review of news articles and shareholder communications; review of other publicly available information concerning Allscripts such as analyst reports, lawsuits, websites, and marketing or other videos; and interviews conducted by an investigator with former employees of Allscripts. Based on the foregoing, Plaintiffs believe the factual contentions have evidentiary support or will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

## INTRODUCTION

1.       This securities fraud class action is brought on behalf of all persons who purchased the common stock of Allscripts (the "Class") between the time of Defendants' November 8, 2010 statements and April 26, 2012, inclusive (the "Class Period") and were damaged thereby. This complaint alleges violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5) by Defendants Allscripts, Tullman, Davis and Shapiro. It also alleges a violation of §20A of the Exchange Act against Shapiro for insider trading (15 U.S.C. §78t-1).

2.     Allscripts is a publicly-traded company on the NASDAQ, trading under the symbol MDRX.  Allscripts sells healthcare information technology software and services to hospitals and physicians.  Its products are intended to implement the transition from paper to electronic health records ("EHR") as well as facilitate billing and revenue cycle management.

3.     On June 9, 2010, Allscripts announced the $1.3 billion acquisition of  Eclipsys Corporation ("Eclipsys"), which then closed on August 24, 2010 (the "Merger").  The fraud alleged herein stems from the false promises Defendants made to investors related to the Merger, the resulting product offerings and the financial success assured as a result.

4.     Prior to the Merger, Allscripts' competitive strengths were in selling EHR products to physician practices (ambulatory offerings) and settings like rehabilitation centers (post-acute). Allscripts' leading products included "Enterprise," "Professional," and "MyWay" which targeted different sized physician practices from large to small.  In contrast, Eclipsys primarily sold EHR products to hospitals (acute offerings).  Eclipsys' leading products included "Sunrise Clinical Manager."

5.     As healthcare providers transitioned to EHR over the last decade by purchasing software from various vendors, they became increasingly focused on being able to seamlessly transmit patient data.  The Merger was intended to capitalize on healthcare providers' desire for integrated EHR products that would enable access to a single patient record across the continuum of the patient's care – for example, data from hospitals, physician practices, rehabilitation centers, pharmacies, etc.

6.     The Merger also occurred during a window of opportunity for Allscripts that was rapidly closing.  In order to encourage the transition to EHR, the federal government provided billions of dollars in stimulus funding to healthcare providers which would only be available until 2016.  According to Tullman in a February 2011 interview:  "the federal government is injecting $30

- 2 -

billion into an industry that is roughly $3 to $4 billion, so there's a 10x stimulus injected, 70% of those dollars need to be spent in the next three years." Thus, Allscripts was under pressure to keep existing and acquire new customers, not simply as part of everyday competition, but in order to gain the lion's share of the federal funds.

7.      Leading up to the close of the $1.3 billion Merger, Defendants set investor expectations as to its substantial benefits. Specifically, Defendants assured investors that the Merger would allow integrated product offerings from day one, product integration was "easy," and the two companies were closely aligned. For example, on June 9, 2010, Allscripts and Eclipsys issued a joint press release entitled "Allscripts and Eclipsys to Merge, Creating New Healthcare Information Technology Leader." The press release touted Allscripts' post-merger ability to offer the most comprehensive set of products stating that the Merger "will create a clear leader in healthcare information technology, with the most comprehensive solution offering for healthcare organizations of every size and setting."

8.      On a conference call later that day, Defendant Tullman told investors that the integration of the two companies – and their products – would provide for the seamless transmission of data, telling them product integration would occur quickly given the companies' common Microsoft platform:

> Because **at the end of the day, this is about a patient. And what does the patient want? They want a seamless experience. They want a single patient record**. No one has really been able to deliver that, because no one could cross the transom between hospitals and extended care and physician offices, and now **we're in a position to do that**.
>
> *       *       *
>
> **This is about as crisp and clean a merger as you are ever going to see from a product perspective.** And as Phil mentioned, with Microsoft's help we will actually put these together very, very quickly. We have a lot of people who will focus on doing just that.

- 3 -

9.      Defendants' statements on the June 9, 2010, call were further illustrated via an accompanying powerpoint presentation, entitled "Two Leaders Become One: One Network. One Platform. One Patient." (attached hereto as Exhibit 1), which Tullman used to highlight the fit between Allscripts' and Eclipsys' product offerings, stating: "So we *can connect the ambulatory, the acute and the postacute*."

10.     The powerpoint illustrated Defendants' promise of "*A true end-to-end, integrated solution for the entire community of care*" by the blending of the two companies' product offerings, and touted management's "strong track record of integrating mergers" as well as its "proven ability to realize synergies."

11.     Shortly after the announcement of the Merger, Defendant Tullman gave an interview with *Healthcare IT News* editor Bernie Monegain. During the interview, Tullman claimed that the Allscripts and Eclipsys products were already working together, integration had been achieved rather than being something that had to be started, and an integrated product would be available at the close of the Merger. Tullman stated:

> You know, what is interesting, is because both applications are based on microsoft.net and other Microsoft technologies *it's very easy to integrate these together*. And while there's always more to do, *we made very substantial progress so the physicians are able to share information between the Eclipsys hospital system and the Allscripts ambulatory system.*

12.     When Monegain asked:

> Okay, well, when you've touched a couple of times already on integration and was hoping that you could talk a little bit – from a practical point of view – how that process will begin. I know you sort of mentioned that it's already begun, but could you talk a little bit about which products you need to integrate and how that will work?

Tullman responded:

> So the products are working. Yeah, *the products are working in an integrated fashion* today at certain of our sites. So I think this is really about enhancing and extending the integration as opposed to beginning a process.

- 4 -

\* \* \*

But that's happening at a number of companies, our integration with Eclipsys will of course be much deeper and much richer than it is with some of those other companies. But, nonetheless, you know, that process has been underway, it will accelerate now, and you know, we will have um, one application which will be the market leader when that's done. And that will – but it's not a, you know essentially, you just keep integrating, keep building these applications. *But the primary functionality, much of that will be available literally when we close the transaction*.

13. When asked what would distinguish the post-Merger Allscripts from its competitors, Tullman again highlighted the integration of products stating:

*And, so, first what distinguishes us is we have usable products.* Second, is we have a base of 180,000, almost half the physicians in this country, 180,000 physicians using Allscripts software. And over 40,000 practices to connect to. And, last but not least, we have over 10,000 post-acute care facilities. So, again, if you're looking at managing the cost, you have somebody with Alzheimer's in the hospital, now you need to get him out of the hospital to reduce the cost and move him to an extended care facility. *Well, you know the beauty is that in our system that's all connected.* Somebody else's system, they might spend a few extra days trying to find the right spot for them. So, it's about quality of care, it's about reducing the cost, it's about eliminating errors, and we have this connected system of health *as opposed to other people who have hospital systems that are disconnected to the rest of the healthcare equation*.

14. In addition to discussing the ease of product integration and the level of integration already existing, Tullman acknowledged in the 2010 interview the importance to the Merger of these entities with different customers of having management aligned and Eclipsys CEO Phil Pead ("Pead") remain at the post-Merger entity stating:

And you know I think it's very important to understand that Phil Pead has agreed to stay on. Not just as chairman of the board but to partner with me – focused on some key areas of the business – to help accelerate and grow the business because, *you know Philip spent the last year getting to know their clients, and the last thing that I wanted, or that anyone wanted, was to lose his expertise, his experience in all that new client knowledge, and so his willingness to stay and his excitement about staying was very material to me* in this transaction and really demonstrates the – the fact that we're merging these businesses and working together on behalf of the client. Because that's what the clients want.

- 5 -

15. On June 15, 2010, Pead and Defendant Tullman also gave an interview with an industry blog entitled "HIStalk" about the merger. Pead reinforced the statements about product integration claiming that as far as clients were concerned integration was already done and met their needs, all Allscripts had to do was deepen it from a technical standpoint beyond what the user could see:

> **We already have mutual clients that have merged or integrated** [the legacy Allscripts and Eclipsys products], where we can believe that there's a level of integration between our software.

> The reason I say, 'believe it' is because at their level[,] **what the user sees,** what a physician uses at Columbia and that's integrated with Sunrise, is very real to them. **That level of integration has already occurred. You could talk to them tomorrow and they'll tell you absolutely, I get whatever I need and I'm done.** But that level of integration is at that first phase. We've made it usable, data transfers, and **as far as they're concerned, they're done**. We'd like to do it at a much deeper level, but it's transparent to the user. That's the first thing.

> The second thing is we're both Microsoft.NET and SQL Server. That makes **the level of integration far less complex** as a result of the platforms being the same . . . . Allscripts has an architecture called UAI and we have Helios. The similarities are quite amazing . . . both of us have abilities to actually integrate levels of applications at a speed that would be very difficult if they were Oracle, Linux, MUMPS.

16. In recognition of how critical product integration was to Allscripts' business, when asked how the success of the Merger should be graded in two years Pead said "If I was a client, *I would grade you by the integration between the product solutions to make this a great experience for their hospital and ambulatory environments so that the two came together*." Tullman agreed: "There is nothing I can add to that, which is rare for me, but I think that summarizes it perfectly."

17. In the June 15, 2010 HIStalk interview, Tullman further highlighted the recent upgrades to each of the key products. For example, Tullman referred to Sunrise 5.5, an acute legacy Eclipsys (hospital) product, saying "It's been a year longer than anyone else – year in QA and QC to make sure that this product, when it hits, is perfect, or as close to perfect as software can be." He

- 6 -

added that Allscripts Professional, a legacy Allscripts ambulatory product came out "without any issues, and it has the least number of defects, I think of any product in the industry."

18.     Pead also claimed during the June 15, 2010 interview that "every single one of those products will connect back to the hospital at whatever level of integration the hospital desires and the physician desires." Tullman closed by noting that the Merger provided an "opportunity to provide a connected system of health that really gives an integrated, end-to-end solution, which is what everyone has been . . . that's been the Holy Grail of healthcare, and it is within reach."(alterations in original).

19.     By the beginning of the Class Period, November 8, 2010, as set forth above, Defendants had made it clear that the $1.3 billion that they invested in Eclipsys would result in integrated products that would meet client expectations and that the Merger would be a success. During the Class Period, Defendants misled investors by: (i) overstating Allscripts' product integration and concealing the substantial work that remained to achieve product integration; and (ii) omitting that as a result of failed product integration that did not meet their needs, customers delayed purchases or fled to competitors.

20.     Defendants falsely claimed during the Class Period, *inter alia*, that: (i) "the integration of the technology of the companies [was] very easy to do"; (ii) Allscripts was in a "unique position as the only company that can deliver one connected network on one common, open platform providing one patient record to clinicians and patients across the care continuum" because "no other company can match the functionality of our full, integrated solution set"; (iii) "The bottom line is that the integration work is on track"; (iv) "with regard to integration . . . being able to pass natively data from acute to ambulatory is something that's working with both Sunrise and Enterprise"; and (iv) that their products "allow[] information to be seamlessly shared." In truth,

product integration was far from easy and was never accomplished during the Class Period, leading to customer defections, disappointing financial results, and the eventual abandonment of products.

21.    Further, Defendants falsely stated that "this is as smooth as an integration effort that you'll ever see in terms of realizing synergies, in terms of very little overlap between the two organizations and between – in terms of the fit" and that "the teams couldn't be more aligned and working very closely together."   In truth, the key management teams could not have been less aligned as they fought over the direction of the Company and product integration, as evidenced by firings and departures among the most senior leaders including the head of sales, the Chief Technology Officer ("CTO"), the Chief Operating Officer ("COO"), Chairman of the Board, three directors, and the CFO.   When all of those people were gone, many pushed out by Tullman, Allscripts' Board of Directors ("Board") eventually ousted Tullman and his President, Defendant Shapiro, followed.

22.    Finally, on February 16, 2012, just as the product integration and executive disagreements were coming to a peak, Defendants issued false financial guidance for 2012 of Non-GAAP Diluted Earnings per share ("EPS") of $1.06 to $1.10 and Non-GAAP revenues of $1.62 to $1.65 billion.  This guidance had no reasonable basis in fact.  For example, it depended on tripling the sales of Sunrise Clinical Manager applications from an average of eight to nine a year – an impossible task given existing customer dissatisfaction with version 5.5 of Sunrise Clinical Manager and the fact that customers were switching vendors or delaying purchases until Allscripts could demonstrate product integration.

23.    As a result of Defendants' false and misleading statements, Allscripts' stock price traded above $20 and even reached a Class Period closing price as high as $22.71 per share on April 5, 2011.  Defendants Tullman, Shapiro and Davis (herein referred to collectively as "Individual Defendants") took advantage of the artificial inflation in Allscripts' stock as a result of their false

statements, selling 675,000 Allscripts shares for proceeds of nearly $14 million during the Class Period.

24.     Two months after Defendants issued false 2012 financial guidance and Defendant Shapiro sold stock for proceeds of more than $1.9 million, Allscripts revealed, in an April 26, 2012 press release and subsequent conference call, disappointing first quarter financial results.  Allscripts dramatically lowered 2012 non-GAAP EPS guidance from $1.06-$1.10 to $0.74-$0.80, a 27% decline, and 2012 non-GAAP revenue guidance from $1.62-$1.65 billion to $1.48-$1.52 billion, a nearly 9% decline.

25.     Further, Defendants admitted on April 26, 2012 that contrary to the Class Period statements about the ease with which Allscripts had integrated its product offerings, the disappointing financial results were due to declining sales as clients were waiting on "more progress with our product integration."   In addition, it was disclosed that Chairman Pead was fired, three directors were leaving Allscripts' Board in protest, and CFO Davis was also departing.  As revealed by this drastic change in senior officers and directors, the Merger had not, as Defendants previously represented been going as "smooth[ly]" as represented and the teams were not "aligned" but were sharply divided.

26.     In reaction to this news, over the course of the next trading day on April 27, 2012, Allscripts' stock plummeted by $5.72 per share, or 35.70%, to close at $10.30 per share on extraordinarily heavy trading volume, a loss of more than $1 billion in market capitalization in a single day.

27.     In recognition of the misleading information that had been given to investors by Defendants during the Class Period, and in response to these disclosures and the disclosure that Allscripts was allocating $190 million in 2012 to "accelerate integration," an analyst with Jefferies

- 9 -

perfectly summed up the situation by reporting on April 27, 2012: "[Allscripts] is reacting belatedly to integration issues *that it previously said were in the rearview mirror*."

28.     Several months after these disclosures, analysts discussed Allscripts going private to conceal its product struggles from public view.  Disgruntled clients also filed a class action lawsuit against Allscripts when it admitted it could not integrate its MyWay EHR product and abandoned the product altogether.  Soon thereafter Defendant Tullman was fired and Defendant Shapiro left with him.

## JURISDICTION AND VENUE

29.     The claims asserted herein arise under and pursuant to §§10(b), 20(a) and 20A of the Exchange Act (15 U.S.C. §§78j(b), 78t(a) and 78t-1(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

30.     This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78a(a)), and 28 U.S.C. §1331.

31.     Venue is proper in this District pursuant to §27 of the Exchange Act, 28 U.S.C. §1391(b).  Many of the acts and practices complained of herein occurred in substantial part in this District, and Allscripts maintained its principal place of business in Chicago, Illinois.

32.     In connection with the acts and conduct alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails and interstate wire and telephone communications.

## PARTIES

33.     Lead Plaintiffs The Government of Bermuda Contributory and Public Service Superannuation Pension Plans purchased Allscripts' common stock during the Class Period and was damaged thereby, as set forth in the attached Certification.

- 10 -

34.     Lead Plaintiffs International Brotherhood of Electrical Workers Local Union 38 Pension Fund purchased Allscripts' common stock during the Class Period and was damaged thereby, as set forth in the attached Certification.

35.     Defendant Allscripts develops and sells information technology services to the healthcare industry.

36.     Defendant Glen E. Tullman was the CEO of Allscripts from 1997 until his abrupt departure on December 19, 2012.  As CEO, Tullman was charged with management of the Company's day-to-day operations, as well as overseeing the direction of the Company and the realization of Allscripts' short- and long-term goals.  During the Class Period, he signed SEC forms 10-Q and 10-K, as well as proxies, prospectuses and registration statements on behalf of Allscripts. He also participated in analyst conferences and earnings calls during the Class Period as alleged herein.

37.     Defendant William J. Davis was the CFO of Allscripts from 2002 until May 18, 2012.  As CFO, he was responsible for all of Allscripts' financial operations, including, among other things, budget management, financial forecasting, and supervising fiscal reporting activities.  He was also the chief financial spokesperson for the Company.  During the Class Period, he signed SEC forms 10-Q and 10-K on behalf of Allscripts.  He also participated in analyst conferences and earnings calls during the Class Period as alleged herein.

38.     Defendant Lee Shapiro was Allscripts' President from 2001 until December 19, 2012.  As President, Shapiro was tasked with overseeing the Company's strategy, corporate marketing, government relations, mergers and acquisitions, international operations, information systems, hosting services, business development and partnerships, health plan initiatives and business activities in the areas of analytics, information and transaction services.   He also participated in an analyst conference during the Class Period as alleged herein.

- 11 -

## CONFIDENTIAL WITNESS ACCOUNTS

39.     As revealed by public information, interviews with multiple former employees, subsequent events, and Defendants' post-Class Period admissions, Allscripts failed to achieve product integration as represented causing customers and prospects to delay purchases or defect to competitors.  During the Class Period, Allscripts had to completely rework its integration tool, ADX 1.0, and never achieved product integration for its key products including MyWay, which it abandoned in Fall 2012.  In addition, the product integration efforts were hindered by sharp disagreements between legacy management at Eclipsys and Allscripts.  Key Eclipsys management felt ignored by legacy Allscripts management, leading to frustration, terminations and departures of key personnel.

**Inability to Integrate Products, Customer Defections and Dissatisfaction**

40.     Confidential Witness No. 1 ("CW1") worked for Eclipsys from 2001 to 2005 and returned in July 2010 before the Merger closed and left Allscripts in September 2012.  Upon return, he[1] worked as a Solutions Architect with Eclipsys, and later Allscripts.  In that role, he supported the new sales or pre-sales teams with answering client technical questions regarding hardware, software, and product interface, and provided technical assistance during product demonstrations with clients.  CW1's supervisor was CW3, and later others when CW3 left.

41.     CW1 explained the different interface integration systems as native integration, disparate integration, and High Level 7 "HL7" interface.  The goal of native integration was to have the ability to update patient information throughout the Allscripts' software offerings.  This would allow Allscripts' Sunrise products to seamlessly integrate with Allscripts' Enterprise, Professional and MyWay products and allow the products to update patient health records without the use of

---

[1]     All CWs are referred to in the masculine gender.

industry standardized codes. Allscripts branded its native software as ADX.[2] CW1 described disparate integration as allowing Allscripts software to interface with non-Allscripts software which he described as a Health Information Exchange ("HIE") software that allowed data to be read and updated from different software vendors.

42. CW1 said ADX 1.0 was designed to pull and update patient electronic health records automatically and was Allscripts' native integration software. In approximately July 2011, he learned that Allscripts began a complete reworking of ADX 1.0 because customers were complaining about the lack of functionality and integration, and that it did not allow the user to review and approve changes made in other healthcare settings before being accepted by the hospital or physician practice systems. The upgrade was going to be known as ADX 1.5, but the method and interface for data integration changed. In particular, the interface was changed to allow clinicians to approve changes before they were entered into the system. He also learned from other Allscripts employees that ADX 1.0 was being beta tested[3] at Blessing Hospital in Quincy, Illinois and another place he could not recall, but it was suspended in approximately the middle of 2011 because it failed to perform to expectations.[4]

43. CW2 was hired in November 2008 as a Community Solutions Sales Executive with Eclipsys. In this position he assisted the sales staff by acting as a subject matter expert relating to

---

[2]     CW1 described the HL7 interface as using industry standardized codes or language to allow users of disparate software systems to update patients electronic health records.

[3]     In software development, "beta testing" generally refers to a testing phase in which a subset of the intended user population tries the product out, in order to see how the product works in real-world conditions.

[4]     *See also* ¶158 (Defendant Davis' May 8, 2012 statement "our initial release of our integrated capability…was launched in the middle of last year"); ¶189; *cf.* ¶76 (CW11's statement that beta testing at Blessing occurred in late 2011 and was halted in Spring 2012); Dkt. No. 64-7 at 1-4 (indicating "ADX implementation" at Blessing from March 2012 to July 2012).

third party company software to interface Eclipsys clients to communicate between various software systems within the healthcare system. Around March 2011, CW2 was offered a position as a senior account manager where he remained until leaving the company in February 2012.

44.     Prior to the merger Eclipsys was using Medicity as the third party vendor for the interface. After the merger with Allscripts, Allscripts canceled its contracts with Medicity in favor of its relationship with dbMotion. CW2 and another Community Solutions Sales Executive ("CSSE 2") received training regarding dbMotion around October 2010. CW2 learned from observations and discussions with Allscripts employees that the dbMotion product was inferior to Medicity and doubted whether it worked because he never witnessed a live demonstration. CSSE 2 left Allscripts and went to work for Medicity as he was dissatisfied with dbMotion. CW2 expressed his concern to Steve Lalonde, the executive VP of sales.

45.     CW2 also described communication issues between what John Gomez ("Gomez") promised clients and what Defendant Tullman would later tell the client with regard to Sunrise Clinical Manager 5.5. Gomez would promise clients certain interface capabilities and dates of availability and Tullman would later inform the client that the dates could not be met. The product issues related to Sunrise Clinical Manager 5.5 and 6.0 and an interface of dbMotion and an Allscripts product known as Helios. Clients were increasingly becoming frustrated as products were not working as promised and the proposed integration for all products from a product named Helios was never released. Helios was touted as the "magic" connection on data exchange for all products, including Sunrise Clinical Manager 5.5, dbMotion, other vendor products and all other Allscripts products.

46.     CW2 identified the University Hospital of Cleveland, New York Presbyterian, and Jefferson Regional of Pine Bluff, Arkansas as clients having issues with Sunrise 5.5. He said the product integration or interface never occurred as planned. He described Sunrise Clinical

- 14 -

Manger 5.5 as an "empty shell" which he further described to mean that Sunrise Clinical Manager 5.5, although it was sold as an upgrade, required all connections and interfaces to be completely reconfigured. He heard this from clients and other Allscripts employees.

47. CW3 was a Vice President of Community Strategy and Industry Compliance at Eclipsys starting in August 2008, and continuing after the Allscripts-Eclipsys merger, until approximately September 2010. CW3's role was to determine the market and client needs and involved both a product development and sales role. CW3 was responsible for clients using the health information exchange software Medicity (which Eclipsys branded Peak Performance). CW3 reported to Jay Deady until Deady left shortly after the Merger and then began reporting to Gomez and Barbara Fox.

48. According to CW3, and consistent with CW2, after the merger, Allscripts terminated the reseller agreement with Medicity in favor of dbMotion. Allscripts had a two-part strategy relating to the interface which used dbMotion and Helios. After the merger, CW3 was also tasked with creating a team to explain to clients the benefit of Allscripts' approach to software interface and he remained in that position until he left the company in April 2011 to work for Medicity. He felt conflicted because he believed that dbMotion was inferior to Medicity and expressed his opinion to Gomez and Pead.

49. CW3 said that Medicity used a loosely coupled interface which required the end users, such as the hospital, physician or lab to approve an update before it would take effect. Allscripts' plan for Helios was to use a tightly coupled philosophy which meant data stored would be updated immediately at the hospital, physician, or lab when entries were made within the system. In his discussions with clients, most said they wanted to review and approve updates before it was brought into their system and did not want to take responsibility for errors made by other users.

- 15 -

50.     Consistent with CW2, CW3 said the Helios system was never taken to production while he worked at Allscripts. After he left to join Medicity he had heard that Allscripts delivered a Helios type product for beta testing in the fall of 2011 at the New York Presbyterian Hospitals and it did not go well and that the beta testing of the Helios product at the North Shore Long Island Jewish Community Hospital was scratched prior to implementation.

51.     While working at Allscripts, CW3 said he attended meetings where Gomez reported that Allscripts acute care and ambulatory software products were on track for seamless integration, which was the ability to seamlessly update electronic patient records by the Sunrise Clinical Manager software used by hospitals and the Allscripts Enterprise, Professional, and MyWay software used by physician practices. He recalled a presentation given by Gomez and attended by Tullman in approximately October 2010 to show seamless integration of patient records between legacy Allscripts and Eclipsys products. Based on this demonstration, in CW3's view, upper management probably believed what they were telling investors at one point because Tullman and others may have felt the statements made by Gomez regarding seamless native integration of the software products were accurate. But CW3 said that Tullman and other executives were aware by late 2010/early 2011 that the Allscripts integration software was not operating as demonstrated in October 2010. CW3 explained that as early as November 2010, the delay of product purchases by current and prospective customers due to integration issues was being discussed at the various monthly management meetings that CW3 attended. These meetings were conducted via telephone on the first Monday of each month and run by Executive VP Steve Lalonde who reported directly to executive management including Tullman. CW3 said Tullman and Shapiro also participated on occasion.

52.     CW3 also said that Tullman and the entire sales organization was present at a meeting in January 2011 in Las Vegas, where the sales managers discussed customer delays due to

- 16 -

native integration issues. The response to these issues was to show a demonstration of Helios providing native integration between Sunrise Clinical Manager and Allscripts Professional as proof that Helios was the answer to native integration.[5]

53. CW3 also said that sales managers used salesforce.com to forecast and record sales progress, and that Lalonde monitored these reports and knew when Allscripts was not meeting its sales targets. At each of the monthly sales meetings they discussed customers delaying product purchases due to the native integration issues.

54. CW3 believed that the integration of products discussed at the time of the Merger was never on track and never delivered. He said that clients such as New York Presbyterian Hospitals, Orlando Health, and Long Island Jewish were increasingly frustrated over issues with software updates and failure to implement the interface they wanted. The clients were upset as Gomez would make statements on what software Allscripts was going to deliver and the benefits of the new release but the releases failed to meet the functionality promised. Sunrise Clinical Manger 5.5 was one of the products that failed to meet client expectations and promises. Sunrise 5.5 was released just prior to the Merger and version 6.0 was not released before he left but was to contain the integration software that would allow native integration between the legacy Eclipsys and Allscripts products.

55. CW3 recalled customers switching to competitor products in Spring of 2011 due to integration problems clients were having with Allscripts products. He also said that while some clients kept the Sunrise acute care product, they all dropped the Allscripts ambulatory products

---

[5]      CW11 described Helios as an initiative to create open source software architecture to allow for the updating or review of patient health records between an acute care and ambulatory healthcare provider whether or not using an Allscripts application or another vendor's application. Helios does not use a single database, but was designed to give the appearance that the information was stored in a single database.

because of the lack of integration. He identified University of Texas, Hoag Hospital, and Methodist Hospital as customers who switched to competitor products because of integration issues with Allscripts' products. He recalled that clients would become upset as Gomez would make statements concerning the software Allscripts would deliver and its benefits, but the product releases failed to meet the functionality promised.

56.     CW3 said that the software integration solution used by Columbia Presbyterian was not the native integration software that Allscripts was developing. The integration software being used was what he described as XDS standard integration software that was engineered using Allscripts software engineers and internal Columbia Presbyterian employees and was unique to the hardware and software used within Columbia.[6] It was a custom developed software integration project.

57.     CW3 also said that the monthly sales meetings by conference call were attended by Tullman and Lee Shapiro on occasion. During these calls, they discussed that Allscripts customers were delaying purchases of Sunrise Clinical Manager, EHR Enterprise, Professional, or MyWay software because of lack of native integration. CW3 identified Hoag Hospital, University Hospital San Antonio, Northside in Atlanta, New York Presby[terian], Hospital for Special Surgery New York, and Orlando Health as examples. CW3 said that the response during these calls from Lalonde or other Senior VPs was that Helios will solve the problem and be available shortly, or will be demonstrated at the Allscripts User Network meeting.[7] Tullman was aware of this and was sending the message that Helios was the magic bullet for native integration. Tullman responded to the

---

[6]     Tullman referenced Columbia Presbyterian as an example of integration. ¶92.

[7]     The "Allscripts User Network" meeting refers to the Allscripts Client Experience ("ACE") which was held August 29-31, 2011 in Nashville, Tennessee.

revelation that customers were delaying product purchases due to the lack of native integration in these meetings that he wanted to personally engage with any customers who were delaying purchases for any reason.

58.     CW4 was a Regional Sales Manager for Allscripts from July 2000 through November 2011. CW4 primarily sold the Allscripts Professional and Practice Management[8] software focusing on physician or ambulatory practices from four to forty physicians. CW4 did not sell the Eclipsys products.

59.     CW4 said he left Allscripts because of poor customer service/support and product development. He said client surveys and client contacts complained about moving customer service and support to India around the time of the merger.[9] According to CW4, the clients also complained that the interface between Allscripts Professional and Practice Management software was not at the level the client wanted and could get with Allscripts' competitors. Clients complained that they wanted a single database and Allscripts' products had separate databases. Allscripts and the CW4 were losing sales to competitors like Epic, Cerner, and other ambulatory software providers.

60.     CW5 was a Regional Sales Manager at Allscripts in 2006, and again in 2008, until leaving the Company in June 2012. He mainly sold Allscripts Professional. He understood that the Allscripts vision was to integrate Allscripts products so a client could communicate and update throughout the hospital, physician, lab, and pharmacy network, but he never actually saw this

---

[8]     Practice Management is also an ambulatory application, however, whereas Enterprise and Professional refer to the EHR software, Practice Management also includes administrative and billing functions.

[9]     In a June 15, 2010 HIStalk interview, Pead, Eclipsys' CEO, noted "[w]e have substantial resources in India for development, for product support, for back office financial functions, Allscripts can take advantage of these."

- 19 -

integration accomplished. Client feedback became increasingly negative up to the time he left Allscripts.

61.     CW5 had access to KLAS industry research and reviewed what clients were saying about Allscripts' products and they were becoming increasingly dissatisfied. CW5 said that after the Merger, Allscripts products were receiving significant bad reviews from clients relating to moving customer support to India and that was hurting his future sales.[10]

62.     CW5 recalled a live presentation by Gomez at a sales meeting in approximately January or February 2011 regarding integration between Allscripts Enterprise EHR software with Eclipsys Sunrise Clinical Manager software. His impression was that the presentation was "all smoke and mirrors" meaning that he did not believe the Allscripts and Eclipsys software was integrating but the presentation gave the impression that it was. He did not form that impression at the time of the presentation, but formed that impression because he never saw integration of the products actually work at a client site.

63.     CW5 said that in December 2010 or January 2011, he sold Allscripts Professional software to Mercy Memorial Hospital in Monroe, Michigan for its affiliated physician practices. At the same time the hospital was implementing Sunrise Clinical Manager. The products were not fully implemented to allow them to interface by the time he left in June 2012. He also said that the hospital was considering purchasing the Allscripts Enterprise EHR products but the reviews from the industry KLAS reports indicated significant disgruntled reports by end-users for the Enterprise

---

[10]     A March 29, 2012, analyst report by Gene Mannheimer at Auriga USA disclosed that "As recently as January's [2012] KLAS rankings of vendor performance, [Allscripts] rated the lowest among major ambulatory vendors with the worst scores for 'Keeps Promises' and 'Would You Buy Again.'"

product because Enterprise required a lot of administrative work. He recommended, and Mercy Memorial ended up choosing, Allscripts Professional.

64.     CW6 was an Allscripts employee beginning in 2006 when the company he was working for, A4 Health Systems, was acquired by Allscripts. CW6 held various technical positions, and from 2009 until he left in August 2011 he worked as a Senior Consultant. His role was to teach clients how to optimize the Allscripts Professional EHR product.

65.     According to CW6, none of the products offered by Allscripts after the merger were what he would consider integrated. Each product had its own database. Allscripts offered an interface in an attempt to allow an entry in the Allscripts Practice Management software to automatically update information stored in Allscripts' Professional and Enterprise software for a given patient without having to enter the information three separate times. The problem was the interface did not work or update the other platforms if it was entered first into the Professional or Enterprise software.

66.     CW7 was an Account Executive at Eclipsys starting in 1997, and became a Senior Account Executive at Allscripts following the Merger. He remained in that position until April 2012 when he decided to leave rather than agree to a performance improvement plan. He sold software updates, add-on applications, and professional services to clients in the acute-care setting, and was assigned to a particular geographic area.

67.     CW7 said that Allscripts did not have the ability to seamlessly transfer and update patient information between the acute care and ambulatory software systems. He was aware that they were developing an integration or interface software branded as Helios which Gomez began developing at Eclipsys before the Merger. He recalled complaints from West Penn regarding the

- 21 -

inability to seamlessly pass patient information between the acute care and ambulatory applications and recalled that Gomez met with them regarding the complaint but was unsure of the date.[11]  He also sold Sunrise Clinical Manager Versions 5.0 and 5.5.  Version 5.5 was released around the first quarter of 2011 and Version 6.0 was not released before he left.  Sunrise 5.5 was not natively integrated with the Allscripts ambulatory software applications.

68.     CW8 was a Regional Sales Executive at Allscripts from Summer 2010 through January 2012.  In this role, CW8 sold the Allscripts' Enterprise and Professional software applications to clients in the ambulatory setting, in an assigned geographical area.

69.     CW8 recalled attending a sales meeting after the Merger in which seamless integration of the acute care and ambulatory software applications was discussed as something Allscripts was working to achieve.  He could not recall the location of the meeting.  By the time he left in January 2012, such integration had not been accomplished and the Allscripts Enterprise and Professional software applications were not integrated with the Allscripts acute care applications.

70.     CW9 was a regional sales manager for a company purchased by Eclipsys in February 2008.  He was promoted from Sales Director to Regional Vice President while working at Eclipsys and became VP, Performance Management Sales after the Merger.  Allscripts Performance Management software was a standalone software application and not part of Sunrise Clinical Manager software application.  Allscripts Performance Management software could integrate using an interface with Sunrise, but was not natively integrated.  CW9 said the customers wanted the legacy Eclipsys acute care and legacy Allscripts ambulatory applications to be natively integrated.

---

[11]     Note that according to public information Gomez departed in May 2011 but was kept as a consultant for several months thereafter.

Based on conversations with Allscripts employees, customers, and information from blog sites he understood that those applications were never natively integrated.

71.     CW10 was a Sales Executive at Allscripts from June 2008 through February 2011, when CW10's title changed to Regional Vice President of Connected Communities. CW10's role as a Sales Executive was to sell primarily Allscripts Professional EHR software to physician practices with 50 or fewer physicians within a designated geographical area.

72.     CW10 met his sales goals in his second year but by 2010 his sales prospects began to dry up as hospitals were buying up physician practices and making the software purchasing decisions for the physician practice. He received a poor review and offered to quit but was offered a position as a Regional Vice President of Connected Communities. In this role, he offered discounted EHR products through hospitals, by seeking their endorsement, to affiliated physician practices. He was responsible for seven or eight hospital accounts. One of them, a hospital in San Diego, had purchased dbMotion, also known to him as Community Record, in order to integrate the hospital EHR with the physician EHR. He did not sell dbMotion or Community Record to that hospital, but believes they had purchased it prior to February 2011, to the best of his recollection. However, by the time he left Allscripts in September 2011 (after being fired for what he was told was insufficient progress since his last evaluation) integration had not been achieved, to his knowledge. He is not aware of any of the hospitals that he was responsible for using Sunrise. He also was not aware of any other hospital that had achieved integration between the hospital records and the physician records, though to his knowledge, one other hospital had bought Medicity for that purpose. He was not aware from any other source of any other hospital that had achieved integration with a physician practice and had no other knowledge on the issue.

- 23 -

73.     CW11[12] worked as a sales executive for Eclipsys beginning in April 2001. At the time of the Merger he was the Area Vice President for the Western region responsible for two sales teams. In January 2012, as part of a sales reorganization, he was promoted to Vice President of Sales for the western region and picked up an additional business sales team. He remained in that position until he quit in August 2012.

74.     CW11 said that Allscripts and Eclipsys had both grown by acquisitions and acquiring product portfolios over time. In contrast, Epic was a privately held company that grew by developing and creating its own software applications internally which made integration simpler. CW11 stated the industry defined native integration as the ability to seamlessly review and update a patient electronic health record in real time between an acute care and ambulatory healthcare provider without the use of an interface.

75.     CW11 said that at the time of the Merger, Eclipsys had some level of native integration components built into Sunrise Clinical Manger but it was not a real-time nor seamless exchange of information. After the Merger they were working to natively integrate the legacy Eclipsys acute care and Allscripts ambulatory applications. Because these were complex software application systems the time frame and effort to achieve native integration were significant.

76.     CW11 said that Blessing Hospital in Quincy, Illinois was beta testing ADX 1.0 sometime in late 2011, but could not recall specifically when it began. CW11 said he was told that the testing was stopped in early 2012 because the product was not working properly and Allscripts deployed a product development team to Blessing Hospital to develop a workflow which lead to ADX 1.5. As far as CW11 knew, no one went live on ADX 1.0. Blessing Hospital began testing

---

[12]     Note that upon re-interview CW11 expressed concern that he could be identified by the details in the complaint and asked that he be removed for professional reasons.

ADX 1.5 in late Spring 2012, and was the first to go live using ADX 1.5 in July 2012 which allowed the integration of patient information seamlessly between Sunrise and Enterprise applications. Components of Helios went into ADX 1.5. ADX 1.5 allowed for integration of patient data relating to PAMI (problems, allergies, medications, and immunizations) but some competitor products allow for significantly more types of data to be seamlessly exchanged and Allscripts was working to increase the types of data that could be seamlessly exchanged between acute care and ambulatory applications.

77. According to CW11, the native integration used by Columbia Presbyterian Hospitals between its acute care and ambulatory health care application was an integration package built by the information technology people at Columbia Presbyterian. CW11 learned from an Allscripts sales executive that this was not a native integration application developed by Allscripts.

**Sharp Division Among Allscripts and Eclipsys Key Personnel**

78. Compounding the inability to integrate the products, were sharp disagreements and divisions among the legacy Allscripts and Eclipsys personnel. Not only did they disagree on which products to move forward with, for example Medicity or dbMotion, but Tullman was running over the Eclipsys key personnel and Allscripts was calling all the shots. This led to defections of key Allscripts and Eclipsys personnel and eventually an attempted coup to oust Tullman. Among the factors CW3 attributed to the inability to integrate products was high turnover and the inability to listen to concerns being raised by staff.

79. Shortly after the Merger the head of sales, Jeff Surges, quit. In a deposition in an unrelated case, Steve Lalonde, Allscripts' Executive Vice President of Sales, was asked about the departure and testified that Surges left shortly after the Merger, and that relations between Surges and Allscripts had become "strained" prior to his departure. Within a few months, two additional

- 25 -

top-level sales executives, Steve Martin and Steve Brewer, departed Allscripts and in fact joined Surges at his new employer.

80.     Less than a year after the Merger, Gomez, Allscripts' CTO, the executive tasked with overseeing product integration, left for undisclosed reasons.  CW2 said he learned from discussions with other Allscripts employees that Gomez was fired after a heated Board meeting. CW2 said he heard rumors that Pead teamed-up with Gomez in an attempt to remove Tullman. CW3 said that he learned from conversations he had with Allscripts employees that Gomez was asked to resign and said he believes that Tullman discovered the issues with Helios which lead to Gomez leaving Allscripts.

81.     CW11 said Gomez told him that Tullman and Gomez butted heads on the direction to take on integration and they had differing opinions on how best to consolidate the integration. In CW11's view this was not out of the norm for executive management. CW11 added that Gomez told CW11 he felt micromanaged by Tullman and noted that this was Tullman's management style. CW11 said that he heard Pead was asking for Tullman's resignation at the April 2012 Board meeting and that Pead and Tullman had competing priorities on where to take Allscripts.

82.     CW3 said that several key Eclipsys product development and sales employees left Allscripts at or around the Fall of 2010 to the Spring of 2011.  He said there was friction between the key legacy Eclipsys and Allscripts employees relating to promises Allscripts executives made to legacy Eclipsys Sunrise software clients at or around the time of the Merger regarding integration capabilities of the Sunrise and Allscripts software products and the timing of when integration would be available.  The friction also included Allscripts key executives making decisions relating to product direction and focus and ignoring input from legacy Eclipsys executives.  CW3 said that he learned from conversations that Tullman was ignoring Pead's input.  CW3 observed that Eclipsys

- 26 -

employees who did not follow the direction of legacy Allscripts executives were being fired or demoted causing some of them to leave.

83.     CW12 was a Sales Executive at Allscripts from 2009 until the time of the Merger; thereafter, CW12's title was Area Vice President of the Health Systems Group.  CW12 reported directly to the Executive Vice President of Sales, which was either Stephen Shute, Stephen Lalonde or Jeff Surges, depending on the time frame. CW12 left Allscripts in June 2012.  CW12 said he heard from other employees and observed significant infighting and jockeying for "boss" positions among the legacy Allscripts and Eclipsys management teams.

84.     CW9 was aware of several senior Eclipsys executives that left between September 2010 and February 2012.  It was common knowledge that the legacy Allscripts employees were taking over key decision making positions and many of the Eclipsys executives were being fired or marginalized.  He stated that if you looked at the Company one year after the Merger, there were more legacy Allscripts personnel in leadership positions, compared to legacy Eclipsys personnel.

**Unobtainable 2012 Financial Guidance**

85.     Despite the increasing customer defections, customer dissatisfaction, product integration failures, and management tensions, Allscripts issued 2012 financial guidance that forecasted 2012 non-GAAP revenues of $1.62 - $1.65 billion and non-GAAP diluted earnings per share of $1.06 - $1.10, projecting significant growth over 2011.

86.     CW3 said that sales managers used salesforce.com to forecast and record customer prospects and their progress to contract software.  The sales managers would discuss the forecast and progress at monthly management meetings with Lalonde.  The salesforce.com reports were available to Allscripts executives and he knew based on conversations at the meetings that Allscripts executives were aware of and closely monitoring the progress of sales and if forecasts were met.

- 27 -

According to CW3, Lalonde and sales managers would know by mid-quarter if they would meet forecast.

87.     CW9 attended the sales meeting in Orlando in January 2012 and received his sales quota from Steve Lalonde. There were VPs and above at this meeting. CW9 believed the sales goals were unrealistic and told his supervisor Martha Thorne and Steve Lalonde. In response he was told to meet his quota. As he recalled, the sales quota for Sunrise Clinical Manager was 26 or 28 or 29. This was much higher than the eight or nine deals a year he knew the sales executives were averaging. He initially stated that there weren't 26 such deals closed in a year by all EHR providers; he later stated that may have been hyperbole, but in any event, to close 26 deals in a year would be a very good year even for a company like Epic who dominated the market. For Allscripts, the consensus among the sales force was that the quota was ridiculous.

88.     CW9 also explained that he participated in a weekly conference call with Steve Lalonde and Ted Hall the VP of Sales Operations and that a detailed sales spreadsheet tracked sales progress to forecasts and was tied into the salesforce.com software Allscripts used to monitor sales. Steve Shute was Executive VP and participated in weekly calls. According to CW9, it was clear from the weekly calls that Allscripts was not meeting the sales quotas on a variety of products including Sunrise Clinical Manager. He was not surprised that Allscripts' actual sales were below forecast and in his view management should not have been either.

89.     CW11 said that he attended a regional sales meeting around the third week of January 2012 with all sales executives VP and above, but could not recall where the meeting took place. Steve Lalonde distributed the sales forecasts or quota for 2012. He and the other sales executives learned that the sales quota increased significantly. His hospital group forecast increased to $245 million. There was a company-wide increase of 20%. He recalled the forecast included 28 net new business sales of the Sunrise Clinical Manager applications even though the most Allscripts

- 28 -

or Eclipsys sold in a year was nine or ten.  He and other Area Vice Presidents and Vice Presidents pushed back and provided feedback on what was more attainable.  The sales executives felt a more attainable number was around 14.[13]  The response they received was management felt they had good support for the significant increase in forecasts and each sales executive needed to find a way to make their quota.  Allscripts had downscaled Sunrise Clinical Manager to compete in the smaller hospital (100-250 bed) market and believed there were significant new opportunities in this market, which CW11 stated was also reported in public reports such as Raymond James, KLAS and McKinsey.  CW11 later added that the increase in sales quotas attributable to increased sales of Sunrise Clinical Manager was a small percentage of the total company guidance for 2012.[14]  CW11 learned that many deals were lost because of the integration issues.

90.    CW11 said that during the first quarter of 2012 Allscripts was in the running for several proposals for its Sunrise Clinical Manager application but was not chosen in three instances. In the feedback, Allscripts learned that the reason for not being chosen was due to lack of native integration.  According to CW11, due to these findings and after the earnings announcement, Allscripts significantly increased its funding for product development to complete seamless integration of its acute care and ambulatory applications.  CW11's account was corroborated by Defendant Tullman's April 26, 2012 statement that Allscripts was allocating $190 million in 2012 to "improve performance and accelerate integration and innovation."

---

[13]    During the April 26, 2012 conference call, Defendants said they netted three new Sunrise deals in the quarter, one in the UK and two in the US.

[14]    *But see* ¶¶155, 158, 159.

## MATERIALLY FALSE AND MISLEADING
## STATEMENTS AND OMISSIONS MADE DURING THE CLASS PERIOD

**Materially False and Misleading Statements Concerning Product Integration**

91.     On November 8, 2010, Allscripts held a conference call with analysts, after the close of the market, to discuss its third quarter 2010 ("3Q10") financial results.  Defendants Davis and Tullman were present on the call. During the call, CEO Tullman materially misled investors as to the current status of Allscripts' product integration:

> ***On a product front***, as we told conference attendees, ***we are on plan to deliver integration between Sunrise and all of the Allscripts electronic health records by the end of the first quarter***.  ***In fact, during the conference keynote, we demonstrated native round-trip integration between our professional electronic health record and Sunrise.  Just over one month post-merger***. [15]  Clearly, integration is and will continue to be a key focus for our clients and for us.

92.     During the November 8, 2010 call, Gene Mannheimer, an analyst with Auriga USA, asked Tullman:

> Can you offer, Glen, what level of integration currently exists between Sunrise and Touchworks, certainly realizing its early post merger?  And what's planned for 2011? Can we get to a single database, a single-instance type of integration, or will it continue to be one of interfacing?

Tullman again misled investors by falsely responding:

> The integration levels will vary by the three different electronic health records and also by the client.  As we mentioned when we announced the merger, ***there are clients like Columbia Doctors, Columbian Presbyterian in New York City, where they are already moving back and forth seamlessly between the Sunrise application and our Enterprise application***.  And they've done that at an object level, at a high level. ***But from a physician standpoint, they see that as providing their needs***.

---

[15]     The emphasis added in the section entitled "Materially False and Misleading Statements Made During the Class Period" highlights the specifically alleged false and misleading portions of statements made (and relevant context) by the specific Defendants on the specific dates identified herein.

Second, we talked about the fact that at the Eclipsys user conference, we already demonstrated round-trip functional integration between Sunrise Clinical Manager and a professional product.

But the real issue here is *people want a single patient record*. They're less concerned – you won't hear doctors talking about single database or the technology or functional integration or object level. They simply say, "*I want one view of the patient. I want a single patient record.*"

And the way we do that at the new Allscripts is inside we have a fully integrated application. And outside the four walls of the organization, we use semantic interoperability. *And we bring that all together in one single patient record. And that's what is unique about the offering*.

93.     Tullman closed the call positively, falsely emphasizing the status of the integration:

And whether you're looking for an integrated offering inside the four walls of the hospital or *looking for an offering that closes the gap and connects*, the healthcare equation to create this connected community of health, that we think is the future, either way, *Allscripts is the answer*. And we're seeing that in terms of our sales results.

Again, the time is now. We're less than 60 days away from the measurement period here people start to measure to get their dollars from the Federal Government, the first payment. . . . *[W]e couldn't be more excited about the opportunity, how the integration is going,* and again, *a lot of kudos to our folks who are making it happen*.

94.     Three weeks later, on November 30, 2010, CFO Davis spoke at a conference for

analysts covering the healthcare industry sponsored by Piper Jaffray. Sean Weiland, the analyst

hosting the event, asked Davis:

Give me two or three things that have come in ahead of your expectations relative to the acquisition and give me two or three things that were the curveball?

Defendant Davis materially mislead the market as to Allscripts' integration of its product offerings

with the following response:

In terms of – *the third thing that I would highlight on the positive is the product integration itself.* Literally four weeks post the closing of the transaction, the Eclipsys User Conference took place in San Diego. John Gomez was actually in front of several thousand individuals beginning to present real code in terms of the integration work that is being done on the product front itself.

- 31 -

95.     On January 10, 2011, Defendants Tullman and Davis participated in a JP Morgan Healthcare Conference for analysts. Tullman not only reassured analysts that integration was achieved but falsely told analysts at the event, "[W]e are a big Microsoft player. Fortunately, Eclipsys was as well. *That's made the integration of the technology of the two companies very easy to do. And we are in great shape from that standpoint.*"

96.     On February 15, 2011, Allscripts held a conference call with analysts after the close of the market, to discuss its 4Q10 financial results. Defendants Davis and Tullman were present on the call. During this call, CEO Tullman misleadingly told analysts:

> *We are now able to show, in realtime, how information flows seamlessly between the hospital and the physician's office to enable a single patient record.* These are realtime record updates, *without the use of add on interfaces.* So, while there is more work to be done, today, *we are well positioned to deliver on our vision.*

97.     During the February 15, 2011 earnings call, Defendant Tullman continued to materially misrepresent the status of the integration of Allscripts' products:

> When we announced the merger with Eclipsys, there were four fundamental questions. . . .
>
> *. . . [L]ast, but not least, can we integrate our products?*
>
> *One month after our merger at the Eclipsys user conference, we demonstrated native integration between Sunrise Clinical Manager and our [P]rofessional electronic health record. In one week, at HIMSS, we'll demonstrate additional integration between our [E]nterprise EHR, and Sunrise.*

98.     Later, during the February 15, 2011 call, Jeremy Lopez, an analyst with William Blair & Co., asked:

> My question, I'm glad I'm recognizing the success you guys are seeing on the cross-selling front and wonder, you kind of alluded to this, can you characterize the pipeline in terms of net new deals that combine the inpatient and the ambulatory offering? I'm assuming you guys have some of those. What are you guys telling them, in terms of availability in terms of a natively integrated offering?

Tullman continued to mislead the market by responding as follows:

- 32 -

Well, as I mentioned, we expect to demonstrate that at HIMSS.  *So, anyone who is buying the combined solution would be installing a solution that natively exchanged information between both the ambulatory and the acute.  But, I think importantly, we've got to throw into there post acute, as well as community.*

\*       \*       \*

*Similarly, when people talk about connectivity, increasingly, they are saying not only how do you get acute to talk to our ambulatory, that's almost a given now.*

99.     Mr. Lopez at William Blair & Co. followed up on his initial question on the February 15, 2011 conference call asking:

But do you have an actual time horizon for when you can actually install a net new inpatient-outpatient, that is the new natively integrated Eclipsys Allscripts offering?

To which Tullman misleadingly responded:

*Yes, we'll have a live code shipping at the end of the first quarter, is what we've said to the market, and we're on schedule*, and we'll show that live code next week at HIMSS.  *For all those folks who are concerned about it, that concern goes away*.

100.     Not satisfied with Tullman's response, Mr. Lopez asked:

Do you have maybe another way to get at this.  Is there a line of existing clients that have raised their hand and say I'm willing to do it as soon as you have it available?

Tullman continued his misleading answers as follows:

*Absolutely. Absolutely. And those are believe me, they are willing, anxious, all anxious to get the first code. They'll get that before the end of the first quarter*.

101.     On February 21, 2011, Allscripts issued a press release entitled, "Allscripts Demonstrates Native Integration of Acute and Ambulatory Electronic Health Records at HIMSS," which stated:

*"The native integration of our acute care and ambulatory solutions without the need for third-party software brings to life the Allscripts vision of a Connected Community of Health, and is well within the time frame we set out when we announced our merger with Eclipsys last summer,"* said Glen Tullman, Chief Executive Officer of Allscripts.  . . . "Allscripts is now in a *unique position as the only company that can deliver one connected network on one common, open*

***platform providing one patient record to clinicians and patients across the care continuum*** – while at the same time being open to alternate solutions, should the client desire."

102.     The same day, Defendant Tullman was interviewed by Steve Aylward of Microsoft at the HIMSS conference which began on February 21, 2011 in Orlando, Florida.  Tullman was asked about the merger and misleadingly referred to how "easy" it was to combine the companies and achieve native integration stating:

> [W]hen we combined Allscripts with Eclipsys, one of the things that made the merger make sense was we're bringing together both an acute hospital base platform with an ambulatory base platform and any time you do a merger there's a lot of questions about can you execute on the merger.  We had the advantage of both being based on our foundational platform was .net and so that allowed us to pull together the two applications in a record format.  ***In fact, today, as we show the applications exchanging information on a native level, what you see is that, you know, we can make patients have more access to their information and really deliver more patient safety based applications because of .net, because of our foundational Microsoft basis.  So, so that really drove part of what made it easy to combine the companies***.

103.     At a March 1, 2011 conference for analysts covering the healthcare industry hosted by Citi Global, Defendant Davis falsely emphasized the status of Allscripts' product integration stating:

> One notable thing that we profiled last week was actually ***the integration that we have done between the acute offering of Eclipsys with our ambulatory of legacy Allscripts***.  We profiled that to not only prospecting customers but also the investment community as well.  Again we're very proud of the progress that we've made to date.  ***We're actually slightly ahead of schedule in terms of where we expected to be at this juncture and again very well received by all that had an opportunity to see that***.

104.     Also on March 1, 2011, Allscripts filed a Form 10-KT with the SEC, describing the Company's financial results for the transitional, post-merger period June 1, 2010 to December 31, 2010.  The Form 10-KT, signed by Defendants Tullman and Davis, falsely represented:

> Combining the companies respective solution sets has created one of the most comprehensive solution offerings for healthcare organizations of every size and setting. ***By combining physician-office and post-acute care solutions from***

- 34 -

> *Allscripts with Eclipsys enterprise solutions for hospitals and health systems, the combined company is able to offer a single platform of clinical, financial, connectivity and information solutions.*

> *Due to the Eclipsys Merger, given the unique breadth of solutions and customer types, the company is uniquely positioned to connect physicians, other care providers and patients across all health care provider settings including hospitals, small or large physician practices, extended care facilities, or in a home care setting.* The combined company has significantly enhanced its ability to compete for opportunities among large hospital and health systems that increasingly are looking to one information technology vendor to provide a single, end-to-end solution across all points of care.

105. In a "Dear Shareholder" letter which accompanied the March 1, 2011 Form 10-KT,

Defendant Tullman wrote:

> *By the end of 2010, just four months after closing the merger, we delivered* exceptionally strong results in our first full quarter as a combined company; *direct integration of data between our hospital and physician clinical solutions without third-party software*; merger-related cost synergies in line with our stated expectations; and significant cross-sales of our solutions into our combined client base, with total sales of over $288 million during the fourth quarter of 2010.

> \*   \*   \*

> *We have demonstrated native integration of our own solutions to create one platform of ambulatory, acute, and post-acute solutions without the need for third-party software. We believe that no other company can match the functionality of our full, integrated solution set, nor its ability to drive utilization by providers.* Some large health systems are spending $250 million or more and taking five years to do what many of our clients will be doing with Allscripts within the year, at a fifth of the cost. The difference between the old, monolithic, single-system approach and the Allscripts open, horizontal architecture is significant.

106. The following week, on March 7, 2011, at an Institutional Investor Conference

hosted by Raymond James, Defendant Davis falsely emphasized Allscripts' product offering post-

Merger:

> Yet, with the two businesses coming together as evidenced here, *we have a complete suite of products that enable us to provide a true end to end solution when you think about again starting in the physician setting all the way through the hospital and extending beyond the four walls of the hospital into post-acute and community solutions.*

107. During the March 7, 2011 conference, Defendant Davis also stated:

- 35 -

*What I have been really intrigued by in virtue of this merger is a clear delineation between those who have the integrated capability and those that do not*. And I have mentioned to many investors that I sincerely believe that this is a market that is converging on a three-headed horse race if you will. And that three-headed horse race is really between *us*, another public company that I think is here today, Cerner, has that capability, and then another private company out of Wisconsin called Epic.

108.    On March 15, 2011, Defendant Tullman would go on to tell analysts gathered at

Barclays Capital's Global Healthcare Conference that:

Now, at the time we did the merger, we basically said that there's four ways to evaluate the success of the merger.

\*        \*        \*

And last but not least, *could you integrate the various products? And at the recent HIMSS Show, we demonstrated live integration at a native level*.

\*        \*        \*

*So what's our competitive differentiation across the entire continuum?* One network, the largest connected network in the nation and in your community. One platform; it's an open platform, Microsoft .NET. It's a platform designed to connect in one patient, which is *one view of the patient* independent of whether *you're using our technology* or even any of our competitors' technology, *our ability to provide one view of the patient for a physician*.

109.    On May 5, 2011, Allscripts hosted an analyst conference call after the close of the

market to discuss its 1Q11 financial results. Defendants Tullman and Davis were present on the call.

Wherein Defendant Tullman materially misrepresented Allscripts' integration success:

We have delivered on the commitments we made.  . . . *We said we would demonstrate success integrating our product portfolio, and we have*.

\*        \*        \*

Before I turn the call over to Bill, I want to make a point on the integration of our products and provide you with an observation from a recent client visit. Many who attended the HIMSS conference in March commented positively on our demonstration of live integration between Sunrise and our ambulatory electronic health records at that event. *We plan to have clients running this native integration in production in time for ACE, our annual user conference, which takes place in August. The bottom line is that the integration work is on track.* Clients are actively participating, and we look forward to the completion of these installed, and the enhanced work flow it will provide for our clients.

- 36 -

110.     Also during the May 5, 2011 earnings call, Larry Marsh, a Barclays Capital analyst, asked Tullman about the departure of CTO Gomez:

We've gotten some feedback already with the announced departure of John Gomez from customers communicating the support of the direction of the Company and not really that much of an overall concern. I was just curious if you could share any additional feedback you've gotten from customers as that's been communicated, and do you have a time line in mind, Glen, when you would like to is somebody else in that slot?

Defendant Tullman mislead the market by responding as follows:

Relative to John, again, I think people were – John had been around the Eclipsys side of the equation for a period of time, was well regarded by those folks, and John had a big part of helping to set our vision.  I think most of those clients would tell you today that they're very focused on execution.  **When John and I talked, I wanted to make sure that  five, five [i.e. Sunrise 5.5] was exactly what we wanted it to be, that the integration work was where we wanted it to be, and that, of course, meaningful use was achieved and that all of those objectives were met**. There couldn't have been a better time if John was going to be departing, that he depart.

111.     Defendant Davis further misled the market by adding:

I'll just reiterate, Glen touched on it and I did in my prepared remarks, one of the most significant positive surprises of this merger having now operated two full quarters, is the success we are having from a cross-sell perspective, which to me is true evidence of the success of bringing these businesses together and the value of bringing the portfolios together, and we're starting to see that extend out into net new opportunities.  **So, the product integration** and the power of the existing relationships, I think, again, things that are **delivering real value to the business.**

112.     Three months later, on August 2, 2011, Allscripts hosted an analyst conference call after the close of the market to discuss its 2Q11 financial results.  Defendants Tullman and Davis were present during the call wherein Defendant Tullman again misled the market as to integration:

The first thing was, as we looked at the merger, people said, well, **can they work together?  Continue to deliver?**  Then can they cross-sell, then can they sell in both directions, and **then the final question was, does the software work together well? Each one of those we've knocked off quarter by quarter** as we continue to educate the sales force, as we continue to educate our clients, and they see what we can deliver.

*          *          *

- 37 -

*So I don't think that we need anything more than we have today.* We just to have get out there and tell the new story.

113. On August 29, 2011, Allscripts issued a press release entitled, "Allscripts User Conference Draws Over 4,700 Attendees," which stated:

*This demonstration of the live integration between the Company's ambulatory and acute care EHRs* [Allscripts Enterprise (TM) Electronic Health Record (EHR) in a physician practice, and Sunrise Clinical Manager (TM) in the hospital] *comes on the first anniversary of the merger of Allscripts and Eclipsys.*

114. During a September 8, 2011 conference which Defendant Shapiro attended, Steve Halper, the Stifel Nicolaus & Co. analyst hosting the event, asked Defendant Shapiro:

So, why don't we dig down a little bit deeper in terms of Eclipsys and what have you done relative to product strategies, as well as some operational synergies that you've accomplished.

Defendant Shapiro mislead the market when he responded as follows:

Well, *when we announced the transaction we promised the market four things. We had said that we would achieve a product integration. And within a month after the close of the transaction, we demonstrated at* [sic] *had been previously scheduled as a user conference the beginnings of that integration.*

*And I'm pleased to say that we've continued to make good product integration progress.* Last week we held our users' conference. We had over 4,000 people attending our users' conference. It was the first combined user conference that we held. It's probably the second largest event in our industry.

And at that conference, we had a client who is *live with the integration*, Jefferson Regional Medical Center, that's *using our acute and ambulatory platforms and having seamless transfer of information between their acute care and ambulatory systems that provide for integrated care.*

115. Mr. Halper of Stifel Nicolaus & Co. continued on the September 8, 2011 call to ask about integration between the legacy Eclipsys and Allscripts products:

So, is there any integration that goes on between Sunrise and the – well, let's take – like, let's take a step back. Why don't you break down the physician marketplace for us in terms of the core ambulatory systems and the three segments that you focus on and what products you have in that – in each of those markets.

116. Defendant Shapiro falsely responded as follows:

- 38 -

*Just very quickly with regard to integration, our meaningful use versions of our products in terms of Sunrise integration, being able to pass natively data from acute to ambulatory is something that's working with both Sunrise and Enterprise, Sunrise and Professional, and soon with regard to the MyWay product.*

117.    When Mr. Halper asked Defendant Shapiro to confirm that "the integration is planned for or being accomplished within all three" of Allscripts' ambulatory platforms (Enterprise, Professional and MyWay), Defendant Shapiro misleadingly responded: "***That's correct***."

118.    Two months later on November 3, 2011, Defendants Tullman and Davis participated in a conference call to discuss Allscripts' 3Q11 financial results.  On the call, Defendant Tullman falsely represented that:

*What physicians want is one comprehensive patient view.*  Not one database, because they realize you can't do that.  . . . What you do want is one patient view, and *that is what we offer through our Community products*.

I think last but not least, *in terms of those folks who do want to go with an approach that mimics that, we have that approach and that is, Sunrise allows you to have an acute and an ambulatory product all in one database. And that we have today*.

119.    Several days later, on November 9, 2011, Defendant Davis kept up the façade, falsely telling analysts gathered at the Credit Suisse Group Healthcare Conference:

Again, we believe that we are *uniquely positioned of being one of very few that has a comprehensive product portfolio that enables us to meet the needs of the hospital environment, the physician office environment, post-acute environment, as well as the integrated market environment which effectively brings these solutions together and allows information to be seamlessly shared.*

120.    Subsequently, on February 16, 2012, Defendants Tullman and Davis participated in an earnings conference to discuss Allscripts' 4Q11 results.  During the call, Defendant Tullman falsely represented the status of Allscripts' product integration stating:

*[O]ur comprehensive Sunrise solution continues to win head-to-head competition for hospitals and health systems who want an open yet fully integrated clinical system, as well as those who want a single database*.

\*        \*        \*

- 39 -

*So our folks are chomping at the bit now that they are really fluent in the whole language of Sunrise and SEM and how it all works together and fits into not just products but in integrated solutions.* So that [is] really where we are.

### Reasons Why Defendants' Statements Concerning Product Integration Were Materially False and Misleading

121. The highlighted statements in ¶¶91-114, 116-118 above were materially false and misleading when made because Allscripts did not achieve product integration during the Class Period and Defendants failed to reveal the true facts which were known or recklessly disregarded by Defendants, based on the allegations pled herein, including, *inter alia*, the following:

(a) Defendants repeatedly touted that they had demonstrated and achieved product integration, and that they had a competitive advantage as a result, when in truth the products were not integrated and they would not achieve product integration until July 2012 and even by December 2012 only one client site was live on a beta version of the product. *E.g.*, ¶¶76, 170, 175;

(b) Defendants failed to disclose the true facts that product integration was not easy, they were months or years away from achieving product integration, product integration required substantial investment of time and resources, and customers were not satisfied with initial product integration efforts. All of which was belatedly disclosed when Defendants revealed on April 26, 2012, among other things, that ADX 1.0 required a complete rework, they needed to invest $190 million in 2012 to "accelerate integration," and customers were still "waiting" on product integration and delaying purchases for new released. ¶¶139, 141-144;

(c) the Merger was premised on the promise that it would be "easy" to deliver an integrated product solution that offered patients and clients a seamless experience, a single patient record between hospitals, physician offices and extended care, and that, as far as customers were concerned integration was "done" and they could get all they need. ¶15. By November 2010, more than two months after the close of the Merger, Defendants knew that they could not deliver the

product integration desired by customers (and which Allscripts claimed to have) which was the key to Allscripts' growth and success;

(d)        As CW11 explained, these were complex software application systems which required a significant time frame and effort to achieve native integration. ¶75. Every inference is that Defendants knew of and deliberately ignored these facts;

(e)        As the promised integration was key to Allscripts' success, Defendants as Allscripts executives were focused on and privy to the difficulties encountered with integration. As such, they knew there was no viable integrated product throughout the Class Period. For example, according to CW11, no clients ever went live on ADX 1.0. ¶76. Even by the end of 2012, ADX 1.5 – which addressed the deficiencies in ADX 1.0 – was only live at a single site. ¶175. Similarly, CW8 (who left in January 2012), CW2 (who left in February 2012), CW7 (who left in April 2012), CW9 (who left in May 2012), and CW5 (who left in June 2012), all give accounts that indicate that the seamless integration Defendants promised and in fact said was achieved was not accomplished by November 2010 or even by the time they departed from the Company. ¶¶43-45, 60-63, 66-70;

(f)        The Confidential Witness accounts are corroborated by Defendants' own admissions, including Defendant Davis' May 8, 2012 admission that Allscripts' initial release of its "integrated capability . . . was launched [in the] middle of last year [*i.e.* mid-2011]" and that "its ultimate functionality was short of where the market would like to see it be." ¶158;

(g)        Defendant Tullman also belatedly admitted on April 26, 2012 that ADX 1.0 "didn't work for [a] set of customers" focused on integration. In doing so, he also conceded that Allscripts "reorganized and put our sales and services together" based on client focus and a lot of work. As described in ¶73, CW11 noted, and later corroborated by Tullman on an August 8, 2012 earnings call, that the reorganization was completed at the beginning of 2012. Thus, at a minimum, Defendants knew Allscripts did not offer a viable integrated product weeks, if not months, before the

- 41 -

sales reorganization in January 2012 rendering their statements in late 2011 and 2012 materially false;

(h)     As of November 2010, it was discussed by management that customers were delaying purchase because of dissatisfaction with the product integration.  According to CW3, as early as November 2010, the issue of customers delaying purchase because of dissatisfaction with the product integration was being discussed at monthly management meetings run by Tullman's direct report, Steve Lalonde; meetings that Tullman and Shapiro occasionally attended.  ¶¶51-53, 57. The same issue was raised at a meeting for Allscripts' entire sales organization in January 2011, attended by Tullman.  ¶52.  CW3 further indicated that customer frustration increased and customers began switching from Allscripts to competitors' products.  ¶54.  According to CW11, even as late as 2Q12 Allscripts was losing competitive bids as a result of their failure to develop a truly integrated offering.  ¶90;

(i)     In addition to the witness accounts, Defendants admitted at the end of the Class Period that customers delayed purchases as a result of the lack of integration.  ¶139.  Further, Defendants finally admitted on April 26, 2012 that they had already decided "to make significant investments in improving client experience and accelerating product development."  *Id.*  Allscripts planned to invest $190 million in 2012 to "improve performance and accelerate integration and innovation," admitting that new releases were "critical" due to delays by clients and a "major driver of future business."  *Id.*;

(j)     Until his departure, Gomez, Allscripts' CTO had responsibilities for product integration.  It was subsequently revealed in a May 14, 2012 analyst report by Cowen and Company that Chief Information Officers ("CIOs") had "communicated that John's [Gomez] methodology involved putting out new products even if it had glitches and then going back to fix the problems." If the CIOs knew of Gomez's practice, the inference is that Defendants did as well.  This inference is

- 42 -

bolstered by the fact that Tullman was known to have a hands-on management style. ¶178. Further, Defendants often highlighted close relationships with clients, including those who gave negative feedback. ¶¶14, 92, 100, 109, 110, 141-142, 148, 179;

   (k) With regard to the purported demonstration of native integration between legacy Allscripts and legacy Eclipsys products in ¶¶91, 94, 97-99, 108, 113 above, CW5 stated his impression after watching such a demonstration in January/February 2011 was that it was "smoke and mirrors." ¶62. He never saw product integration working at any client sites. *Id.*;

   (l) With regard to Defendants' misleading use of Columbia Presbyterian as an example of a site where their integrated products were fully functional as set forth in ¶92 above, the applications used at Columbia Presbyterian were custom-tailored and not generally available to other Allscripts clients. ¶¶56, 77. CW11 stated that the native integration package used by Columbia Presbyterian between its acute care and ambulatory health care application was an integration package built by Columbia Presbyterian's own information technology people. ¶77. CW3's account corroborates that of CW11. CW3 indicated that the integration software being used at Columbia Presbyterian was engineered using Allscripts software engineers and internal Columbia Presbyterian employees and was unique to the hardware and software used within Columbia. ¶56;

   (m) With regard to Defendant Tullman misleadingly stating that product integration was "where [he] wanted it to be" as was Sunrise 5.5 ("five, five") as set forth in ¶110 above, the 5.5 upgrade did not offer any meaningful improvement over 5.0. Defendants acknowledged this fact in post-Class Period statements, the product failed to satisfy clients who deferred purchases waiting for Sunrise 6.0. ¶¶138, 143-144, 158. CW2 described the upgrade from Sunrise 5.0 to 5.5 as an "empty shell," which he later further described to mean that Sunrise Clinical Manager 5.5, although sold as an upgrade, required all connections and interfaces to be completely reconfigured. ¶46;

(n)     With respect to Tullman's November 8, 2010 statement that Allscripts was "on plan to deliver integration between Sunrise and all of the Allscripts electronic health records by the end of the first quarter" 2011, Allscripts was nowhere near achieving such integration and did not achieve integration of Sunrise and one Allscripts EHR software, Enterprise, until July 2012 after extensive work with Blessing Hospital and never achieved such integration for MyWay which it abandoned in October 2012.  ¶¶168-171; and

(o)     With respect to MyWay, Tullman's November 8, 2010 statement that it was "on plan" to deliver integration for "all" EHR products with Sunrise by the first quarter of 2011 and Shapiro's September 8, 2011 misleading statement that MyWay was close to meaningful use which would be achieved "soon" as set forth in ¶¶116-117, it was never integrated and Allscripts eventually abandoned the product in 2012.  ¶¶168-169.   As a result, a class action lawsuit was filed by physicians who purchased the product based on false and misleading statements like Shapiro's above.

122.    For all of the reasons in ¶121 above, investors were deceived.   Defendants materially misled investors when they claimed that they had "demonstrate[d] success integrating our product portfolio" and that product integration was already "delivering real value to the business." Allscripts was not "having seamless transfer of information between their acute care and ambulatory systems that provide for integrated care."  Nor was Tullman's statement that he didn't "think that we need anything more than we have today.  We just to have get out there and tell the new story" truthful.  Likewise, there was no "true end-to-end solution," "integrated solution set" and the integration was not "on schedule."  There was a lot more work to be done on product integration and Defendants knew it.  Some two years after the Merger, Allscripts would still only have a lone customer live on a beta version of ADX 1.5.  ¶¶76, 175.

**Materially False and Misleading Statements Regarding Merger Integration**

123.     Given that the Merger took place during a period of time when a window of opportunity to benefit from federal stimulus funding was closing, it was important for Allscripts to assure investors that the Merger was going smoothly and was not interfering with the ability to maximize its sales to the customers of the now-combined businesses.  As a result, Defendants repeatedly reassured investors during the Class Period that the Merger was going smoothly and the key talent at each company was working together effectively.  In fact, there was a deep divide between the two companies' management.

124.     During the November 30, 2010 Piper Jaffray Healthcare Conference attended by Defendant Davis, Sean Weiland, the analyst hosting the event, asked CFO Davis:

> Give me two or three things that have come in ahead of your expectations relative to the acquisition and give me two or three things that were the curveball?

Defendant Davis mislead the market with the following response:

> ***So I am very encouraged by where the business is at from an integration perspective***.

125.     Some five months later, during a May 5, 2011 earnings call attended by Defendants Tullman and Davis, a William Blair & Co. analyst asked:

> I'm just curious, you have several months of Eclipsys under your belt. I'm curious as you look at that business strategically, if you have made changes or see any changes from a go to market standpoint, whether it be in terms of how Eclipsys contracts.

Tullman misleadingly responded:

> One, strategically, this is probably, given where the market is today and the need to operate across ambulatory, acute and post acute.  This was as well timed a merger as you'll ever see.  From an execution standpoint, we've now done a few of them. ***This is as smooth as an integration effort that you'll ever see in terms of realizing synergies, in terms of very little overlap between the two organizations and between – in terms of the fit***.

- 45 -

126. Also during the May 5, 2011 earnings call, Larry Marsh, a Barclays Capital analyst, asked Tullman about the departure of Gomez, Allscripts' CTO:

> We've gotten some feedback already with the announced departure of John Gomez from customers communicating the support of the direction of the Company and not really that much of an overall concern. I was just curious if you could share any additional feedback you've gotten from customers as that's been communicated, and do you have a time line in mind, Glen, when you would like to is somebody else in that slot?

Defendant Tullman mislead the market by responding as follows:

> Relative to John, again, I think people were – John had been around the Eclipsys side of the equation for a period of time, was well regarded by those folks, and **John had a big part of helping to set our vision**. I think most of those clients would tell you today that they're very focused on execution. When John and I talked, I wanted to make sure that five, five [Sunrise 5.5] was exactly what we wanted it to be, that the integration work was where we wanted it to be, and that, of course, meaningful use was achieved and that all of those objectives were met. **There couldn't have been a better time if John was going to be departing, that he depart**.

127. At the same May 5, 2011 earnings call, Defendant Davis reaffirmed the success of the Merger when he highlighted "the success we are having from a cross-sell perspective, **which to me is true evidence of the success of bringing these businesses together** and the value of bringing the portfolios together, and **we're starting to see that extend out into net new opportunities**."

128. Three months later on an August 2, 2011 earnings call that was attended by Defendants Tullman and Davis, Defendant Tullman misled investors by reporting that:

> **The first thing was, as we looked at the merger, people said, well, can they work together? Continue to deliver?** Then can they cross-sell, then can they sell in both directions, and then the final question was, **does the software work together well? Each one of those we've knocked off quarter by quarter** as we continue to educate the sales force, as we continue to educate our clients, and they see what we can deliver.

129. On September 8, 2011, Defendant Shapiro participated in a conference for analysts covering the healthcare industry, hosted by Stifel, Nicolaus & Co. During this conference, Shapiro falsely represented:

- 46 -

We just celebrated the one-year anniversary of the merger with Eclipsys and we've been quite pleased with the performance since the time that the transaction closed.

One of the things we knew going in was that there was a great team in place and a great culture that existed, and that has been, frankly, a pleasure in terms of our ability to work with the team that was there. Sometimes you find yourselves in terms of thinking that there's a great strategic rationale for going forward with another organization, but the fit might not be right from a people standpoint and that creates dissonance in terms of having a solid integration. *But from our perspective, the teams couldn't be more aligned and working very closely together in the market*.

**Reasons Why Defendants' Statements Regarding Merger Integration Were Materially False and Misleading**

130. The highlighted statements above in ¶¶124-129 regarding the "smooth" integration and "fit" of Eclipsys and Allscripts as merged companies were materially false and misleading because they failed to reveal the true facts, which were known or recklessly disregarded by Defendants, which include, *inter alia*, the facts below:

(a) Tullman belatedly admitting by implication, on April 26, 2012 that Allscripts and Eclipsys, from the beginning of the Merger, had a "different view[s] of the future and of the direction that the organization should go and who should take the organization in that direction" which led to the termination of former Eclipsys CEO Pead as Chairman of the Allscripts Board and, in turn, resignation of three other Allscripts Board members. ¶147;

(b) Consistent with Tullman's admission, CW3 describing conversations he had in the Fall of 2010 and Spring of 2011 regarding what he called "friction" between legacy Eclipsys and Allscripts executives and employees. ¶82. The conversations related to Allscripts' executives making promises to clients regarding integration capabilities of the two companies' products that could not be delivered on, and ignoring input from legacy Eclipsys personnel when making decisions about product direction and focus. *Id*.;

(c)       Pead and Tullman having "competing priorities," especially with regard to the direction of product integration according to CW11. Gomez felt micromanaged and that Tullman did not provide Gomez the ability to make decisions on integration. ¶81;

(d)       Legacy Eclipsys management feeling they were being ignored by Tullman and wanted to oust Tullman. In turn, there was a growing and irreparable rift between Tullman and the legacy Eclipsys management including Gomez, Pead and the legacy Eclipsys directors, as revealed by Gomez being pushed out, Pead's eventual firing, and the departure of two legacy Eclipsys directors. ¶¶81-82;

(e)       After the revelations on April 26, 2012 with respect to the termination of Pead and two other legacy Eclipsys Board members, a Barclays Capital analyst adeptly observed that "it would suggest to some that the business [Allscripts] acquired in 2010 may be meaningfully different in value"; and

(f)       Specifically with respect to Tullman's misleading response to the analysts' questions that Gomez had helped "set our vision" and that there "couldn't have been a better time" for his departure, Tullman deliberately concealed that Gomez was forced out due to his substantial disagreements with Tullman on product integration. ¶80. Clients and confidential witnesses reported that Gomez would overpromise on the functionality new products could deliver and would release a product "even if it had glitches and then go[] back to fix problems." ¶¶45, 54, 160. Further, the timing of Gomez's departure was not ideal. ¶203. It only increased the complications Allscripts was having in developing an integrated product to satisfy increasing customer concerns, leading to ADX 1.0 being scrapped and ADX 1.5 being developed as a complete rework. ¶¶42, 141, 189. Thus, investors were left with the false impression that Gomez's departure was in the normal course of business and not because of the failure to integrate the visions of Allscripts and Eclipsys.

- 48 -

**Defendants' False 2012 Financial Guidance**

131.     On February 16, 2012, in a press release reporting the Company's 4Q11 and FY11 financial results, Defendants provided the following financial guidance for 2012:

| Calendar Year 2012 Guidance Range(7) | |
|---|---|
| *Non-GAAP Revenue* | *$1,620.0 to $1,650.0 million* |
| *Non-GAAP Operating Income* | *$345.0 to $355.0 million* |
| *Non-GAAP Operating Margin* | *21.0 to 22.0 percent* |
| *Non-GAAP Net Income* | *$207.0 to $215.0 million* |
| *Non-GAAP Diluted Earnings Per Share* | *$1.06 to $1.10* |
| Diluted Shares | 195.0 million |

132.     In a conference call after the close of the market on the same day that Defendants Tullman and Davis participated in, CFO Davis also told analysts:

> Now I would like to provide our 2012 guidance. **We anticipate 2012 non-GAAP revenue of between $1.62 billion and $1.65 billion**.

> \*          \*          \*

> This equates to **non-GAAP net income between $207 million and $215 million** or a growth of between 15% to 20% over 2011. **Non-GAAP diluted earnings per share are expected to be in the range of between $1.06 and $1.10**, based on weighted average diluted shares outstanding of approximately 195 million shares.

133.     The 2012 guidance projected significant improvement over 2011 non-GAAP revenues of $1.47 billion, non-GAAP diluted EPS of $0.93, non-GAAP operating margin of 20.4% and non-GAAP net income of $178 million.  Defendant Tullman assured the market that Allscripts had "some very strong momentum to support our growth in 2012."

**Reasons Why Allscripts' 2012 Financial Guidance Was False**

134.     The highlighted 2012 guidance in ¶¶131-132 above was materially false because Defendants lacked a reasonable basis for the guidance that was issued (and Defendants knew it) for the following reasons, among others:

- 49 -

(a)     Sales of an integrated product solution was a key focus for the Defendants after the $1.3 billion Merger.  The Merger was intended to drive sales and growth vis-a-vis the ability to offer an integrated seamless product across the continuum of care.  ¶¶7, 10, 13, 16, 19.  Yet, Defendants knew as described in ¶¶87-89 that Allscripts could not deliver on the promised product.  In turn, Allscripts' 2012 financial guidance, which depended on the ability to sell an integrated product offering, lacked any reasonable basis when it was issued;

(b)     Defendants knew or recklessly disregarded that the projected growth over 2011 was unattainable in light of the failed product integration, customer complaints and purchasing delays, disruption from turnover of key personnel in sales and product development (*e.g.*, ¶¶51-53, 81-82, 139, 141-144, 158), and need to invest in hiring new employees and achieving product integration as revealed by Defendant's admissions after the Class Period that they needed to hire 400 additional employees and invest $190 million in integration efforts.  ¶139;

(c)     Defendants have admitted that the lack of integration (which they knew of when they issued 2012 guidance) negatively impacted Allscripts' ability to achieve financial results.  Defendants admitted on April 26, 2012 that Allscripts' "***overall results were primarily affected by lower than expected sales and an unfavorable sales mix, which directly impacted revenue and profit***."  Defendants also explained that "***a number of our clients and prospects delayed commitments as they wait for us to introduce new releases and demonstrate more robust integration***";

(d)     A significant portion of Allscripts' business was reoccurring.  For example, on April 26, 2012, Allscripts admitted that its 1Q12 reoccurring revenue was 69%.  Thus, new sales and sales to new clients were key to achieving the robust guidance issued by Defendants on February 16, 2012 for 2012.  These sales depended on offering an integrated product – Allscripts purported competitive advantage in a highly-competitive industry;

- 50 -

(e)     The guidance was given six weeks into the quarter, in a business that, as Defendant Davis himself has acknowledged, had a "significant level of visibility" on revenue sources and cash flow.  Allscripts reportedly had as much as ***80% revenue visibility*** at the start of any given year, according to an Accretive Capital LLC article issued on February 16, 2011 discussing a note issued by Citi Investment Research.  Further, according to Citi "[i]t would take unusual customer churn or a change in the market of sales trends to cause a big miss at the revenue line."  Yet, unbeknownst to investors this was exactly the situation heading into 2012 as a result of Allscripts' lack of a desired integrated product;

(f)     According to CW 11 and CW9, the above guidance included sales quotas of 26 to 28 new Sunrise deals in the year, nearly triple the sales in an average year.  ¶¶87, 89.  CW9 reported the sales goals were unrealistic.  According to CW9, closing 26 electronic medical record deals in a year would have been remarkable even for a company like Epic who "dominated the market," and was a "ridiculous" goal for Allscripts.  ¶87.  CW11 explained that he and other Area Vice Presidents and Vice Presidents pushed back on the forecast they received in January 2012, explaining that a more attainable number was half of what the forecast called for.  ¶89.  Further, CW11 indicated that he knew of three deals that were lost because of integration issues.  ¶¶89-90.  In fact, only 3 new customers purchased Sunrise in 1Q12, as revealed during Defendants' April 26, 2012 conference call;

(g)     Consistent with Allscripts' revenue visibility, CW3 indicated that based on discussions held on weekly conference calls, "it was apparent" Davis and Tullman were closely monitoring the progress on sales.  ¶86.  Further, CW9 explained that he was not surprised, and management most certainly should not have been surprised, to know that Allscripts' actual sales were well under forecast, based on the discussions at weekly sales conference calls and the data entered into salesforce.com.  ¶88; and

(h)     The unreasonableness of Defendants' guidance is further demonstrated by the fact that at the end of the Class Period, just two short months after Defendants issued 2012 financial guidance, they were forced to revise guidance by unprecedented amounts including: (i) slashing 2012 non-GAAP EPS targets by nearly a third from $1.06-1.10 to $0.74-0.80; (ii) drastically reducing non-GAAP revenue guidance from $1.6 -$1.65 billion to $1.48-$1.52 billion; (iii) cutting non-GAAP operating margin guidance from 21-22% to 16-17%; and (iv) reducing non-GAAP operating income guidance by more than $100 million from $345-$355 million to $241-$259 million.  In comparison Allscripts reported non-GAAP diluted earnings per share of $0.93 and non-GAAP operating margins of more than 20% in 2011, and non-GAAP revenue of $1.47 billion.  By November 2012, Allscripts' problems with product integration contributed to its withdrawal of 2012 guidance altogether.

## THE RELEVANT TRUTH IS REVEALED

135.     On April 26, 2012, Allscripts issued a press release on *PR Newswire* after 4:00 p.m. EST announcing alarming financial results for 1Q12 and lowering their 2012 financial guidance issued just two months earlier.  Defendants reported disappointing trends, below guidance, and below 2011 in bookings, revenues, income, and earnings-per-share.  Specifically, they reported:

First Quarter Results:

- Bookings of approximately $194.6 million. This compares to bookings of $212.4 million in the first quarter of 2011.

- GAAP revenue of $364.7 million and non-GAAP revenue of $365.5 million. This compares to GAAP and non-GAAP revenue of $335.3 and $346.1 million, respectively, in the first quarter of 2011.

- GAAP operating income of $13.0 million; non-GAAP operating income of $40.9. This compares to $24.5 million and $72.1 million, respectively, in the first quarter of 2011.

- GAAP net income(1) of $5.8 million; diluted earnings per share of $0.03. This compares to $12.6 million and $0.07, respectively, in the first quarter of 2011.

- Non-GAAP diluted earnings per share of $0.12, compared to $0.21 in the first quarter of 2011.

136.    In the same press release Defendants lowered their 2012 financial guidance: (i) "2012 Revised Guidance" with "Non-GAAP Revenue" decreased from previously guided $1.62-$1.65 billion to $1.48-$1.52 billion; (ii) "Non-GAAP Operating Margin" decreased from 21-22% to 16-17%; (iii) "Non-GAAP Diluted EPS" decreased from $1.06-$1.10 to $0.74-$0.80.

137.    In a conference call with investors, Dave Morgan, Allscripts' SVP of Finance, added that the revised 2012 financial guidance decreased "non-GAAP operating income" from $345-$355 million to $241-$259 million.  Thus, rather than improvement over 2011, the revised guidance provided essentially flat revenues and substantially lower profitability as reflected in revised non-GAAP EPS guidance well below the $0.93 reported in 2011.

138.    The April 26, 2012 press release attributed these disappointing financial results to failed product integration and announced key executive firings and departures stating:

> ***"Our overall results were primarily affected by lower than expected sales and an unfavorable sales mix, which directly impacted revenue and profit,*** " said Glen Tullman, Chief Executive Officer of Allscripts. "In addition, ***our investments in improving client experience and accelerating product development, as well as higher than expected software development expense, also put pressure on our bottom line***.
>
> "While Allscripts continued to win important new clients, including three new Sunrise Clinical Manager contracts in the quarter, ***a number of our clients and prospects delayed commitments as they wait for us to introduce new releases and demonstrate more robust integration***.  This dynamic, combined with the recent reorganization of our sales and service teams, were the primary factors that caused sales to be lower than our expectations.
>
> "We believe our revised full-year guidance for the remainder of 2012 gives us flexibility to further invest as necessary to improve client experience and focus on key product requirements and innovation, which will be our highest priority."

- 53 -

\*　　\*　　\*

*Allscripts also announced that Bill Davis, Chief Financial Officer, has decided to leave the Company, effective May 18, 2012*, to pursue another opportunity with a private company outside of the healthcare industry.

\*　　\*　　\*

The Company also announced that *Phil Pead's service as Chairman of the Board, director and officer of the Company terminated yesterday*. Prior to this action, the Board engaged in extensive deliberations regarding the leadership of the Company. Following the deliberations, those who concurred with the consensus regarding such leadership expressed their intention to continue as directors, and those who did not concur (*Catherine M. Burzik, Eugene V. Fife and Edward A. Kangas*) *informed the Company that they have resigned as directors*.

139.　After the market closed on April 26, 2012, Allscripts held an unscheduled conference call, in which it made additional disclosures about the dismal 1Q12 results as a result of Allscripts' failed product integration, stating:

[Tullman:] *Our overall results were primarily driven by lower than expected sales and an unfavorable sales mix*. This *directly impacted both revenue and profit*. We also *experienced pressure on the bottom line due to our decision to make significant investments in improving client experience and accelerating product development* as well as lower-than-expected software capitalization. *A number of our clients and prospects delayed commitment as they waited for us to introduce new releases and demonstrate more robust integration*. This dynamic, combined with the first quarter reorganization of our sales and service teams under one leader, were the *primary factors that caused our lower than expected sales*.

\*　　\*　　\*

[Davis:] *First-quarter bookings of $194.6 million declined 8% over the prior year*. As Glen touched on, *the majority of the bookings shortfall resulted from two primary factors – a delay in certain transactions that we expected to close among our existing client base as well as lower-than-expected sales to new clients. Both our acute care and our ambulatory businesses did not perform up to our expectations with regard to both new and existing client sales*.

\*　　\*　　\*

Our performance closing transactions towards the end of the quarter, more specifically, was significantly lower than it has been historically. In some cases, *clients and prospects are delaying as they await upcoming product enhancements as well as more progress with our product integration*. Most of these opportunities, in fact, remain in our pipeline.

- 54 -

*  *  *

Now let me briefly run through our income statement. Non-GAAP revenue grew 6%, and totaled $366 million. The $800,000 of deferred revenue included in non-GAAP revenue is allocated $400,000 each to professional services and transaction revenue. Relative to our expectations, *the revenue shortfall is entirely attributable to the bookings result I discussed earlier*.

Approximately 69% of revenue was reoccurring in nature this quarter. First-quarter gross margin performance reflects a much lower than anticipated mix of software revenue and a higher mix of third-party systems sales, which carry lower gross margin.

*  *  *

[Tullman:] *The first pillar is product delivery*. We are investing over $190 million this year to improve performance and accelerate integration and innovation. Under the direction of Cliff Meltzer, whose experience at Apple, Cisco and IBM gives him the right perspective and experience to drive our operation, the rollout of major new releases and improvements is something we view as a major driver of future business. These releases are critical, as *a number of our clients have delayed their purchasing until some of these updates come out. These solutions will dramatically increase the quality of our client experience*, and I believe they will also spur new client sales.

*  *  *

The second pillar of our plan is client experience. A big part of our focus over the last year has been upgrading our client base to help them achieve Meaningful Use. To put this in perspective, we have the largest client base in the industry and no competitor has had to touch as many clients in such short order as we have.

Given that many of our clients are smaller practices, the challenges have not just been about upgrading software, but also include hardware upgrades, connectivity issues and work flow. For some, this is the first upgrade or change in years. While we have added staff to manage through this, there have been challenges, and candidly, there is more work to do relative to improving the client experience. On that note, we have added more than 400 front line support personnel to our team, many of whom are just now becoming productive.

*  *  *

[Dave Morgan:] With that said, *we now anticipate 2012 non-GAAP revenue of between $1.48 billion and $1.52 billion*. We anticipate *non-GAAP operating income of between $241 million and $259 million*, which equates to an adjusted operating income margin of between 16% and 17%. *The revised operating profit*

- 55 -

*outlook afflicts lower revenue combined with the increased investments to support the four-point plan Glen discussed earlier*.

140.     In addition, on the same conference call, Defendant Tullman spoke to the unprecedented departures of Allscripts' CFO Davis, and three Board members as well as the abrupt termination of its Chairman of the Board Pead as described in the above press release.

141.     Analysts had many questions on the April 26, 2012 conference call following these dramatic announcements.  In response to analysts' questions Defendant Tullman further explained Allscripts' product integration failures:

> We, I think, during the comments, mentioned that we were not satisfied with our performance this quarter.  That said, the fact is that we are selling and we are making progress.  We, in a number of areas, *as I mentioned*, *in integration*, *we hope that 1.0*, *ADX 1.0 would address the issue*.  *It did not*, *so a number of clients are waiting for ADX 1.5*.  We change the process of development there to involve the clients very directly, and those clients are giving us very good feedback about ADX 1.5, and it's coming out soon.  So we think that will address the problem.

> Similarly, in a number of areas, we have made progress.  But unfortunately, *that progress isn't as fast as we or the market would like it*.

142.     Analysts at Barclays Capital openly questioned the value of the Eclipsys Merger as a result of the termination of Pead and the resignation of three other Board members:

> [I]t looks *like all the Eclipsys legacy board members either were terminated or quit*.  *So it would suggest to some that the business you acquired in 2010 may be meaningfully different in value* than what you thought. Can you comment on that?  And can you give us any sense of how you're going to be able to run this Company and convince your clients of your leadership if a third of the Board just resigned?

Tullman responded that his focus was on the client perspective:

> I think from a client perspective, *the way that clients evaluate most companies is based on their products and the performance of those products*.  I'm not sure that many of our clients could name any of our Board members.  Maybe they could have named one.  And I think, going forward, the way they will judge us is based on the way the products work.  And I think there's a lot of loyalty in the client base relative to those products.

> That said, *I think we've been very straightforward in saying that there are areas that they are waiting for*, *whether it be integration, whether it be or some additional product functionality*, *performance and the like*.  And we are highly

- 56 -

focused on delivering that.  One of the things that we've done is, as mentioned, we've changed our development methodology to be more client responsive and faster to market, going from Waterfall to Agile.  And in addition, we are actually pumping more dollars and we've done more of the hiring up front than we had initially planned, based on our view that *we had to address some of those gaps*, and we will.

143.    Rightfully, an analyst at UBS wanted to know what exactly customers were waiting for:

Okay, and then if I can sneak in a follow-up here related to the close rate and customers waiting for product enhancement. *What specifically are they looking for*? I understand your comments around the integration and the ADX upgrade. But what else are they waiting for, from Allscripts?

144.    Tullman's response – integration:  "I think it's – the customers that we were specifically referring to, some of *those customers are waiting for that integration*.  Some are waiting for some *better third-party integration of products*.  And then, *in terms of the performance*, *I think on Enterprise we've had some folks who are waiting for newer versions of Enterprise*."

145.    Goldman Sachs analyst Sebastian Paquette followed up on the April 26, 2012 conference call with a request for clarification on the $50 million bookings miss:

Just on the $50 million miss in bookings, I was interested in – could you just parse out *what portion of that was due to existing customers using Allscripts and Eclipsys products that were waiting to upgrade, versus customers in your late stage pipeline that you are expecting to close into bookings but are waiting for next stage and iteration of products?*

To which Defendant Davis responded:

Let me attempt to – I'll answer your question this way.  Just under half of the miss, I would say, was expected to be derived from existing clients. . . . And then the other, just over a half would be effectively, effectively from new prospects.  And again, it's just important to note that we did not, from a pipeline perspective, see much of that go away permanently.  *It was very much a function of the belief that they wanted to see more from the Company in terms of* the stability and the *incremental integration* that Glen outlined.

146.    With regard to the Board departures, an analyst with Piper Jaffray & Co asked on the same conference call:

With four Board members up and resigning, and I've never seen that kind of board turnover because of a sloppy bookings quarter. So I guess my question is, what else? What else is going on here that would cause that kind of turnover on the Board?

147.    Defendant Tullman's response was in stark contrast to the Class Period statements of how the entities could not have been more aligned and that it was as "smooth" a merger as any in history, admitting that the separate entities had not been aligned from the very beginning stating:

> That said, I think if you look at the history of mergers, sometimes you start off with two companies. **Sometimes those two companies have a different view of the future and of the direction** that the organization should go and who should take the organization in that direction. So without saying a whole lot more, I think you can look at the statement that was made and the disclosures that have been made.

148.    Given the false and misleading Class Period statements and the market's stunned response to the revelations that product integration failures were causing reduced earnings and major disruptions at the highest levels of the Company, it was no surprise that analysts highlighted Defendants' lack of credibility. During the April 26, 2012 earnings call, an analyst for Cowen and Company asked Defendant Tullman about a prior misstatement:

> You know, Glen, **at HIMSS this year**, **which was only about a month and a half ago**, **you talked at length about sort of where you thought things were going**. You had new managers out there, and you were discussing **in response to a question about integration and concerns that you were kind of saying that it is important but it is not the deciding factor**. Yet, here you're telling us now that you have prospects **delaying their commitments**, **they are not happy with the initial integration**, **integrated offering here**. **Is it for us to believe that integration actually is very important, and is it a differentiating factor**? **Because it does seem to be bared out here in these results**.

Defendant Tullman, responded by admitting that:

> I think – and again, I stand by what I said, and that is that **integration absolutely matters to a segment**, and that segment was focused on 1.0. It worked technically; **it didn't work for those – that set of customers**. That was one of the elements. The complication here was there were multiple elements that came together in a negative way at the same time. So, based on a lot of work we did and based on client focus, we reorganized and put our sales and services together. I think Bill referenced the point that in terms of what we expect to close, that rate was lower this quarter than it had been in, I don't know, eight quarters, 10 quarters, maybe ever.

- 58 -

And so we converted less at the end of the quarter. We think that was a sales execution issue. That alone wouldn't have been the issue.

Second, *we had some big clients recent we are going to wait until you deliver on 1.5*. So that was the second issue.

149.     Additionally, George Hill, an analyst at Citigroup, commented on the April 26, 2012 earnings call that "investors are going to have a tough time here with management credibility." He also questioned whether Defendants were being fully truthful even now stating: "On this call, you said to us that you continue to think that the Company is best positioned to maintain and win share. The market statistics and the channel checks that I think myself and everybody else does, *does not bear that out remotely*."

150.     Sandy Draper, an analyst with Raymond James & Associates, echoed the concerns with management's truthfulness reporting: "As many other questions have come, there's going to be serious credibility [concerns] for a while."

151.     The fallout from Allscripts' revelations continued on the next day. On April 27, 2012, a Jefferies analyst report noted that: "We recently interviewed hospital CIOs to get their views of the various software vendors" and "[n]early all expressed the view that integration is highly important." The report also reported the market had been mislead stating Allscripts stock "is *reacting belatedly to integration issues that [Allscripts] previously said were in the rearview mirror*."

152.     The same day, an analyst report by Caris & Company reported that "management credibility has diminished considerably" adding "senior management has lost credibility with investors and the Street." It continued, "Since CEO Glenn Tullman retains his post, MDRX senior management credibility will remain in question. To regain investor trust, MDRX Board of Directors should have installed new leadership."

- 59 -

153.    In addition to noting management's lack of credibility, analysts also reported that the disappointing results were the result of failed integration.  On April 27, 2012, Credit Suisse reported that "the *failure to successfully integrate the ambulatory and acute offerings puts [Allscripts] at a significant disadvantage when selling into a very competitive marketplace*.  While the specifics of why the integration has been such a challenge are not completely clear, we note this process has been going on for almost two years."

154.    Likewise, analysts at Oppenheimer downgraded Allscripts' stock on April 27, 2012 noting:

> Allscripts pre-released disastrous 1Q12 results, missing across the board in terms of bookings, revenue, and EPS.  Aside from whiffing the quarter, the company also announced the departure of its CEO and a failed power play, which resulted in four of nine board members resigning.  Completing the trife[c]ta, it also *slashed 2012 guidance by ~30% to account for a challenging sales environment*.  The shares traded off ~40% in the after market and *we do not expect them to recover until there are signs the  new software releases correct existing deficiencies*.

155.    Analysts at Sterne Agee answered the question "Why?" Allscripts' stock showed substantial weakness in their April 27, 2012 report:

> Why? *MDRX is struggling with its current acute offering, Sunrise v5.5, as customers and prospective clients are unimpressed by the interoperable-capabilities between the inpatient-to-inpatient and inpatient- to-outpatient settings*.  While mgmt had projected to offer the "fixed" version, Sunrise 6.0, in June, it has been delayed to 4Q12.  Many health systems/hospitals are reassessing their current acute offering, looking for fully integrated inpatient-outpatient clinical and financial IT systems.  Besides MDRX, it appears that only two other vendors, Cerner (CERN, Buy, $73.82) and Epic (private), can truly offer such systems.
>
> *The fact is that MDRX's brand has been negatively impacted within the healthcare community, largely driven by shortfalls in their acute software*.  Assuming sunrise v6.0 is the panacea for MDRX's woes, we must assume that it will take the company some time to make current customers happy and, given the highly referential nature of this business, get prospective clients confident enough to choose MDRX over Cerner and Epic.  We would have to think this is a 2013/2014 event.

156.    Analysts with Auriga USA commented that the "main driver of the miss this quarter was system sales, which were $25 million shy of our estimate" adding that "[w]e find it interesting

- 60 -

timing that outgoing CFO Bill Davis takes a new job just as the Company generates one of its worst quarters in recent history."

157.    An analyst report by William Blair & Co. summed up the market's collective disappointment stating "the fundamental business performance and near-term outlook appear much worse than we could have imagined."

158.    A week and half later, during a May 8, 2012 conference call, Defendant Davis admitted that while "initial indications" were that the shortfall was "attributed to that sales and service reorganization," it was truly the result of customers delaying purchases due to product dissatisfaction:

> [W]hat we came to recognize is that many of our clients and prospects, quite frankly, were looking for more progress from the Company in terms of some key product deliverables that are expected to come out this year.
>
> And I'll cite four specifically for you. The first is, on the hospital side, we're expected to deliver Sunrise 6.0. That is slated for beta release the middle of this year and general release at the end of the year. Second is our enterprise, which is our EHR on the physician side, our flagship product for the high end. Its version is 11.4, which is also slated in the second half of the year. We got a lot of feedback most notably from our clients that use both our hospital and ambulatory solution, but also *prospects that are looking for an integrated solution, that our initial release of our integrated capability, which was launched middle of last year*, while it technically delivered on the key functionality, *its usability and its ultimate functionality was short of where the market would like to see it* to be. So there's added emphasis on what will be 1.5 of our Allscripts Data Exchange [ADX].

159.    On May 14, 2012, analysts at Cowen and Company indicated that they had reached out to CIOs from Allscripts facilities and noted that:

> For Allscripts to effectively compete for new clients against some of it peers like Cerner and Epic, the CIOs we spoke with highlighted a number of changes that need to be implemented. Most importantly, *the company needs to deliver a solid and reliable integration engine (ADX 1.5) in the near-term*, *which we believe will help the company satisfy the integration needs of its current clients and prospects* that have integration requirements, and Sunrise Clinical Manager (SCM) 6.0 this fall, which should help with pursuing new opportunities.

*    *    *

- 61 -

In our view, ***the significant bookings shortfall in 1Q12 is partly attributable to the fact that Allscripts still doesn't have an integrated offering***. As background, Allscripts reported $194.6 million in total bookings, well below consensus of $245 million for 1Q12. The company commented during the earnings call that ***a number of clients delayed their commitments to sign on with Allscripts because they weren't satisfied with what the company was offering on the integration front.*** With the transition to the ACO model now in full swing, a number of providers, particularly those belonging to large health systems, are seeking to employ EHR vendors with integrated solutions.

       ***We believe the lack of integrated offering could be a deal breaker for some hospitals*** . . . .

160.    Moreover, the Cowen report publicly disclosed information that was consistent with what the Confidential Witnesses described as occurring during the Class Period. Specifically, the May 14, 2012 Cowen report stated that "A number of CIOs noted that there has been tension building between Glen [Tullman] and Phil [Pead] for quite some time" adding that "[q]uite a few of the CIOs we spoke with were legacy Eclipsys clients and a number of them expressed concerns that Allscripts doesn't have a good understanding of the inpatient business." Finally, it reported that "some CIOs communicated that John's [Gomez] methodology involved putting out new products even if it had glitches and then going back to fix the problems."

161.    On May 15, 2012, Defendant Tullman was interviewed by Bernie Monegain of *Healthcare IT News*. She reported that "***It's the difficulties with integration that seem to have led to the EHR company's recent troubles*** – at least it's what Allscripts customers and analysts mention most often." When asked for his vision on how to make Allscripts thrive again, Tullman responded by stating "We are investing $190 million in 2012 in improving performance, integration and innovation with a number of major releases and improvements in motion. Relative to improving product performance, we have established test labs to eliminate past integration challenges, especially third-party products and the new apps being built for our open platform." When asked what he viewed as the "greatest challenge to recovery," Defendant Tullman stated, "***From a client***

*perspective*, *we have to deliver on robust integration and focus on our client experience with our offerings given the number of upgrades and new installs we have*."

162.    In stark contrast to his prior bullish statements about product integration during the Class Period, *when asked what he wished he "had done differently*," Defendant Tullman admitted in the interview that "*we could have executed more effectively, especially along the lines of software development as it relates to product integration.  This is a critical area where we need additional traction* and it is now heading in the right direction . . . ."

163.    A May 21, 2012 article on HIStalk reported on a "79 member HIS talk Advisory Panel" which "is a group of hospital CIOs, hospital CMIOs [Chief Medical Informatics Officers], practicing physicians, and a few vendor executives who have volunteered to provide their thoughts on topical industry issues."  The panel was asked what advice they would give to Allscripts "after the company's recent earnings disappointment and board shakeup."  Among the reported responses were:

> *They need to focus on clean integration of productions they are selling as integrated*. *The last few times we purchased 'integrated' solutions from Allscripts, we had to take over the integration because we were getting nowhere with the company*.

164.    Analysts at Wells Fargo Securities summarized the market reaction on May 29, 2012 writing:   "*Poor-quality software releases* and disruptions in the company's sales/support organization *drove a material March quarter miss*."

165.    Allscripts was sued by major investor HealthCor Partners Management, L.P. ("HealthCor"), which, according to news reports, had called for Tullman's resignation.  As reported by analysts with Caris & Company on June 4, 2012, the lawsuit was settled through an agreement allowing HealthCor to appoint three Board members.  The analysts reported:

> Facing rising legal pressure, we believe MDRX management decided to settle the litigation.  In the past week, HealthCor's attorneys were conducting discovery and

- 63 -

deposing key current and former executives. Fearing potential revelations regarding the recent Board fight and 1Q12 earnings results, MDRX opted to settle the case and put under seal whatever was discovered.

166.    The fallout continued. On August 8, 2012 Allscripts reported its 2Q12 results. Analysts at Jefferies noted that "every 2Q metric missed published consensus" and that while Allscripts slightly increased 2012 EPS guidance from $0.74-0.80 to $0.77-0.83, it was driven by "lower expected share count."

167.    Later, analysts at Jefferies noted on October 1, 2012 that Allscripts was in the process of exploring the possibility of going private, writing Allscripts appears to be "seeking shelter from public market scrutiny while it slogs through a critical product release" and it "*continues to climb a steep product integration hill that would be more comfortable out of the public eye*."

168.    In October 2012, Allscripts also announced that it would no longer support its MyWay product as meaningful use was never achieved. This lead to its competitor, Aprima, offering an "Aprima Rescue Plan" to allow Allscripts customers to upgrade to their products. Aprima's CEO stated with regard to the former Allscripts customers who were rushing to Aprima to obtain the product Allscripts had promised and never delivered that "we knew we had a very frustrated and outraged set of new customers coming on board."

169.    Soon thereafter a class action was filed against Allscripts based upon MyWay's "shortcoming and inherent defects" that prevented it from obtaining meaningful use status even by late 2012, despite the numerous Class Period statements about product integration including Shapiro's materially false and misleading statement in September 2011 that it would be available "soon." According to the class action complaint about 5,000 small group physicians were sold MyWay from 2009 to 2012, but Allscripts never achieved meaningful use which would have qualified providers for bonus payments from the federal government stimulus plan.

170.     An October 2012 report sponsored by Allscripts and entitled "Bridging Inpatient and Ambulatory Care at Blessing Health System"("Quincy Report"), reported that the hospital system in Quincy, Illinois only achieved product integration between Allscripts Sunrise Acute Care EHR and Allscripts Enterprise EHR through an Allscripts ADX integration bridge in the middle of 2012, well after the end of the Class Period.  The Quincy Report corroborated CW11 that the "go-live" date was July 2012.   The report said that before this integration, patient records could only be accessed by making "numerous phone calls, and requests for information would be passed back and forth" and said just "now" integration was available to allow the seamless exchange of information between the Allscripts EHR products.

171.     As noted in the December 20, 2012 Oppenheimer Report, ADX 1.5 was only live at one beta site.  ¶175.

172.     On November 8, 2012, Allscripts was forced to withdraw its 2012 guidance and confirmed that the Company was pursuing strategic alternatives.  The Company reported adjusted revenue of $361 million, "well below the $367.7 million consensus forecast primarily because of weaker-than-expected system sales" according to analysts at William Blair & Co. in their November 8, 2012 analyst report.  They further reported that 3Q12 bookings of $161.9 million, was down 39.3% year-over-year noting "[m]anagement commented that the bookings weakness in the quarter was due in large part to customer delays resulting from the recent takeout rumors as well as ***delays from customers waiting for product updates***."

173.     On November 27, 2012 analysts at JMP Securities echoed the recurring theme ***"integrating ambulatory and acute offerings remains a challenge for MDRX and in our view, has negatively impacted the company's competitive positioning***."

174.     A few weeks later, on December 19, 2012 Defendant Tullman was ousted by Allscripts' new Board with Paul M. Black ("Black") announced as Allscripts' new CEO.  CEO

Black held an executive conference with analysts the following day. Although he did not refer to the Defendants' false and misleading statements which overstated the functionality and integration of Allscripts' products during the Class Period, Black nevertheless acknowledged the problem by telling analysts that "I don't think right now that all of our clients are happy. We've got a lot of work to do in that space . . . ." He later added "So I don't – we don't have that situation right now, and that's what I would consider to be a happy installed base."

175.     The same day, December 20, 2012, analysts at Oppenheimer would note "we did not gain much clarity on the call about whether the product integration plan will need to be altered, resulting in a complete re-write of the Sunrise and ambulatory platforms onto one database." They went on to observe that "ADX 1.5 [was] still only live at [a] lone beta site."

## ADDITIONAL SCIENTER ALLEGATIONS

176.     As alleged herein, Defendants had actual knowledge of the falsity of the statements they made, or acted in reckless disregard of the truth or falsity of those statements. In doing so, Defendants participated in a scheme to defraud and committed acts, practices and participated in a course of business that operated as a fraud or deceit on purchasers of Allscripts stock during the Class Period.

**Defendants Were Directly Responsible for Allscripts' Product and Merger Integration as Well as Its Financial Guidance**

177.     The Individual Defendants were the long-time CEO, CFO, and President of Allscripts. They were hands-on managers who were responsible for, and remained well informed of, critical business issues including product integration, merger integration, and financial guidance alleged to be falsely represented herein. Allscripts' proxy statements filed with the SEC on November 4, 2010, May 20, 2011 and June 15, 2012 all confirm that it was the Defendants, "senior

- 66 -

management," who knew of and were responsible for keeping abreast of Allscripts' "financial and business risks."

178.     Defendant Tullman became CEO of Allscripts in 1997, a Board member in 1999 and led Allscripts' initial public offering as well as the $1.3 billion Merger of Allscripts and Eclipsys. He was ousted from Allscripts on December 19, 2012.  Defendant Tullman's hands-on management style was well known within and outside of Allscripts.  Tullman was fully immersed in the details. For example, after Tullman was fired in December 2012, John Bosco the CIO at North Shore Long Island Jewish Health System, which was reported to be Allscripts' largest client, said with regard to Tullman's departure that "the CEO is not the person that you want having his ***hands very deep in the day-to-day operations of the company, Glen [Tullman] maintained that control*** – and I think that was a problem.  I think that he would have fared a lot better if he hired a very strong COO and was willing to step back a little bit."   Further, CW11 reported Gomez complained because he felt Tullman micromanaged him.  ¶81.

179.     Tullman subsequently admitted in an interview with *Healthcare IT News* that he had "learned that the best way to build long-term value is to deliver for our clients – they have always been and will always be my primary focus. I am incredibly close with many of our clients and spend most of my time with them, so their support is very much appreciated."

180.     Defendant Davis served as Allscripts' CFO from October 2002 to May 2012.  As CFO of Allscripts, he was responsible for its financial operations.  He has considerable experience in accounting and business, having served previously as the Corporate Controller, and later, CFO of Lante Corporation from 1999 to 2002, and as a Senior Manager at PriceWaterhouseCoopers LLP from 1991 to 1999.   He is a Certified Public Accountant and has a Masters of Business Administration from Northwestern University.

181. Defendant Shapiro joined Allscripts in 2001 and, according to his Company bio, "overs[aw] the company's strategy, corporate marketing, government relations, mergers and acquisitions, internal operations, information systems, hosting services, business development and partnerships, health plan initiatives and business activities in the areas of analytics, information and transaction services." Shapiro is a graduate of the University of Chicago Law School and was the COO of Douglas Elliman-Beitler prior to joining Allscripts. Shapiro left his position on December 19, 2012, the same day as Tullman was fired.

182. Defendants' experience, responsibilities and focus informed them that their statements during the Class Period, that Allscripts offered an integrated seamless solution for the entire community of care, were materially false. Their experience was touted by CFO Davis during a November 18, 2010 Maxim Group LLC Growth Conference analyst conference as follows:

> *We have a very high degree of confidence in terms of our ability to execute, not only on the integration but the broader market opportunity that we have before us. And as you can see, it is represented by a significant amount of experience both within running large software companies*, but also large software companies that are oriented towards the healthcare IT market.

183. As revealed by the Confidential Witnesses, Defendants were intimately involved in product integration, customers, and monitoring the financial results. ¶¶51-52, 57, 78, 81, 84, 86, 89. In fact, according to CW3, Tullman stated he wanted to personally engage with any customer delaying purchase for any reason. ¶57. In addition, Defendants, Allscripts senior executives, can be presumed to have knowledge of adverse facts impacting the Company's core business, in particular, given that product integration was a primary factor driving the success of the Merger. A seamless integrated customer experience – the ability to see and access patient information across the continuum of care – was key to Allscripts' success and as such, a key focus of the Defendants.

184. In addition to their roles in the Company and the CW and customer accounts of their hands-on-management and frequent customer contacts, Defendants said they would be directly

- 68 -

involved in monitoring product integration after the $1.3 billion Merger. During Allscripts' 3Q10 earnings call on November 8, 2010, for example, when talking about the merger Defendant Tullman admitted that "[c]learly, integration is and will continue *to be a key focus* for our clients and *for us*."

185. As part of that key focus, Defendants commissioned a study conducted by McKinsey going back into 2009 that informed them that they needed an "integrated solution" to effectively compete in the marketplace as reflected by CFO Davis' comments during a November 9, 2011 conference call:

> And so what this study told us was not only was the standalone ambulatory market still a very robust market, but what was emerging and parallel with it was *an integrated market where increasingly certain decision makers were interested in an integrated solution in terms of hospital and physician office capability*. *And it was this slide that we spent a fair amount of time deliberating with our board of directors that led us to the decision to merge with Eclipsys Healthcare a year ago in terms of bringing hospital and ambulatory capabilities together*. So the good news is that by virtue of *our solutions set* today, we truly are one of only three players that *legitimately can effectively compete* in all three of these substantial segments of the market.

¶138.

186. Further, Tullman, in a June 15, 2010 HIStalk interview, agreed with Pead that his performance would be graded "by the integration between the product solutions to make this a great experience for their hospital and ambulatory environments so that the two [come] together," if he was to be graded two years out. The market understood the intended message – integration was Allscripts senior management's top priority.

187. Shortly before the end of 1Q11 – the target date by which Defendants had promised the market they would deliver an integrated EHR product – Glenn Garmont of Think Equity LLC observed:

> *Full technological integration of the Eclipsys and Allscripts solutions remains a key deliverable for the company,* one that Allscripts management is targeting for completion by the end of the first quarter. We believe this is an aggressive time line, but *to realize the full potential of the combination, the various solutions must be fully integrated, not simply interfaced,* and should provide for a

- 69 -

similar look and feel regardless of where a physician might happen to be accessing the system. ***There is no doubt in our minds that this is Priority #1 for the Allscripts senior management team,*** and for now, we are willing to give them the benefit of the doubt that integration activities are progressing according to plan.

*     *     *

But ***the combination of Allscripts and Eclipsys should deliver to the market what only Epic has thus-far been able to do: offer a single, integration solution that is strong in both the inpatient and ambulatory environments***. Eclipsys has a very strong core CPOE engine, while Allscripts is a leader on the ambulatory side. We believe bringing the two companies together makes solid strategic sense, although full product integration is key for the combination to realize its full potential.

188.    Defendants' repeated statements to the investing public regarding their focus and time spent on the integration of Allscripts and Eclipsys demonstrates knowledge on the topics which they spoke during the Class Period. For example:

(a)    On a June 9, 2010 call to discuss the announced Allscripts-Eclipsys Merger, Defendant Davis admitted: "***[W]e have spent a lot of time over the last few months really evaluating every function of the combined business*** . . . [a]nd in keeping with what we demonstrated on Misys, I really see minimal risk in terms of our ability to deliver on these; and

(b)    On a September 16, 2010 call Defendant Davis admitted to analysts gathered at the Stifel Nicolaus Healthcare Conference: "***[W]e put a lot of care into the development of our integration plan.*** And in both instances, we were able to ***exceed the expectations that we had set for ourselves and, in turn, had set for the marketplace,*** both in terms of time required for its integration, but also it's resultant benefit . . . ."

189.    Defendants have also admitted direct knowledge that they were not integrating according to plan. For example, Defendant Tullman admitted during a *Healthcare IT News* interview on May 15, 2012 that "ADX 1.0 [software that integrates Allscripts' acute and ambulatory technologies] was released some time ago and met the technical requirements, but it ***didn't meet our***

- 70 -

*clients' needs*. *So we worked side by side with our clients* to rebuild the product using Agile rapid prototyping techniques to ensure it was what our clients wanted and needed."

190.    Further, the nature of Allscripts' business was "one that has a *significant amount of visibility*" according to CFO Davis at a June 15, 2011 William Blair & Company LLC Growth Stock Conference.  Earlier that year, on February 16, 2011, Accretive Capital LLC discussed a note Citi Investment Research had issued:

> "It would take *unusual customer churn* or a change in the market of sales trends to cause a big miss at the revenue line, and *we believe management could likely respond* to a change in time to achieve earnings targets. Allscripts' backlog coverage on revenue is now almost two years, excluding longer duration maintenance contracts.  More than 2/3 of Allscripts revenue is recurring and *the company has more than 80% revenue visibility at the start of any given year*."

191.    Having visibility, Defendants knew Allscripts' 2012 guidance was false when issued.  Defendants missed analysts' 1Q12 EPS expectations by 50%.  For example, analysts at Caris & Company issued a report on April 27, 2012 that Allscripts had missed 1Q12 analyst consensus of $0.24 when it reported $0.12.  Further, at the end of the Class Period Allscripts revised its 2012 guidance dramatically downward, cutting non-GAAP EPS estimates by $0.30 per share and reducing revenue outlook significantly. Defendants were later forced to withdraw 2012 guidance altogether as a result, at least in part, of the failed integration they concealed from investors during the Class Period.

**Defendants' Insider Sales Further Support a Strong Inference of Scienter**

192.    Defendants were further motivated to engage in their fraudulent scheme in order to allow Individual Defendants Tullman, Davis, and Shapiro to collectively sell 675,000 shares of their personally-held Allscripts' common stock for proceeds of nearly $14 million.  Other Allscripts insiders also traded during the Class Period, raking in an additional $8.8 million after disposing of

- 71 -

anywhere from 8% to 80% of their holdings. The Allscripts insiders' trading and proceeds are set forth in detail in the attached Exhibit 2.

193.    Defendants Tullman, Davis and Shapiro sold significant amounts of their personally-held Allscripts' common stock during the Class Period and while in possession of material, non-public information about Allscripts.  As set forth above, Tullman, Davis and Shapiro knew, and failed to disclose, that: (i) the efforts to integrate legacy Allscripts and Eclipsys products were failing miserably; (ii) customers were delaying purchase of Allscripts EHR products due to the failure to integrate; (iii) as a result of dwindling sales and a lack of an integrated product, Allscripts would not be able to deliver on its 2012 financial guidance; and (iv) there was significant tension between the legacy Allscripts and legacy Eclipsys management, further hampering the process of integrating the two companies.

194.    Defendants Tullman, Davis and Shapiro traded in amounts that were suspicious in scope, and provide additional indicia of scienter. These trades occurred while Allscripts' stock price was artificially inflated as a result of Defendants' false and misleading statements and material omissions:

(a)    During the Class Period, Defendant Tullman sold 300,000 shares, or 30% of his holdings, on February 18, 2011. Tullman's proceeds from the sale amounted to more than $6.2 million – approximately eight times his 2010 annual salary of $750,000.  In comparison, in 2010, Tullman sold Allscripts stock for proceeds of only $1 million;

(b)    During the Class Period, Defendant Davis sold 150,000 shares, or 29% of his holdings. Davis reaped proceeds of $3.1 million from these sales, approximately seven times the amount of his annual salary of $425,000.  His proceeds exceeded his prior year stock sales by more than $2.4 million; and

- 72 -

(c)      During the Class Period, Defendant Shapiro sold 225,000 shares, or 30% of his holdings. Shapiro's proceeds from these transactions was over $4.5 million, more than seven times his annual salary of $600,000. In comparison, in 2010, Shapiro sold his Allscripts stock for $3.5 million.

195.    The timing of the Individual Defendants' insider sales was also highly suspicious as they were calculated to take maximum advantage of the artificial price inflation caused by Defendants' misrepresentations and while Allscripts stock was trading at or near Class Period highs. Defendants Tullman, Davis and Shapiro all sold shares on February 18, 2011 – unloading a combined total of 575,000 shares for proceeds of $11.9 million – just days after hosting the 4Q10 earnings call in which Tullman assured the market that the product integration was "on schedule" and that "the company has never really been better positioned than it is today."

196.    On February 22, 2012, Defendant Shapiro sold an additional 100,000 shares, in another suspiciously-timed sale – in the midst of an important healthcare IT industry conference at which Allscripts was purportedly demonstrating its integrated product. Later, on April 27, 2012, analysts at Auriga USA would note that "[i]n hindsight, investors would have been wise to take the cue from President Shapiro as he unloaded 100,000 shares in February (during HIMSS no less)."

197.    Additionally, the Individual Defendants' Class Period stock sales must be evaluated in light of the fact that they were required, under penalty of termination, to maintain minimum levels of stock ownership. Allscripts maintained stock ownership requirements of its senior executives according to its 2010 Proxy filed on May 20, 2011 with the SEC. Shapiro and Davis were required to own stock with a fair market value of "100% of their respective base salaries on October 10, 2008 from October 10, 2008 through October 9, 2009; (ii) 66% of their respective base salaries on October 10, 2008 from October 10, 2009 through October 9, 2010; and (iii) 33% of their respective base salaries on October 10, 2009 from October 10, 2010 through October 9, 2011." Tullman's

- 73 -

"minimum ownership level is measured as of the same periods noted above for Messrs. Shapiro and Davis." According to the Company's June 15, 2012 Proxy, Tullman's salary was $800,000, Davis' $500,000 and Shapiro's $600,000.

**The Individual Defendants' Compensation and "Retention Plan" Bonuses Also Support a Strong Inference of Scienter**

198. Defendants Tullman, Davis and Shapiro's bonus compensation provides a further indicia of their scienter. During the Class Period, the Individual Defendants' compensation was heavily dependent on meeting Allscripts' strategic priorities related to the Allscripts and Eclipsys Merger. In connection with the Allscripts-Eclipsys Merger, the Allscripts Compensation Committee developed a "Retention Plan," aiming to "retain certain highly qualified individuals in the employment of Allscripts, ***provide incentive and reward to such individuals to diligently and successfully complete the merger with Eclipsys***, and to mitigate distractions to such individuals resulting from the transaction."

199. Pursuant to the Retention Plan, Defendants Tullman, Davis and Shapiro were each eligible for a bonus equal to ***250% of their annual base salary***, consisting of 50% cash and 50% restricted shares, for meeting certain performance metrics, including: "Performance Shares [to] vest up to 50% in each of the years following the closing of the merger based on the achievement of certain cost synergies and the ***booking of new integrated deals*** as established by the board of directors." According to Allscripts' Proxy filed June 15, 2012, it was designed to "reward . . . individuals to ***diligently*** and successfully complete the merger with Eclipsys."

200. The "Potential Target Award Value Subject to Vesting and Performance Criteria" amounts for each Individual Defendant were as follows:

Defendant Tullman   $1,875,000
Defendant Shapiro   $1,500,000
Defendant Davis     $1,062,500

201.    In 2011, Tullman received a cash bonus of nearly $469,000 as a result of the Retention Plan.  He also received $5.9 million in stock awards, 162% more then he received in 2010. Davis received $312,500 and Defendant Shapiro $375,000 under the Retention Plan.

**The Federal Stimulus and Suspicious Exodus of Executives and Directors Adds to Scienter**

202.    As Defendant Tullman noted, the federal stimulus was injecting $30 billion into a $3 billion industry.  The stimulus was injected at the same time that the industry was increasingly demanding integrated products.  In order to compete for the massive injection of federal funds into the industry before the expiration in 2016, it was critical that Defendants convince investors and customers that they had the integrated products that would drive customers' decisions in the market. This provided a motive for Defendants to overstate the true state of progress and functionality of product integration.

203.    Additionally, numerous executive resignations are indicative of scienter.  Shortly after the close of the merger, Jeff Surges, Allscripts' top sales executive, left the Company, followed by two additional sales executives in February 2011. On April 6, 2011, six months into the Allscripts-Eclipsys Merger, the Company's CTO Gomez resigned effective at the end of May 2011. According to a Forbes, April 15, 2011 article, Gomez was previously the CTO of Eclipsys and was "widely respected."  He left "in the middle of a critical phase—that of overseeing integration of disparate electronic health records."  He had the "task of tying Allscripts' electronic health records with Eclipsys products."  On this news, which analysts at Auriga USA described as a "red flag," Allscripts stock plummeted from a close of $22.49 on April 6, 2011 to $20.29 on April 12, 2011, a drop of more than 9%.  Three months later, on July 13, 2011, Allscripts announced its COO Eileen McPartland had resigned effective virtually immediately.  She had been responsible for the operations of Allscripts' development, service, support and associated teams.

204.     On April 26, 2012, it was announced by Allscripts that Pead, the former CEO and President of Eclipsys and Allscripts' Chairman of the Board, had been terminated (*i.e.*, fired) the day before after "extensive deliberations regarding the leadership of the company."  Three other Board members resigned in protest – Catherine M. Burzik, Eugene V. Fife (former Eclipsys board chairman), and Edward A. Kangas (former Eclipsys board member).  On the same day, it was also announced that CFO Davis had resigned after nearly ten years with Allscripts.  Tullman was ousted and Defendant Shapiro followed in December 2012, after Allscripts' withdrawal of its 2012 guidance.

### LOSS CAUSATION/ECONOMIC LOSS

205.     During the Class Period, as detailed above, Defendants misrepresented to investors Allscripts' guidance, operations, financial and business conditions by failing to disclose that Allscripts could not deliver a seamless customer experience and concealing known problems with the interface of Allscripts' legacy products with Eclipsys' products.  Defendants' materially false representations and omissions artificially inflated Allscripts' stock price and operated as a fraud or deceit on Class-Period purchasers of Allscripts' common stock.  When the material flaws with Allscripts' product offering and the resulting financial impact began to be disclosed, Allscripts' stock price declined and the artificial inflation came out of the Company's stock price. As a result, class members who purchased Allscripts stock during the Class Period suffered economic loss.

206.     Defendants' false statements and material omissions pled herein in ¶¶91-114, 116-120, 124-129, and 131-132, had the intended effect and caused Allscripts stock to trade at artificially inflated levels during the Class Period as reflected in the chart below:



207.    Defendants failed to disclose that (i) Allscripts products were not integrated as promised; (ii) customers were delaying purchase of Allscripts EHR products due to the lack of integration; (iii) as a result of the lack of Allscripts' product integration, Allscripts 2012 financial guidance lacked a reasonable basis; and (iv) there was significant tension between the legacy Allscripts and legacy Eclipsys management, further hampering the process of integrating the two companies.   As a direct result, Defendants gave the investing public a materially false and misleading impression of Allscripts business and prospects.   Defendants' omissions and material misstatements of fact caused Allscripts stock to trade at artificially inflated levels throughout the Class Period.

208.    As a direct result of the April 26, 2012 disclosures described in ¶¶135-149 in detail including that: (i) Allscripts' 1Q12 financial results were far below analyst expectations and drastic reduction of prior 2012 finance guidance; (ii) Chairman of the Board Pead had been terminated and that three additional directors had resigned in protest over Pead's departure; (iii) Defendant Davis, Allscripts' CFO, was resigning, effective May 12, 2012; and (iv) the poor financial results and financial guidance was a symptom of the lack of promised product integration causing many prospective clients to delay purchase of Allscripts' products until functionality improved, Allscripts stock price fell sharply over the course of the next trading day from a closing price of $16.02 on April 26, 2012 to close at $10.30 on April 27, 2012, a more than 35% decline.  Trading volume increased tremendously to more than 87,000,000 shares – nearly ten times the previous day's volume – a company-specific stock decline that damaged Class Period purchasers.  Thus, in a single day over $1 billion in Allscripts' market capitalization was eliminated and investors suffered economic losses.  This drop removed the artificial inflation from Allscripts' stock price, causing real economic loss to investors who purchased Allscripts' common stock during the Class Period.

209.    As one analyst during the April 26, 2012 earnings call accurately predicted, Allscripts' stock got "pummeled" when the market opened the following morning.  Several analysts downgraded the stock and slashed price targets in response to the news of Allscripts' failure to integrate its product offerings as well as its leadership.

210.    Analysts targeted the failed integration as the reason for Allscripts' poor financial performance, and expressed skepticism about the Company's ability to improve its earnings, as described in ¶¶153-157 and shown in the sample excerpts below:

- David Windley, Jefferies: "[Allscripts] is reacting belatedly ***to integration issues*** that it previously said were in the rearview mirror."

- Glen Santangelo, Credit Suisse: "We believe the *failure to successfully integrate* the ambulatory and acute offerings puts [Allscripts] at a significant disadvantage when selling into a very competitive marketplace."

211.    Likewise, Comtex News issued an article on April 27, 2012 describing the market and analyst reactions to the April 26, 2012 disclosures:

> *It is clear the integration between Allscripts and Eclipsys has run into complications,* and it will require time and significant resources to address the problem. We believe the required resources to address the issues will result in negative earnings leverage, and the CFO & Board departures will further complicate the turnaround efforts. . . . We believe the *failure to successfully integrate the ambulatory and acute offerings puts [Allscripts] at a significant disadvantage when selling into a very competitive marketplace.*

212.    Similarly, on May 14, 2012, analysts at Cowen and Company exclaimed that: "In our view, the significant bookings shortfall 1Q12 is partly attributable to the fact that Allscripts still doesn't have an integrated offering."

213.    The timing and magnitude of Allscripts' stock price decline negates any inference that the loss suffered by Plaintiffs and other Class members was caused by changed market conditions, macroeconomic or industry factors. Nor was the decline caused by Company-specific facts unrelated to Defendants' fraud.

## NO SAFE HARBOR

214.    The statutory safe harbor provided for forward-looking statements in certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the statements were misleading in light of omissions of material facts concerning the true status of product integration, customer dissatisfaction, and the sharp divisions among legacy Allscripts and Eclipsys management, and the failure to make a statement cannot be considered forward-looking. The specific false statements pleaded herein were either not forward-looking or were not identified as "forward-looking statements" when made.

- 79 -

215.  For example, the following statements, among others, identified as false or misleading are statements of past or present fact and are not forward-looking: (i) "we are **on plan to deliver** integration between Sunrise and all of the Allscripts electronic health records by the end of the first quarter" (¶91); (ii) "We are a big Microsoft player. Fortunately, Eclipsys was as well. That's made the integration of the technology of the two companies **very easy to do**. **And we are in great shape** from that standpoint." ¶95; (iii) "Yes, we'll have a live code shipping at the end of the first quarter, is what we've said to the market, and **we're on schedule** . . . ." ¶99; (iv) "the only company that **can deliver** one connected network on one common, open platform providing one patient record to clinicians and patients across the care continuum" (¶101); (v) "We're actually slightly **ahead of schedule** in terms of where we expected to be at this juncture and again very well received by all that had an opportunity to see that." ¶103; (vi) "**able to offer** a single platform of clinical, financial, connectivity and information solutions" (¶104); (vii) "**we have a** complete suite of products that enable us to provide a true end to end solution" (¶106); (viii) "We said we would **demonstrate success** integrating our product portfolio, and **we have**" (¶109); (ix) "[t]he bottom line **is** that the integration work **is on track**" (*id*.); (x) "being one of very few that **has** a comprehensive product portfolio that enables us to meet the needs of the hospital environment, the physician office environment, post-acute environment" (¶119); and (xi) "[t]his **is** as smooth as an integration effort that you'll ever see" (¶125).

216.  To the extent any of the statements were identified as forward-looking statements they do not fall within the protections of the Safe Harbor because they were not accompanied by specific, **meaningful** cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. The Safe Harbor warnings in Allscripts' SEC filings and releases as well as those made at the start of Allscripts conference calls were boilerplate and did not materially change during the Class Period,

- 80 -

even though the economic and business conditions in which Allscripts operated and the risks facing its business did. Moreover, the warnings were insufficient because they warned only of generalized risks that could happen rather than of the specific risks which were materializing.

217. For example, Defendants' generic warning in the Company's 2010 Form 10-K that a potential risk factor was "integrating complex technologies, solutions and products from different companies in a manner that is seamless to customers" was not meaningful because Defendants had said such integration had already occurred and the warning was itself materially misleading for the same reasons as described in ¶121. Further, it did not meaningfully caution investors that this risk had already come to fruition.

218. Defendants are also liable for any false or misleading forward-looking statements pled herein because, at the time each forward-looking statement was made, the particular speaker knew that the particular forward-looking statements was false or misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of Allscripts who knew that the statement was false when made.

**APPLICABILITY OF PRESUMPTION OF
RELIANCE: FRAUD ON THE MARKET**

219. Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)  Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)  The omissions and misrepresentations were material;

(c)  The Company's stock traded in an efficient market;

(d)  The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

- 81 -

(e)     Plaintiffs and other members of the Class purchased Allscripts' common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

220.    At all relevant times, the market for Allscripts' common stock was an efficient market, entitling Plaintiffs to rely upon the presumption of reliance established by the fraud-on-the-market doctrine, for the following reasons, among others:

(a)     Allscripts' common stock met the requirements for listing, and was listed and actively traded on the NASDAQ;

(b)     As a regulated issuer, Allscripts filed periodic public reports with the SEC;

(c)     Allscripts regularly communicated with the investing public via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major news wire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Allscripts was followed by numerous securities analysts employed by major brokerage firms who wrote reports when were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

221.    As a result of the foregoing, the market for Allscripts' publicly-traded securities promptly digested current information regarding Allscripts from publicly available sources and reflected such information in Allscripts' stock price. Without knowledge of the misrepresented and omitted material facts alleged herein, Plaintiffs and other Class members purchased Allscripts' common stock during the Class Period between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were revealed and suffered similar injury. Thus, the Class is entitled to the presumption of reliance.

## CLASS ACTION ALLEGATIONS

222.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class consisting of purchasers of Allscripts' common stock during the Class Period who were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of Allscripts, and their families and affiliates.

223.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Throughout the Class Period, Allscripts' common stock was actively traded on the NASDAQ and had more than 190 million shares of stock outstanding as of April 24, 2012 according to Allscripts' June 15, 2012 Proxy.  While the exact number of Class members in unknown, Plaintiffs believe that there are thousands of members in the proposed Class.  Members of the Class may be identified from records maintained by Allscripts or its transfer agent.

224.    Plaintiffs' claims are typical of the claims of the Class members because Plaintiffs and the Class sustained damages from Defendants' wrongful conduct in violation of the federal securities laws that is complained of herein.

225.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual class members include:

(a)    Whether the Exchange Act was violated by Defendants;

(b)    Whether Defendants omitted and/or misrepresented material facts;

(c)    Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

- 83 -

(d)     Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(e)     Whether Defendant Shapiro violated §20A of the Exchange Act;

(f)     Whether the prices of Allscripts securities were artificially inflated; and

(g)     The extent of damage sustained by class members and the appropriate measure of damages.

226.    Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests that are in conflict with those of the Class.

227.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violations of Section 10(b) of the
### Exchange Act and Rule l0b-5 Against All Defendants

228.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

229.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew to be or recklessly disregarded whether they were misleading, in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

230.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)     employed devices, schemes, and artifices to defraud;

(b)      made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)      engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Allscripts' common stock during the Class Period.

231.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Allscripts as specified herein.

232.     Plaintiffs and Class members were damaged in that, in reliance on the integrity of the market, they paid artificially inflated prices for Allscripts' common stock.  Plaintiffs and the Class would not have purchased Allscripts' common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

233.     As a direct and proximate cause of Defendants' wrongful conduct, Plaintiffs and the other Class members suffered damages in connection with their purchase of Allscripts' common stock during the Class Period.

234.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Allscripts' common stock during the Class Period.

## COUNT II

### For Violations of Section 20(a) of the
### Exchange Act Against All Defendants

235.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

236.    Each of the Individual Defendants acted as a control person of the Company within the meaning of §20(a) of the Exchange Act (15 U.S.C. §78t(a)), as alleged herein. By virtue of their stock ownership, high-level positions, and participation in and/or awareness of the Company's operations and finances, each individual defendant had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading. Each Individual Defendant was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

237.    Each Individual Defendant had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control the public statements about Allscripts giving rise to the securities violations as alleged herein, and exercised the same. Defendants Tullman, Davis and Shapiro had the power and ability to control (and did influence and control, directly or indirectly) the actions of Allscripts and its employees, including the content of Pfizer's financial statements, releases and conference call statements. Allscripts controlled the Individual Defendants and all of Allscripts' employees and directors.

238.    By reason of such wrongful conduct, Allscripts and the Individual Defendants are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of the wrongful

conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's stock during the Class Period.

## COUNT III

### For Violation of Section 20A of the Exchange Act
### Against Individual Defendant Shapiro

239.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

240.    During the Class Period, each Individual Defendant, including Defendant Shapiro, occupied a position that made him privy to non-public information about Allscripts' business and financial operations. Because of this access, Shapiro knew that the adverse facts specified herein were being concealed and that Defendants' statements were false and misleading. In violation of his duty to refrain from trading in Allscripts' stock while in possession of material, non-public information about the Company, Shapiro sold his personally-held Allscripts' common stock, and profited therefrom, while Plaintiffs purchased contemporaneously.

241.    While Allscripts' stock was trading at an artificially inflated price, Defendant Shapiro sold 100,000 shares of Allscripts' stock on February 22, 2012 at $19.17 per share while in possession of adverse material non-public information about Allscripts, for which Shapiro reaped proceeds of $1,917,000 in illegal insider trading proceeds. Plaintiffs contemporaneously purchased a combined total of 171,860 shares as reflected in the certifications attached hereto. Specifically, the Government of Bermuda Contributory and Public Superannuation Pension Plans purchased 155,500 shares of Allscripts' stock at $19.52 per share on February 27, 2012 and the International Brotherhood of Electrical Workers Local Union Pension Fund purchased 16,360 shares of Allscripts' stock at $19.49 per share on February 23, 2012.

- 87 -

242.    The Plaintiffs and all other members of the Class who purchased Allscripts contemporaneously with the sales on February 22, 2012 by Shapiro:

(a)    have suffered substantial damages in that they paid artificially inflated prices for Allscripts' stock as a result of violations of §10(b) of the Exchange Act and Rule 10b-5 herein described; and

(b)    would not have purchased Allscripts' stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by Defendants' false and misleading statements.

243.    As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages.

244.    By the reason of the foregoing, Defendant Shapiro violated §20A of the 1934 Act and is liable to the Plaintiffs and other members of the Class for the substantial damages they suffered in connection with their purchase of Allscripts stock.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray for judgment as follows:

A.    Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding Plaintiffs and other members of the Class damages together with interest thereon;

C.    Awarding Plaintiffs and other members of the Class costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

D.     Awarding Plaintiffs and other members of the Class such equitable/injunctive or other

and further relief as may be just and proper under the circumstances.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues.

DATED:  May 15, 2013                                ROBBINS GELLER RUDMAN
                                                                    & DOWD LLP
                                                      JAMES E. BARZ (IL Bar # 6255605)


                                                                s/ James E. Barz
                                                      JAMES E. BARZ

                                                      200 South Wacker Drive, 31st Floor
                                                      Chicago, IL  60606
                                                      Telephone:  312/674-4674
                                                      312/674-4676 (fax)

                                                      ROBBINS GELLER RUDMAN
                                                         & DOWD LLP
                                                      WILLOW E. RADCLIFFE
                                                      Post Montgomery Center
                                                      One Montgomery Street, Suite 1800
                                                      San Francisco, CA  94104
                                                      Telephone:  415/288-4545
                                                      415/288-4534 (fax)

                                                      ROBBINS GELLER RUDMAN
                                                         & DOWD LLP
                                                      SUSANNAH R. CONN
                                                      655 West Broadway, Suite 1900
                                                      San Diego, CA  92101
                                                      Telephone:  619/231-1058
                                                      619/231-7423 (fax)

                                                      Lead Counsel for Plaintiff

- 89 -

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

GOVERNMENT OF BERMUDA CONTRIBUTORY AND PUBLIC SERVICE SUPERANNUATION PENSION PLANS ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.    Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

> *Edwards v. Satcon Technology Corporation, et al.*, No. 1:11-cv-11270 (D. Mass.)
> *Rush v. Walter Energy, Inc., et al.*, No. 2:12-cv-00281 (N.D. Ala.)
> *Kmiec v. Powerwave Technologies, Inc., et al.*, No. 8:12-cv-00222 (C.D. Cal.)

6.    The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

ALLSCRIPTS

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 11th day of June , 2012.

GOVERNMENT OF BERMUDA
CONTRIBUTORY AND PUBLIC
SERVICE SUPERANNUATION
PENSION PLANS

By: _Michael Simmons_

Michael C. Simmons, Manager
Treasury of Investments

- 2 -

ALLSCRIPTS

## SCHEDULE A

### SECURITIES TRANSACTIONS

**Contributory Pension Plan**

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 06/24/2011 | 300 | $18.70 |
| 02/27/2012 | 114,000 | $19.52 |

Sales

| Date Sold | Type/Amount of Securities Sold | Price |
|---|---|---|
| 10/04/2011 | 26,500 | $16.58 |
| 11/30/2011 | 6,580 | $19.30 |
| 02/13/2012 | 5,870 | $20.47 |

*Opening position of 39,720 shares.

**Public Service Superannuation Pension Plan**

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 06/24/2011 | 100 | $18.70 |
| 02/27/2012 | 41,500 | $19.52 |

Sales

| Date Sold | Type/Amount of Securities Sold | Price |
|---|---|---|
| 10/04/2011 | 9,700 | $16.58 |
| 11/30/2011 | 2,400 | $19.30 |
| 02/13/2012 | 2,150 | $20.52 |

*Opening position of 14,460 shares.

CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS
LOCAL UNION 38 PENSION FUND ("Plaintiff") declares:

1.  Plaintiff has reviewed a complaint and authorized its filing.

2.  Plaintiff did not acquire the security that is the subject of this action at the
direction of plaintiff's counsel or in order to participate in this private action or any
other litigation under the federal securities laws.

3.  Plaintiff is willing to serve as a representative party on behalf of the
class, including providing testimony at deposition and trial, if necessary.

4.  Plaintiff has made the following transaction(s) during the Class Period in
the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.  Plaintiff has not sought to serve or served as a representative party in a
class action that was filed under the federal securities laws within the three-year
period prior to the date of this Certification except as detailed below:

6.  The Plaintiff will not accept any payment for serving as a representative
party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 28 day of June , 2012.

INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL UNION 38 PENSION FUND

By: _Halter OMalley_

Its: _CHAIRMAN_

ALLSCRIPTS

## SCHEDULE A

### SECURITIES TRANSACTIONS

**Acquisitions**

| Date<br>Acquired | Type/Amount of<br>Securities Acquired | Price |
|---|---|---|
| 10/03/2011 | 11,790 | $18.04 |
| 11/16/2011 | 19,500 | $20.47 |
| 12/30/2011 | 13,010 | $18.97 |
| 01/26/2012 | 10,000 | $18.48 |
| 02/23/2012 | 16,360 | $19.49 |
| 04/20/2012 | 8,300 | $16.61 |

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 15, 2013, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 15, 2013.

s/ James E. Barz
JAMES E. BARZ

ROBBINS GELLER RUDMAN
& DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
E-mail:jbarz@rgrdlaw.com

Case: 1:12-cv-03297 Document #: 78 Filed: 05/15/13 Page 100 of 100 PageID #:1815

## Mailing Information for a Case 1:12-cv-03297

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Rachel A. Avan**
  ravan@labaton.com

- **James E Barz**
  jbarz@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Walter C. Carlson**
  wcarlson@sidley.com,efilingnotice@sidley.com

- **Susannah R. Conn**
  sconn@rgrdlaw.com

- **James Wallace Ducayet**
  jducayet@sidley.com,efilingnotice@sidley.com

- **Carol V Gilden**
  cgilden@cohenmilstein.com,lhoeksema@cohenmilstein.com

- **Christopher J. Keller**
  ckeller@labaton.com

- **Jeremy Alan Lieberman**
  jalieberman@pomlaw.com,lpvega@pomlaw.com

- **Louis Carey Ludwig**
  lcludwig@pomlaw.com

- **Zachary Allen Madonia**
  zmadonia@sidley.com,efilingnotice@sidley.com

- **Danielle S. Myers**
  dmyers@rgrdlaw.com,willowr@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Willow E. Radcliffe**
  willowr@rgrdlaw.com,tcraig@rgrdlaw.com

- **Dominic J. Rizzi**
  drizzi@caffertyclobes.com,csanchez@caffertyclobes.com,docket@caffertyclobes.com,snyland@caffertyclobes.com

- **Michael W. Stocker**
  mstocker@labaton.com,electroniccasefiling@labaton.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)